

# Fox Rothschild LLP
### ATTORNEYS AT LAW

Citizens Bank Center
919 North Market Street, Suite 1300
P.O. Box 2323
Wilmington, DE 19899-2323
Tel 302.654.7444  Fax 302.656.8920
www.foxrothschild.com

Francis G.X. Pileggi
Direct Dial:  (302) 655-3667
Email Address:  fpileggi@foxrothschild.com

June 2, 2010

VIA eFILING

Dr. Peter T. Dalleo
Clerk of Court
U.S. District Court for the District
   of Delaware
Room 4209
844 N. King Street
Wilmington, DE  19801

Re:  <u>Doe v. Wilmington Housing Authority, et al., C.A. No. 1:10-cv-00473-UNA</u>

Dear Dr. Dalleo:

This matter was originally filed in the Delaware Court of Chancery on May 26, 2010.  On June 1, 2010 a Notice of Removal was filed.

Pursuant to Local Rule 81.2, this is the requisite statement on behalf of the plaintiff, identifying the pending matters that require judicial action.  The following motions were pending in the Delaware Court of Chancery at the time of removal and are being re-filed today in this Court after reformatting the caption and adding federal caselaw:

1)     Motion for Expedited Proceedings (and supporting Memorandum of Law);

2)     Motion for Preliminary Injunction (with supporting Memorandum of Law).

We are also submitting today for filing an Acceptance of Service of the Complaint by the defendant effective May 27, 2010 (which was effective prior to the date of removal), and which should be made part of the record in this Court.

A0097



**Fox Rothschild** LLP
ATTORNEYS AT LAW

Dr. Peter T. Dalleo
June 2, 2010
Page 2

I understand that the case in this Court has not yet been assigned to a judge, but as explained in the Motion for Expedited Proceedings and Supporting Memorandum, we ask that this case be assigned or at least be reviewed by the "duty judge," so that prompt scheduling can be put in place. Thank you.

Respectfully,

*/s/ Francis G.X. Pileggi*

Francis G.X. Pileggi
(Del. Bar No. 2624)

FGXP:mar

cc:   Barry Willoughby, Esquire (via eFiling)

IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | |
| | ) | C.A. No. 10-473-LPS |
| WILMINGTON HOUSING AUTHORITY | ) | |
| and FREDERICK S. PURNELL, SR., in his | ) | |
| official capacity as executive director of the | ) | |
| Wilmington Housing Authority, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ANSWER AND AFFIRMATIVE DEFENSES

Defendants answer Plaintiff's Complaint as follows:

### Parties

1.      Defendants do not have knowledge or information sufficient to form a belief as to the truth of the allegation that Plaintiff Jane Doe is a resident of The Park View (incorrectly referred to in the Complaint as Parkview Apartments).  Denied that The Park View is a public housing facility administered by Wilmington Housing Authority ("WHA").  By way of further answer, The Park View is a privately owned apartment building currently being operated by the WHA, pursuant to an agreement with Electra Arms Senior Associates, L.P.

2.      Denied, except it is admitted that the WHA was created pursuant to 31 Del. C. § 4303 and that its administrative office is located at 400 N. Walnut Street, Wilmington, Delaware 19801.

3.      Admitted.

### Jurisdiction

4.      This paragraph states a legal conclusion to which no response is required.

1

A0099

## Background

5.      Denied.  By way of further answer, if Plaintiff is living at The Park View, she entered into a lease agreement with the Electra Arms Senior Associates, L.P., owners of The Park View.

6.      Admitted that WHA's standard Lease and Grievance Procedure for Public Housing Residents Part I contains such a provision.  Denied that any residents of The Park View are subject to this lease provision.

7.      Admitted that WHA's standard Lease and Grievance Procedure for Public Housing Residents Part I contains such a provision.  Denied that any residents of The Park View are subject to this lease provision.

8.      Defendants do not have knowledge or information sufficient to form a belief as to the truth of this allegation.

9.      Denied.  By way of further answer, the lease provisions quoted in Paragraphs 6 and 7 of the Complaint are not applicable to residents of The Park View.

10.     Defendants do not have knowledge or information sufficient to form a belief as to the truth of the allegation that Plaintiff is a responsible, law-abiding adult who is qualified to own firearms in her home for lawful self-defense and other lawful purposes.  Denied that The Park View has any lease provision or rule that would prevent a resident of The Park View from lawful possession of firearms in her residence.

11.     Denied.  By way of further answer, Defendants received a letter dated February 1, 2010 from Robert Dowlut, General Counsel for the National Rifle Association, stating his belief that the WHA's lease violates the Second Amendment.  In addition, neither Plaintiff nor the

2

other residents of The Park View are subject to the WHA's lease provisions quoted in the Complaint.

12.     Denied.  By way of further answer, none of Defendants' actions have deprived any individual of any constitutional right, whether state or federal.  Because Defendants have not deprived any individual of any constitutional right, they cannot fail to restore those constitutional rights.

13.     Denied.

14.     This paragraph states a legal conclusion to which no response is required.  To the extent this paragraph contains factual allegations, they are denied.

15.     Denied.

16.     Denied.  By way of further answer, many provisions in the Delaware Code limit the right of individuals to keep and bear arms. See 11 Del. C. §§ 1441-1459.

## Basis for Injunctive Relief

17.     This paragraph states a legal conclusion to which no response is required.  To the extent this paragraph contains factual allegations, they are denied.

18.     This paragraph states a legal conclusion to which no response is required.  To the extent this paragraph contains factual allegations, they are denied.

19.     Denied.

20.     This paragraph states a legal conclusion to which no response is required.  To the extent this paragraph contains factual allegations, they are denied.

21.     This paragraph states a legal conclusion to which no response is required.  To the extent this paragraph contains factual allegations, they are denied.

22.     This paragraph states a legal conclusion to which no response is required.  To the extent this paragraph contains factual allegations, they are denied.

3

A0101

## COUNT 1 – VIOLATION OF FEDERAL CONSTITUTIONAL RIGHTS

23.     Defendants incorporate by reference all of the answers contained in the foregoing paragraphs of this Answer as if set forth in full herein.

24.     Admitted.

25.     Admitted.

26.     Denied.  By way of further answer, the United States Supreme Court held in District of Columbia v. Heller, __ U.S. ___, 128 S. Ct. 2783, 2813 n.23 (2008), that the Second Amendment does not apply to the States through the Fourteenth Amendment.  In the case of McDonald v. City of Chicago, No. 08-1521, the Court is expected to address the question of whether the Second Amendment right to keep and bear arms is incorporated as against the States by the Fourteenth Amendment's Privileges or Immunities or Due Process Clauses.  The Court heard oral argument in McDonald on March 2, 2010.

27.     Denied.

28.     Denied.

29.     Denied.

30.     Denied.

## COUNT 2 – VIOLATION OF STATE CONSTITUTIONAL RIGHTS

31.     Defendants incorporate by reference all of the answers contained in the foregoing paragraphs of this Answer as if set forth in full herein.

32.     Admitted.

33.     Denied.

34.     Denied.

YCST01:9758584.1                                                                    050548.1081

A0102

## COUNT 3 – PREEMPTION BY STATE LAW

35.     Defendants incorporate by reference all of the answers contained in the foregoing paragraphs of this Answer as if set forth in full herein.

36.     This paragraph states a legal conclusion to which no response is required. To the extent this paragraph contains factual allegations, they are denied.

37.     Admitted.

38.     Admitted.

39.     Admitted only that the Complaint accurately quotes part of 22 Del. C. § 111; otherwise denied.

40.     Admitted only that the Complaint accurately quotes part of 9 Del. C. § 330(c); otherwise denied.

41.     Denied.

## COUNT 4 – EXCEEDING SCOPE OF AUTHORITY

42.     Defendants incorporate by reference all of the answers contained in the foregoing paragraphs of this Answer as if set forth in full herein.

43.     Denied.

44.     This paragraph states a legal conclusion to which no response is required. To the extent this paragraph contains factual allegations, they are denied.

45.     Denied.

## COUNT 5 – DECLARATORY RELIEF UNDER 10 DEL. C. § 6501

46.     Defendants incorporate by reference all of the answers contained in the foregoing paragraphs of this Answer as if set forth in full herein.

47.     Denied. By way of further answer, see Paragraph 10 above. In addition, Plaintiff has failed to establish that she has standing to pursue this action.

YCST01:9758584.1     050548.1081

A0103

48.      This paragraph states a legal conclusion to which no response is required.  To the extent this paragraph contains factual allegations, they are denied.

49.      This paragraph states a legal conclusion to which no response is required.  To the extent this paragraph contains factual allegations, they are denied.

## AFFIRMATIVE DEFENSES

1.      Plaintiff fails to state a claim upon which relief may be granted.

2.      Plaintiff lacks standing to pursue the claims set forth in the Complaint.

3.      Plaintiff has failed to exhaust her administrative pre-litigation remedies.

4.      Defendants have not knowingly or intentionally waived any applicable defenses, and reserve the right to assert and rely on such other applicable defenses as may later become available or apparent.  Defendants further reserve the right to amend their Answer and/or defenses accordingly.

YCST01:9758584.1                                                           050548.1081

A0104

WHEREFORE, Defendants Wilmington Housing Authority and Frederick S. Purnell respectfully request that this Court deny Plaintiff's requests for relief, and enter judgment in favor of the Defendants.

YOUNG CONAWAY STARGATT & TAYLOR, LLP

*/s/ Barry M. Willoughby*
Barry M. Willoughby, Esquire (I.D. No. 1016)
Teresa A. Cheek, Esquire (I.D. No. 2657)
Lauren E. Moak, Esquire (I.D. No. 5366)
The Brandywine Building, 17th Floor
1000 West Street
P.O. Box 391
Wilmington, Delaware 19899-0391
Telephone: (302) 571-6666
Facsimile: (302) 576-3286
E-mail:  bwilloughby@ycst.com; tcheek@ycst.com
*Attorneys for Defendants*

Dated:  June 16, 2010

YCST01:9758584.1                                    050548.1081

A0105

# YOUNG CONAWAY STARGATT & TAYLOR, LLP

BEN T. CASTLE
SHELDON N. SANDLER
RICHARD A. LEVINE
RICHARD A. ZAPPA
RICHARD H. MORSE
DAVID C. McBRIDE
JOSEPH M. NICHOLSON
CRAIG A. KARSNITZ
BARRY M. WILLOUGHBY
ANTHONY G. FLYNN
JEROME K. GROSSMAN
EUGENE A. DIPRINZIO
JAMES L. PATTON, JR.
ROBERT L. THOMAS
WILLIAM D. JOHNSTON
TIMOTHY J. SNYDER
BRUCE L. SILVERSTEIN
WILLIAM W. BOWSER
LARRY J. TARABICOS
RICHARD A. DILIBERTO, JR.
MELANIE K. SHARP
CASSANDRA F. ROBERTS
RICHARD J.A. POPPER
TERESA A. CHEEK
NEILLI MULLEN WALSH
ROBERT S. BRADY
JOEL A. WAITE
BRENT C. SHAFFER
DANIEL P. JOHNSON

CRAIG D. GREAR
TIMOTHY JAY HOUSEAL
MARTIN S. LESSNER
PAULINE K. MORGAN
C. BARR FLINN
NATALIE WOLF
LISA B. GOODMAN
JOHN W. SHAW
JAMES P. HUGHES, JR.
EDWIN J. HARRON
MICHAEL R. NESTOR
ROLIN P. BISSELL
SCOTT A. HOLT
JOHN T. DORSEY
M. BLAKE CLEARY
CHRISTIAN DOUGLAS WRIGHT
DANIELLE GIBBS
JOHN J. PASCHETTO
NORMAN M. POWELL
ELENA C. NORMAN
EDMON L. MORTON
JOHN E. TRACEY
ADAM W. POFF
SEAN M. BEACH
JOSEPH M. BARRY
SHARON M. ZIEG
DAVID R. HURST
TIMOTHY E. LENGKEEK
MATTHEW B. LUNN

THE BRANDYWINE BUILDING
1000 WEST STREET, 17TH FLOOR
WILMINGTON, DELAWARE  19801

P.O. BOX 391
WILMINGTON, DELAWARE  19899-0391

(302) 571-6600
(800) 253-2234 (DE ONLY)
FAX: (302) 571-1253

110 WEST PINE STREET
P.O. BOX 594
GEORGETOWN, DELAWARE 19947
(302) 856-3571
(800) 255-2234 (DE ONLY)
FAX: (302) 856-9338
WWW.YOUNGCONAWAY.COM

DIRECT DIAL:  (302) 571-6666
DIRECT FAX:   (302) 576-3345
bwilloughby@ycst.com

KAREN E. KELLER
JENNIFER M. KINKUS
SARA BETH A. R. KOHUT
EVANGELOS KOSTOULAS
PILAR G. KRAMAN
JOHN C. KUFFEL
ANDREW A. LUNDGREN
JAIME N. LUTON
ANDREW L. MAGAZINER
ADRIA B. MARTINELLI
KATHALEEN McCORMICK
TAMMY L. MERCER
MARIBETH L. MINELLA
LAUREN E. MOAK
MICHAEL S. NEIBURG
JENNIFER R. NOEL
ROBERT F. POPPITI, JR.
NICHOLAS J. ROHRER
ANDREW E. RUSSELL
JUSTIN H. RUCKI
CHERYL A. SANTANIELLO
MORGAN L. SEWARD
MONTÉ T. SQUIRE
MICHAEL P. STAFFORD
RICHARD J. THOMAS
JAMES M. YOCH, JR.

RYAN M. BARTLEY
DONALD J. BOWMAN, JR.
MICHELE SHERRETTA BUDICAK
EMILY V. BURTON
ERIKA R. CAESAR
JEFFREY T. CASTELLANO
DOUGLAS T. COATS
KARA HAMMOND COYLE
KRISTEN SALVATORE DEPALMA
MARGARET M. DIBIANCA
JUSTIN P. DUDA (NY ONLY)
MARY F. DUGAN
ERIN EDWARDS
KENNETH J. ENOS
KERRIANNE MARIE FAY
MARIS FINNEGAN
WILLIAM E. GAMGORT
MARGARET WHITEMAN GREECHER
SEAN T. GREECHER
MEGAN C. HANEY
A. DAVID HANSEN
STEPHANIE L. HANSEN
JAMES L. HIGGINS
LAUREN HUDECKI
PATRICK A. JACKSON

SPECIAL COUNSEL
KAREN L. PASCALE

SENIOR COUNSEL
CURTIS J. CROWTHER

OF COUNSEL
BRUCE M. STARGATT
STUART B. YOUNG
EDWARD B. MAXWELL, 2ND
JOSY W. INGERSOLL

July 29, 2010

<u>**VIA E-FILE**</u>

Honorable Leonard P. Stark
J. Caleb Boggs Federal Building
844 N. King St.
Wilmington, DE 19801-3750

Re:     *Doe v. Wilmington Housing Authority*, C.A. No. 10-473-LPS

Dear Judge Stark:

      Enclosed please find a copy of the Declaration of Frederick S. Purnell, Sr., the Executive Director of the Wilmington Housing Authority.  This Declaration is submitted in anticipation of tomorrow's Status Conference.

      Please contact me with any questions.

Respectfully,

Barry Willoughby (#1016)

BMW:y

cc:    Clerk of the Court (via CM/ECF)
      Francis G. X. Pileggi, Esq. (via E-mail)

IN THE UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| JANE DOE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | C.A. No. 10-473-LPS |
| WILMINGTON HOUSING AUTHORITY | ) | |
| and FREDERICK S. PURNELL, SR., in his | ) | |
| official capacity as executive director of the | ) | |
| Wilmington Housing Authority, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF FREDERICK S. PURNELL, SR.

I, Frederick S. Purnell, Sr., make the following declaration to the best of

my knowledge, information and belief, subject to the penalties for perjury set forth in

28 U.S.C. § 1746:

1.    I have been employed as the Executive Director of the

Wilmington Housing Authority ("WHA") since March 8, 2000.  As Executive Director,

I am responsible for oversight of the entire WHA organization as well as the

administration and application of WHA's policies.  The WHA is a non-profit

organization that provides housing to thousands of low-income families and individuals

in the City of Wilmington.

### OWNERSHIP OF PARK VIEW APARTMENTS

2.    The Park View is managed by WHA, but it is not a public

housing site and it is not owned by WHA.

3.    The Park View is a high-rise building that was completely

renovated in 2001.  Its residents are age 62 and older.  It has an on-site manager and

maintenance staff, a 24-hour security surveillance system, on-site security key-card access, and secured parking areas.  It has had no problems with violent crime.

4.    It is owned by an independent business entity known as Electra Arms Senior Associates, L.P., a limited partnership formed under Delaware law.[1]

5.    Electra Arms Senior Associates, L.P. is in turn owned by Edison Capital Housing Investment, Inc. a private, California corporation, and Wilmington Revitalization Corporation, Inc., a not-for-profit Delaware corporation.[2]

6.    Edison Capital is the limited partner in Electra Arms Senior Associates, L.P.

7.    Wilmington Revitalization Corporation is the general partner in Electra Arms Senior Associates, L.P.

8.    Electra Arms Senior Associates entered into a management contract with WHA on October 9, 1998, governing management of the Park View.[3]

THE PARK VIEW LEASE

9.    As set forth in WHA's Answer and Affirmative Defenses, Plaintiff, Jane Doe, has incorrectly identified the Lease applicable to residents of The Park View.  The Park View residents are not parties to the lease that covers WHA's public housing properties.[4]

---

[1] A copy of the Deed conveying the property from WHA to Electra Arms Senior Associates L.P. is attached as Exhibit A.

[2] A copy of the Electra Arms Senior Associates Limited Partnership Agreement is attached as Exhibit B.  A copy of the Certificate of Incorporation for Wilmington Revitalization Corporation is attached as Exhibit C.

[3] A copy of the Management Agreement between Electra Arms Senior Associates LP and Wilmington Housing Authority is attached as Exhibit D.

[4] A copy of the Park View Lease and House Rules are attached as Exhibit E.

A0108

10.     The portion of the Park View lease that governs possession and use of weapons is Paragraph 24 of the House Rules.  The House Rules are incorporated into The Park View lease as Attachment 3.

11.     House Rule 24 provides: "Tenant is not permitted to display or use any firearms, BB guns, pellet guns, slingshots, or other weapons on the premises."

12.     The Park View lease does not prohibit, nor has House Rule 24 been interpreted by WHA to prohibit, the lawful possession and use of weapons by residents in their units for self-defense.

13.     Although WHA has not interpreted the House Rules of the Park View to prohibit possession of a weapon in the residence for self defense, as the manager of The Park View, WHA has amended House Rule 24.[5]

## THE LEASE APPLICABLE TO PUBLIC HOUSING UNITS

14.     The lease applicable to WHA's public housing units is different from the lease applicable at The Park View.

15.     With respect to firearms and weapons, the lease applicable to the public housing units states:

> Resident shall be obligated:
>
> Not to display, use, or possess or allow members of Resident's household or guests to display, use or possess any firearms, (operable or inoperable) or other dangerous instruments or deadly weapons as defined by the laws of the State of Delaware anywhere on the property of the Authority.

16.     At no time during my employment with WHA has any resident asked to keep a firearm in his or her residence.

---

[5] A copy of the proposed amended Rule 24 is attached as Exhibit F.

YCST01:9772875.2                                                                050548.1081

17.     At no time during my employment with WHA has any resident complained about, or objected to, the weapons provisions contained in either The Park View lease, or the WHA lease applicable to public housing units.

18.     At no time during my employment with WHA has any resident been evicted solely on the basis of violating the weapons provisions contained in either The Park View lease or the WHA lease applicable to public housing units.

19.     To the extent that any evictions have involved a resident's possession of a firearm, none of those evictions resulted from a resident's *lawful* possession or use of a firearm.

20.     No one from WHA has approached, attempted to intimidate, or threatened to evict any resident of The Park View in connection with this case.

<u>AMENDMENT OF PUBLIC HOUSING LEASE AND</u>
<u>ADOPTION OF FIREARMS AND WEAPONS POLICY</u>

21.     After the U.S. Supreme Court decision in *MacDonald v. City of Chicago*, the Board of Commissioners of the Wilmington Housing Authority sought legal advice on the impact of the decision on the lease applicable to public housing units. On July 26, 2010, the Board authorized a proposed amendment to Article IX.P of the public housing lease. The proposed amendment deletes the existing language in the public housing lease and replaces it with the following:

> Ownership, possession, transportation, and use of firearms and weapons is governed by Wilmington Housing Authority Firearms and Weapons Policy.

4

A0110

22.     The WHA Board of Commissioners also authorized the adoption of the Wilmington Housing Authority Firearms and Weapons Policy on July 26, 2010.[6]

23.     In accordance with regulations applicable to the Wilmington Housing Authority through the United States Housing and Urban Development Department, WHA is required to post proposed changes to the Lease applicable to residents who reside in units in public housing and allow a forty-five (45) day period for public comments. A public hearing will be held to allow interested parties to comment on and/or propose amendments or modifications. The WHA Board will thereafter determine whether amendments or modifications should be made to the proposed Lease Modification and Firearms and Weapons Policy. The Board will formally act on the Lease Modification and Firearms and Weapons Policy at a Board meeting.

25.     During the interim, WHA will not enforce Article IX.P of the public housing lease with respect to possession and use of firearms for self-defense in public housing units.

26.     Based on the foregoing, I do not believe there is any dispute between Jane Doe and the Wilmington Housing Authority.

The preceding is true and correct to the best of my knowledge, information and belief. I make this declaration this _29th_ day of _July_, 2010, subject to the penalties for perjury set forth in 28 U.S.C. § 1746.

_Frederick S. Purnell_

Frederick S. Purnell, Sr.

_July 29, 2010_

[6] A copy of the Wilmington Housing Authority Firearms and Weapons Policy is attached as Exhibit G.

5

A0111

# EXHIBIT

# A

98 OCT 13 A 9:52.0

RICH... ...A
RECO... ...EEDS
NEW C... ...DE

Parcel No. 26-014.40-001
Prepared By & Return To:
Clifford B. Hearn, Jr.
606 Market Street
Wilmington, DE 19801

# This Deed, Made this

9 day of October .in the year of

our LORD one thousand nine hundred and ninety-eight

BETWEEN, WILMINGTON HOUSING AUTHORITY, a public body corporate and politic, organized and existing under the laws of the State of Delaware, party of the first part,

– and –

ELECTRA ARMS SENIOR ASSOCIATES, L.P., a Delaware limited partnership, party of the second part,

**Witnesseth,** That the said part y of the first part, for and in consideration of the sum of

ONE DOLLAR ($1.00)————————————————lawful money of the United States of America,

the receipt whereof is hereby acknowledged, hereby grant s and convey s unto the said

part y of the second part,

**ALL** that certain lot, piece or parcel of land with the building thereon erected, situate in the City of Wilmington, New Castle County and State of Delaware, known as No. 1800 NORTH BROOM STREET, being more particularly bounded and described as follows, to-wit:

BEGINNING at a point in the Northeasterly side of Eighteenth Street (at 50 feet wide), said point of Beginning being distant North 32 degrees, 08 minutes West, 100 feet measured along the said side of Eighteenth Street from the intersection thereof with the Northwesterly side of North Franklin Street (at 50 feet wide); thence from the said point of Beginning by the said side of Eighteenth Street, North 32 degrees, 08 minutes West, 185 feet to the intersection thereof with the Southeasterly side of North Broom Street (at 60 feet wide); thence by said side of North Broom Street, North 57 degrees, 51 minutes East, 255 feet 6 inches to the intersection thereof with the Southwesterly side of Nineteenth Street (at 50 feet wide); thence thereby South 32 degrees, 08 minutes East, 185 feet to a point; thence parallel to North Franklin Street, South 57 degrees, 51 minutes West, 255 feet 6 inches to the place of Beginning.

SUBJECT to an Agreement between Bell Atlantic-Delaware, Inc. and Wilmington Housing Authority, recorded January 9, 1998 in Deed Book 2383, Page 163, New Castle County records.

SUBJECT to a Memorandum of Lease Agreement between Wilmington Housing Partnership and Cellco Partnership t/a Bell Atlantic Nynex Mobile, recorded April 17, 1997 in Deed Book 2258, Page 1, New Castle County records.

SUBJECT to a Cable TV rights Agreement between Wilmington Housing Authority and Rollins Cablevue, Inc., dated August 1, 1985 and recorded in Deed Book 361, Page 146, New Castle County records.

BEING a part of the same lands and premises which Electra Arms Apartment and Medical Center Foundation, Inc., a Delaware Corporation by Deed dated January 31, 1968 and fo record in the office of the Recorder of Deeds in and for New Castle County, Delaware in Deed Record F,

A0113

# EXHIBIT

# B

A0114

FIRST AMENDED AND RESTATED

LIMITED PARTNERSHIP AGREEMENT

OF

ELECTRA ARMS SENIOR ASSOCIATES, L.P.

A DELAWARE LIMITED PARTNERSHIP

THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION DOES NOT PASS UPON THE MERITS OF OR GIVE ITS APPROVAL TO ANY SECURITIES OFFERED OR THE TERMS OF THE OFFERING, NOR DOES IT PASS UPON THE ACCURACY OR COMPLETENESS OF ANY OFFERING CIRCULAR OR OTHER SELLING LITERATURE. THESE SECURITIES ARE OFFERED PURSUANT TO AN EXEMPTION FROM REGISTRATION WITH THE COMMISSION; HOWEVER, THE COMMISSION HAS NOT MADE AN INDEPENDENT DETERMINATION THAT THE SECURITIES OFFERED HEREUNDER ARE EXEMPT FROM REGISTRATION.

THE SECURITIES OFFERED BY THIS INSTRUMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE SECURITIES LAWS OF ANY STATE. THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFERABILITY AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND THE APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM.

IN MAKING AN INVESTMENT DECISION INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE PERSON OR ENTITY CREATING THE SECURITIES AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED. THESE SECURITIES HAVE NOT BEEN RECOMMENDED BY ANY FEDERAL OR STATE SECURITIES COMMISSION OR REGULATORY AUTHORITY. FURTHERMORE, THE FOREGOING AUTHORITIES HAVE NOT CONFIRMED THE ACCURACY OR DETERMINED THE ADEQUACY OF THE DOCUMENT. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6

A0115

TABLE OF CONTENTS

Page

ARTICLE 1: DEFINITIONS.................................................................1

ARTICLE 2: CONTINUATION ..........................................................12

    2.1.    Continuation.................................................................12
    2.2.    Name.............................................................................13
    2.3.    Purpose.........................................................................13
    2.4.    Principal Office; Agent For Service of Process..........13
    2.5.    Taxable Year; Accounting Method..............................13
    2.6.    Nature of Interests in Partnership. ...........................13
    2.7.    Withdrawal of Initial Limited Partner.......................14

ARTICLE 3: CERTIFICATES .............................................................14

    3.1.    Certificates Under Act. ..............................................14
    3.2.    Other Certificates.......................................................14
    3.3.    Execution by Attorney-In-Fact. .................................15

ARTICLE 4: TERM ............................................................................15

    4.1.    Effective Date. ............................................................15
    4.2.    Dissolution. ................................................................15
    4.3.    Continuation...............................................................16

ARTICLE 5: PARTNERS AND CAPITAL............................................16

    5.1.    General Partner's Capital Contributions. .................16
    5.2.    Limited Partner's Capital Contribution. ...................17
    5.3.    Additional Capital Contributions..............................18
    5.4.    No Interest on Capital. ...............................................19
    5.5.    No Third Party Rights. ...............................................19
    5.6.    Operating Deficits and Payment of Partnership Expenses. ...................20
    5.7.    Loans from Partners....................................................21
    5.8.    Capital Accounts. .......................................................21
    5.9.    Use of Revenues from Certain Sources. .....................22

ARTICLE 6: PROFITS AND LOSSES; CREDITS; DISTRIBUTIONS ....................23

    6.1.    Allocations of Profits and Losses. ..............................23
    6.2.    Low Income Housing Credits.....................................27
    6.3.    Distributions...............................................................27
    6.4.    Effect of Distribution. ................................................29
    6.5.    Form of Distribution. .................................................30
    6.6.    Partnership Adjustment.............................................30
    6.7.    Allocation to Transferred Interest.............................30
    6.8.    Allocations of Distributions.......................................31
    6.9.    Sharing of Excess Nonrecourse Liabilities.................31

i

A0116

Page

6.10.   Federal and State Income Tax Allocations. .........................................................31
6.11.   Certain Definitions. ..............................................................................................32

ARTICLE 7: MANAGEMENT...............................................................................................35

7.1.    Control in General Partner. ..................................................................................35
7.2.    Limitations on General Partner's Authority. ........................................................36
7.3.    No Liability; Indemnification of Partners..............................................................37
7.4.    Devotion of Skill and Time...................................................................................39
7.5.    Fees and Reimbursement of General Partner and Affiliates................................39
7.6.    Fiduciary Duty of General Partner........................................................................40
7.7.    Investment Opportunities......................................................................................40
7.8.    General Partner or Affiliates Dealing With the Partnership. ................................41
7.9.    Tax Matters Partner................................................................................................42
7.10.   General Partner's Obligation to Operate the Project In Accordance with
        All Requirements. .................................................................................................43
7.11.   Reports to Lenders and Government Agencies. ...................................................44
7.12.   Establishing and Maintaining the Reserves. ........................................................45
7.13.   Representations and Warranties of the General Partner. ......................................46
7.14.   Section 754 Election. ............................................................................................55
7.15.   Notice of Litigation................................................................................................55
7.16.   Obligation to Repair or Rebuild............................................................................56

ARTICLE 8: APPROVAL RIGHTS OF THE LIMITED PARTNER .................................57

8.1.    Approval. ...............................................................................................................57
8.2.    Consent of General Partner; Effect of Approval..................................................62
8.3.    Removal of the General Partner.............................................................................62

ARTICLE 9: RECORDS, REPORTS AND ACCOUNTS .................................................68

9.1.    Books and Records. ...............................................................................................68
9.2.    Delivery to Limited Partner. .................................................................................69
9.3.    Inspection by Limited Partner................................................................................69
9.4.    Reports. ..................................................................................................................70
9.5.    Tax Returns............................................................................................................71
9.6.    Bank and Money Market Accounts. .....................................................................72
9.7.    Asset Management..................................................................................................72

ARTICLE 10: DISPOSITION OF PARTNERSHIP INTERESTS....................................72

10.1.   Generally................................................................................................................72
10.2.   General Partner......................................................................................................73
10.3.   Limited Partner. ....................................................................................................76
10.4.   Binding on Successors. .........................................................................................77
10.5.   Conditions to Substitutions...................................................................................77
10.6.   No Release or Waiver. ...........................................................................................77

ARTICLE 11: DISTRIBUTIONS ON DISSOLUTION .....................................................77

ARTICLE 12: MISCELLANEOUS .....................................................................................79

ii

A0117

Page

| 12.1. | Headings. | 79 |
| 12.2. | Time of Essence. | 79 |
| 12.3. | Entire Agreement. | 80 |
| 12.4. | Amendment. | 81 |
| 12.5. | Governing Law; Choice of Forum. | 81 |
| 12.6. | Attorneys' Fees. | 81 |
| 12.7. | Severability. | 81 |
| 12.8. | Terminology. | 81 |
| 12.9. | Notices. | 82 |
| 12.10. | Counterparts. | 82 |
| 12.11. | Further Assurances. | 82 |
| 12.12. | No Partition. | 82 |
| 12.13. | Waiver. | 83 |
| 12.14. | Not for Benefit of Creditors. | 83 |
| 12.15. | Binding on Successors. | 83 |
| 12.16. | Insurance. | 84 |
| 12.17. | Liability of Limited Partner. | 84 |

iii

A0118

FIRST AMENDED AND RESTATED

LIMITED PARTNERSHIP AGREEMENT

OF

ELECTRA ARMS SENIOR ASSOCIATES, L.P.

A DELAWARE LIMITED PARTNERSHIP

This FIRST AMENDED AND RESTATED LIMITED PARTNERSHIP

AGREEMENT, amending and restating the limited partnership agreement of ELECTRA ARMS

SENIOR ASSOCIATES, L.P. dated as of July 24, 1998, is entered into as of October _9_, 1998,

by and between WILMINGTON REVITALIZATION CORPORATION, INC., a Delaware non-

profit corporation, as General Partner, and EDISON CAPITAL HOUSING INVESTMENTS, a

California corporation, as Limited Partner.

The parties agree as follows:

ARTICLE 1:

DEFINITIONS

The capitalized terms not defined elsewhere in this Agreement shall have the

meanings ascribed to them in this Section 1.

Accountant.  Heller, Blosky & Dabagian, P.C., or such other accounting firm

approved by the Limited Partner.

Act.  The Delaware Uniform Limited Partnership Act, as amended from time to

time.  Reference to any section of the Act shall be deemed to refer to a similar provision in any

amendment to the Act.

Affiliate.  An individual, corporation or any other legal entity that directly, or

indirectly, through one or more intermediaries, controls, is controlled by, or is under common

1

A0119

control with, the designated party, or any officer, director or partner of the designated party or any company of which the designated party is an officer, director or partner. "Control" shall mean (i) ownership or control of 10 percent or more of the shares entitled to vote for the election of directors in the case of a corporation and 10 percent or more of the beneficial interests in the case of a legal entity other than a corporation, (ii) boards of directors that overlap by fifty percent (50%) or more of their directors, or (iii) control of a majority of the directors in the case of a corporation. Without limiting the generality of the foregoing, the Developer is an Affiliate of the General Partner.

Agency. The tax credit allocating agency for the State of Delaware.

Asset Management Fee. The fee payable to Limited Partner in accordance with Section 9.7 hereof.

Base Management Fee. The base partnership management fee payable to the Developer in accordance with the Partnership Administration and Guaranty Agreement of even date herewith.

Bonds. The tax exempt bonds issued by City of Wilmington, Delaware in the amount of Eight Million Seven Hundred Twenty-Five Thousand Dollars ($8,725,000) which will be fully amortizing over a thirty (30) year term at an interest rate equal to 6.25% per annum and shall provide for a debt service coverage ratio of 1.25.

Capital Account. An individual account maintained for each Partner in accordance with the provisions of Section 5.

Capital Contribution. Any payments as they are paid which a Partner contributes to the Partnership capital in its capacity as a Partner. All Capital Contributions shall be made in cash.

January 4, 1999
::ODMA\PCDOCS\LA1\378941\6
PARTNERSHIP AGREEMENT

A0120

Cash From Refinancing.  The net cash the Partnership realizes from the refinancing of all or a portion of the Project after payment of the following sums in the following order: (a) payment of all partnership expenses related to the refinancing, (b) to the payment of all matured debts and liabilities of the Partnership (including amounts due pursuant to the Loan, and all expenses of the Partnership incident to any such sale), excluding (1) debts and liabilities of the Partnership to Partners or any Affiliates, and (2) all unpaid fees owing to the General Partner or Affiliates thereof under this Agreement; (c) to the Partners in amounts equal to their income tax liability attributed to the allocation of net taxable income of the Partnership (if any) based upon the then-current maximum marginal tax rate; (d) to the repayment of any loans made by Limited Partner hereunder to the Partnership; (e) to the repayment to the guarantor under the Completion Guaranty, the Operating Deficit Guaranty, and the Indemnification Agreement; and (f) the balance of such remaining sum, ninety nine and nine tenths per cent (99%) thereof to the Limited Partner, and one-tenth percent (1%) thereof to the General Partner.

Cash From Sales.  The net cash the Partnership realizes from the sale or other disposition of the Project, or from insurance proceeds paid for damage to or destruction of the Project, or due to any award paid on account of a taking of the Project by eminent domain, after payment of the following sums in the following order:  (a) payment of all partnership expenses related to the sale or event, (b)  to the payment of all matured debts and liabilities of the Partnership (including amounts due pursuant to the Loan, and all expenses of the Partnership incident to any such refinancing), excluding (1) debts and liabilities of the Partnership to Partners or any Affiliates, and (2) all unpaid fees owing to the General Partner or Affiliates thereof under this Agreement; (c) to the Partners in amounts equal to their income tax liability attributed to the allocation of net taxable income of the Partnership (if any) based upon the then-current

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0121

maximum marginal tax rate; (d) to the repayment of any loans made by Limited Partner

hereunder to the Partnership; (e) to the repayment to the guarantor under the Completion

Guaranty, the Operating Deficit Guaranty, and the Indemnification Agreement; and (f) the

balance of such remaining sum, ninety nine and nine tenths per cent (99%) thereof to the Limited

Partner, and one-tenth percent (1%) thereof to the General Partner.

Code.  The Internal Revenue Code of 1986, as amended.

Completion Guaranty.  That certain agreement among the Developer and the

Limited Partner pursuant to which the Developer is making certain guarantees relating to the

completion of the Project.

Compliance Monitoring Fee.  The annual fee payable to the Housing Authority of

the County of Chester in accordance with the Compliance Monitoring Agreement of even date

herewith.

CPI Increase.  The ratio, the numerator of which is the "Consumer Price Index -

for the U.S. and Selected Areas for Urban Wage Earners and Clerical Workers, all Items (1982-

1984 - 100)" published by the U.S. Department of Labor, Bureau of Labor Statistics for the

Wilmington, Delaware Metropolitan Area ("Consumer Price Index") most recently published as

of the applicable anniversary date of this Agreement and the denominator of which is the

Consumer Price Index most recently published before the date of this Agreement (the "Base

Month").  If the Bureau of Labor Statistics ceases to use the 1982-1984 average of 100 as the

basis of computation, then the ratio shall be changed so as to reach the same figure that would

have been arrived at had such other price index been in effect in the Base Month.  If the aforesaid

Consumer Price Index is no longer published or used, then a reliable government or other non-

partisan publication evaluating the information theretofore used in determining the Consumer Price Index shall be used.

Developer.  Wilmington Housing Authority, a public body corporate and politic and existing under and by virtue of the laws of the State of Delaware.

Developer Fee Note.  That certain document entitled "Non-Recourse Mortgage Note" dated as of the date hereof evidencing the obligation of the Partnership to pay any deferred portion of the Development Fee to the Developer in accordance with the Development Services Agreement.

Development Fee.  The development fee payable to the Developer for services performed in accordance with the Development Services Agreement.

Development Services Agreement.  That certain Development Services Agreement executed by the Partnership and Developer.

Distributable Cash.  Excess Cash less payment of the following items in the following order of priority:  (i) the Asset Management Fee, (ii) any Development Fee or Developer Fee Note up to 50% of Excess Cash remaining after the payment of items in subparagraph (i) above, (iii) the Compliance Monitoring Fee, (iv) the balance of any Development Fee or Developer Fee Note (v) additional deposits to the Operating Reserve which may be required to maintain a balance of not less than $125,000, (vi) the Base Management Fee and (vii) the Incentive Management Fee.

Distribution.  Any cash the Partnership distributes to a Partner without consideration.

Economic Projections.  The economic projections prepared by the Accountants and attached to the Funding Agreement between the Partnership and the Limited Partner as

January 4, 1999
::ODMA\PCDOCS\LA1\378904\6
PARTNERSHIP AGREEMENT

A0123

Exhibit B thereto, which economic projections shall be superseded by revised economic projections (the "Revised Economic Projections") pursuant to the terms of the Funding Agreement.  The Revised Economic Projections are subject to the reasonable approval of Limited Partner.  The Economic Projections have been prepared by Limited Partner based on information, assumptions and estimates provided by the General Partner and its affiliates.  Limited Partner makes no assurances as to the completeness or accuracy of any of the information, assumptions or estimates contained in the Economic Projections.  The Economic Projections have been prepared to assist Limited Partner in analyzing its investment and are to be used solely for the purposes set forth in this Agreement and in other documents related hereto, and are not to be relied upon for any other purpose or by any other person.  The Economic Projections shall be revised from time to time as set forth in the Funding Agreement and in other documents related thereto based upon, among other things, the following:  the date on which the rehabilitation of the Project is completed, the date on which 100% of the units at the Project shall be rented to low income households, as defined in Section 42 of the Code, and the actual tax credit rate and the actual tax credit basis as determined by a cost certification from the Accountants.

Excess Cash.  Cash revenues generated by Partnership operations (other than Cash From Sales and Cash From Refinancing), less the aggregate amount of Partnership Expenses.  For the purposes of determining Excess Cash, Partnership Expenses shall not include those Partnership Expenses specifically excluded pursuant to Section 5.6(b).

Final Funding Date.  The last day of the first tax credit year.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0124

Funding Agreement.  That certain agreement of even date herewith between the Limited Partner and the Partnership and incorporated herein by this reference, pursuant to which the Limited Partner shall pay certain of its Capital Contributions in accordance with its terms.

General Partner.  Wilmington Revitalization Corporation, Inc., a Delaware non-profit corporation, and its successors and assigns that are admitted to the Partnership as a substitute General Partner pursuant to Section 10.2 below.

Incentive Management Fee.  The incentive management fee payable to the Developer for services performed in accordance with the Partnership Administration and Guaranty Agreement.

Indemnification Agreement.  The agreement among the General Partner, the Developer, the Partnership and the Limited Partner and incorporated herein by this reference, pursuant to which the Limited Partner is indemnified with respect to certain tax benefits related to its Partnership interest.

Initial Capital Contribution.  An amount equal to 19.17% of the Capital Contribution (or approximately $522,500) that the Limited Partner shall pay to the Limited Partnership upon the execution of this Agreement.

Limited Partner.  Edison Capital Housing Investments, a California corporation, as to a 99% Percentage Interest in the Partnership, or any other Person who is admitted as Limited Partner of the Partnership as shown on the books and records of the Partnership at the time of reference thereto.

Limited Partner Date.  The date on which the Limited Partner becomes a Partner in the Partnership.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0125

Loan Agreement. That certain loan agreement dated October [±], 1998 by and between The City of Wilmington, Delaware, and the Partnership, in connection with the issuance of the Bonds.

Loans. The Bonds.

Losses. The meaning set forth in Section 6.

Low Income Housing Credits. The federal low income housing tax credits allowable under Section 42 of the Code for qualified low income housing projects.

Management Agreement. The property management agreement between Manager and the Partnership for the management of the Project.

Manager. Wilmington Housing Authority, or such other property manager as approved by the Limited Partner.

Mortgages. All of the Partnership liabilities secured by any deeds of trust, mortgages, or security agreements on the Project.

Operating Deficit. For any calendar year or, in 1998, that part of the calendar year beginning with the date of this Agreement, the excess of Partnership Expenses for said calendar year (or portion of the calendar year) over the Partnership's cash revenues of every kind (including, without limitation, proceeds of "rental value insurance", laundry income, and security deposits applied to the payment of rent under any lease of any portion of the Project) from operations (other than Cash From Sales and Cash From Refinancing) for said calendar year (or portion of said calendar year) and any Capital Contributions to the extent used to pay Partnership Expenses as shown in the Economic Projections for said calendar year (or portion of said calendar year). For purposes of determining Operating Deficits, Partnership Expenses shall not

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0126

include those Partnership Expenses specifically excluded pursuant to Section 5.6(b) and shall exclude the following:

(i)    depreciation and other non-cash items;

(ii)    prepaid expenses which are not customarily prepaid in the ordinary course of business; provided, however, that such prepaid expenses shall be included in Partnership Expenses on a pro rata basis over the term for which the expenses apply;

(iii)    any item, not paid out of cash revenues, which would otherwise constitute a Partnership Expense, including without limitation items that are paid out of the proceeds of the Mortgages or out of the Reserves;

(iv)    real estate taxes and real estate assessments, other than assessments in the amounts set forth in the Economic Projections;

(v)    sums payable to the General Partner, the Developer, or any Affiliate thereof; and

(vi)    amounts paid under the Indemnification Agreement; and

(vii)    any late fees, default interest and the like arising out of the Partnership's or General Partner's failure to pay any expenses when due.

Operating Deficit Guaranty Agreement.  That certain agreement, the form of which is attached hereto as Exhibit F and incorporated herein by reference, pursuant to which the Developer guarantees the General Partner's obligations under Section 5.6.

Operating Reserve Fund.  Shall have the meaning ascribed to it in the Trust Indenture.

9

A0127

Option Agreement.  That certain Right of Refusal and Option Agreement of even date herewith between the Partnership and the General Partner, and incorporated herein by this reference, pursuant to which General Partner has an option to purchase the Project.

Partner.  Any General Partner or Limited Partner.

Partnership.  The limited partnership continued by this Agreement.

Partnership Administration and Guaranty Agreement.  The agreement by and between the General Partner and the Partnership and incorporated herein by this reference, pursuant to which the Developer agrees to provide administrative and management services to the Partnership.

Partnership Expenses.  All reasonable out-of-pocket costs and expenses of every kind and character the Partnership incurs in connection with the operation of the Project, including without limitation, capital expenditures (except to the extent paid with insurance proceeds), debt service on the Mortgages, the property management fee and required additions to the Reserves, but excluding payments from Reserves and debt service on any Mortgage that is not payable currently.  Partnership Expenses shall not include (a) salaries, compensation and fringe benefits of directors, officers and employees of the General Partner or the Developer, (b) overhead of the General Partner or the Developer, including rent and general office expenses or (c) the development fee and partnership management fee described in Section 7.5 or any payment made to any Person for some or all of the services required under the Development Services Agreement, Partnership Administration and Guaranty Agreement or Management Agreement (other than the out of pocket costs and expenses of preparing the reports, statements, and tax returns relating to the Partnership and Project required by Sections 9.4 and 9.5).

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0128

Percentage Interest. The following percentage interests: (a) with respect to the Limited Partner, a ninety-nine percent (99%) interest; and (b) with respect to the General Partner, a one percent (1%) interest.

Person. Any individual, general partnership, limited partnership, trust, estate, association, corporation or other entity.

Profits. The meaning set forth in Section 6.

Project. The Property and improvements thereon consisting of two hundred (200) residential units for low income households located in Wilmington, Delaware, which units are known as "Electra Arms Senior Apartments," situated on the Property, together with any personal property owned by the Partnership that is now or hereafter located in the Project.

Property. The real property located in Wilmington, Delaware, which the Partnership owns in fee, upon which the improvements are situated and which is described in Exhibit A attached to, and incorporated by reference into, this Agreement.

Regulatory Agreements. (a) The regulatory agreement to be entered into between the Delaware State Housing Authority and the Partnership to be recorded against the Project in compliance with Section 42 of the Code and the applicable requirements for state credits ("Tax Credit Regulatory Agreement"), as the same may be amended from time to time, (b) the regulatory agreement entered into between the City of Wilmington and the Partnership recorded against the Project ("Bond Regulatory Agreement"), and (c) any other similar documents or instruments recorded against the Project which relate to the use and operation thereof.

Replacement Reserve Fund. Shall have the meaning ascribed to it in the Trust Indenture.

11

Reserves.  The amount of cash, subject to the requirements of Section 7.13, that is

set aside as necessary to satisfy the requirements of the Operating Reserve Fund, Debt Service

Reserve Fund and Replacement Reserve Fund, as those terms are defined in the Trust Indenture.

Terminating Event.  The happening of any of the events described in Section Title

6 Delaware Code, Section 17-801 of the Act with respect to the General Partner.

Transfer.  Any sale, exchange, assignment, encumbrance, hypothecation, pledge,

foreclosure, conveyance in trust, gift or other transfer of any kind, whether direct or indirect,

other than as a direct consequence of a Terminating Event.

Trust Indenture.  That certain Trust Indenture dated as of October [1], 1998, by

and between the City of Wilmington and Wilmington Trust Company, as Trustee, securing

multi-family rental revenue bonds (Electra Arms Senior Associates, L.P. Project) Series 1998.

Treasury Regulations.  Regulations, final and temporary, promulgated under the

Code.

Unanticipated Losses.  Losses suffered by the Partnership attributable to tort

liabilities, uninsured losses, security law violations, or any other uninsured losses.

ARTICLE 2:

CONTINUATION

2.1.    Continuation.

The limited partnership agreement was signed on July 24, 1998.  A certificate of

limited partnership was filed on July 24, 1998, as required by the Act.  The Partners hereby

continue the Partnership under the Act in accordance with the provisions of this Agreement.

Upon execution of this Agreement by the Partners, the General Partner shall take all actions

required to perfect and maintain the Partnership as a partnership under the Act.

January 4, 1999
::ODMA\PCDOCS\LA1\378946
PARTNERSHIP AGREEMENT

A0130

2.2.   <u>Name</u>.

The name of the Partnership is "Electra Arms Senior Associates, L.P., a Delaware Limited Partnership".

2.3.   <u>Purpose</u>.

The Partnership's sole purpose is to develop, rehabilitate, own, hold for investment, refinance, operate, manage, sell and lease in an efficient and business-like manner all of the Project and to operate two hundred (200) residential units so as to qualify for, and prevent any recapture of, the Low Income Housing Credits, all pursuant to the provisions of this Agreement.

2.4.   <u>Principal Office; Agent For Service of Process</u>.

The address of the Partnership's principal executive office shall be 400 Walnut Street, Wilmington, Delaware 19801, or such other address in Delaware as the General Partner may designate from time to time.  The Partnership's agent for service of process shall be CT Corporation Service, Wilmington, Delaware, and shall not thereafter be changed without the prior written consent of Limited Member.

<u>Taxable Year; Accounting Method</u>.

The Partnership's taxable year shall be the calendar year, unless changed by the General Partner, which change shall only be made with the consent of the Limited Partner.  The Partnership's books shall be maintained on an accrual basis as defined in the Code.

2.5.   <u>Nature of Interests in Partnership</u>.

Each Partner's interest in the Partnership shall be personal property; no Partner shall have any interest in the Project.

<div align="center">13</div>

A0131

2.6.    Withdrawal of Initial Limited Partner.

The General Partner shall cause Charlie H. Smith, Jr., as the initial limited partner of the Partnership to withdraw from the Partnership and to provide a release in the form of Exhibit D, attached hereto and incorporated herein by this reference, upon execution of this Agreement by the Limited Partner.  Upon withdrawal, the initial limited partner shall receive his Capital Contribution of $1, which shall be payable without interest.

ARTICLE 3:

CERTIFICATES

3.1.    Certificates Under Act.

The General Partner shall timely prepare, sign, acknowledge and file in the office of the Delaware Secretary of State any certificate or amendment thereto the Act requires.  If the General Partner fails to sign or file any certificate or amendment thereto that the Act requires within five business days after the Limited Partner has requested in writing that it be filed, the Limited Partner may prepare, sign, acknowledge and file the certificate or amendment thereto.  A certified copy of each certificate or amendment thereto shall be filed for recording in the Official Records of the State of Delaware.

3.2.    Other Certificates.

The General Partner shall timely prepare, sign, acknowledge, verify, publish, file and/or record, as may be necessary or appropriate, any notices, certificates, statements or instruments required:  (a) to comply with all laws that apply to the Partnership or the conduct of its business including the federal and state requirements applicable to Low Income Housing Credits; (b) to maintain its existence; (c) to enable the Partnership to hold the Project in the

January 4, 1999
::ODMA\PCDOCS\LA1\378946
PARTNERSHIP AGREEMENT

A0132

Partnership's name; or (d) to create presumptions in favor of bona fide purchasers or encumbrances for value of the Property pursuant to the Act.

    3.3.  <u>Execution by Attorney-In-Fact</u>.

Any certificate or other instrument which a Partner may sign, acknowledge and/or verify under this Section may be signed, acknowledged and/or verified by an officer or general partner of that Partner or the Partner's duly appointed attorney-in-fact.

<div align="center">ARTICLE 4:</div>

<div align="center"><u>TERM</u></div>

    4.1.  <u>Effective Date</u>.

This Agreement shall be effective as of the date set forth above.  The term of the Partnership commenced on July 24, 1998 and shall continue until December 31, 2050, unless sooner terminated pursuant to the provisions of this Agreement.

    4.2.  <u>Dissolution</u>.

The Partnership shall dissolve upon the first to occur of the following dates and events:

    (a)  December 31, 2050.

    (b)  The mutual consent of the Limited Partner and the General Partner.

    (c)  Subject to the provisions of Section 4.3, the occurrence of a Terminating Event with respect to the sole remaining General Partner.

    (d)  The entry of a decree of judicial dissolution under the Act by a court of competent jurisdiction.

    (e)  The sale of all or substantially all of the Partnership's assets.

<div align="center">15</div>

A0133

      (f)     The Limited Partner electing to terminate the Partnership in circumstances where the Limited Partner has the right to remove the General Partner under Section 8.3 of this Agreement.

   4.3.   <u>Continuation.</u>

      Within ninety (90) days of the occurrence of a Terminating Event with respect to a sole General Partner, the remaining Partners by a unanimous vote may elect to continue the Partnership's business and admit a new general partner.  If a General Partner ceases to be a general partner for any reason and there is no remaining or surviving general partner, admission of a new general partner and the decision to continue the Partnership's business must be approved by the remaining Partners within ninety (90) days of the occurrence of such event. Expenses incurred by the Partnership (and not by the General Partner in contesting any decision or action of the Limited Partner) in connection with the events contemplated in this Section 4.3 shall constitute Partnership Expenses.

<div align="center">ARTICLE 5:</div>

<div align="center"><u>PARTNERS AND CAPITAL</u></div>

   5.1.   <u>General Partner's Capital Contributions.</u>

      The Wilmington Housing Authority shall contribute the Property to the Partnership as a capital contribution on behalf of the General Partner.  The value of such Property shall be credited to the capital account of the General Partner in the aggregate amount of $3,600,000.00, with the allocation of such amount between the land and the building and the other assets related to the Property being made as set forth in the Economic Projections.  The General Partner shall contribute any additional capital if and as required under the Funding Agreement or this Agreement.

<div align="center">16</div>

A0134

5.2.   <u>Limited Partner's Capital Contribution.</u>

(a)   The Limited Partner shall pay the Initial Capital Contribution on the date of this Agreement and the balance of the Capital Commitment according to the terms of the Funding Agreement.

(b)   At least ten (10) working days before a payment is due under the Funding Agreement, and as a condition thereto, (1) the General Partner shall notify the Limited Partner in writing of the payment amount due and where the payment should be sent, taking into account the rights of lenders, and shall provide a written statement in the form of a certificate acceptable to the Limited Partner representing and warranting that (i) the General Partner has satisfied and continues to satisfy all of its material obligations under this Agreement, (ii) the representations and warranties set forth in Section 7.14 (except for Section 7.14(j) and 7.14(k)) are true and correct as of the date of the certificate or, to the extent any such representations and warranties are no longer true and correct, shall describe any such change in circumstances and shall represent and warrant that any such change shall not have a material adverse effect on the Partnership, or the use, occupancy or operation of the Project, or on the tax consequences to the Limited Partner from its investment in the Partnership as projected on the date of this Agreement, (iii) the Partnership is not in default under any of the Mortgages, the Management Agreement or other obligations, or the Partnership is in default and that receipt of the Capital Contributions due under the Funding Agreement will cure any default and will be so used; (2) the Limited Partner shall have reasonably determined that the representations and warranties in said certificate are true and correct on the date thereof and on the payment date, or to the extent the representations and warranties are no longer true and correct, the Limited Partner shall have determined that any such change shall not have a material adverse effect on the Partnership, or

<div align="center">17</div>

the use, occupancy or operation of the Project, or on the tax consequences of the Limited Partner

from its investment in the Partnership as projected on the date of this Agreement; (3) all

conditions to the applicable installment of Capital Contribution shall have been satisfied; and (4)

all conditions set forth in the Funding Agreement shall have been satisfied for the Limited

Partner's obligation to pay the applicable Capital Contribution.

    5.3.    <u>Additional Capital Contributions.</u>

        (a)    Except as set forth in this Article 5 and subparagraph (b) of Article 11

hereof or as required under the Indemnification Agreement as to the General Partner and Section

5.2 hereof as to Limited Partner, a Partner shall not be required to make any Capital Contribution

or otherwise advance funds to the Partnership.  A Partner shall have the right to make voluntary

Capital Contributions to the capital of the Partnership to the extent the Partnership requires funds

in addition to the funds provided under this Section 5 and the Operating Deficit Guaranty

Agreement.

        (b)    The Limited Partner may, prior to the time prescribed by law for filing of

the Partnership's federal income tax return for any fiscal year (not including extensions), elect to

be unconditionally obligated to restore all or a portion of any deficit in Limited Partner's Capital

Account upon liquidation of its interest in the Partnership.  Any such election shall be evidenced

by written notice to the General Partner at its principal executive office, delivered prior to such

time, specifying the amount of any deficit for which the Limited Partner elects a deficit

restoration obligation, with a copy to Dermot F. Kennedy, Esq., at 332 W. Broad Street,

Quakertown, Pennsylvania 18951.  Any amount owing pursuant to a deficit restoration

obligation shall be payable upon the later of (a) the end of the fiscal year in which Limited

Partner's interest is liquidated or (b) ninety (90) days after the date of such liquidation.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0136

(c)     The amount of any such election shall automatically be reduced to the extent the deficit in the Limited Partner's Capital Account (after reduction for the items described in (4), (5) and (6) of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)) is subsequently reduced or eliminated as of the end of the Partnership's taxable year without affecting the validity of prior allocations.  If an allocation or distribution thereafter increases the deficit in the Limited Partner's Capital Account, unless the Limited Partner elects otherwise under (a) above, the Limited Partner will be obligated to restore the deficit only to the extent of the lesser of (i) the deficit amount the Limited Partner has previously elected to restore or (ii) the smallest deficit balance in the Limited Partner's Capital Account (after reduction for the items described in (4), (5) and (6) of Treasury Regulations Section 1.704-1(b)(2)(ii)(d)) as of the end of the Partnership's taxable year subsequent to the taxable year for which the election was made in (i).  For purposes of determining the amount referred to in (ii), the income, gain, losses and deductions of the Partnership shall be allocated under an interim closing of the books method.

    5.4.   <u>No Interest on Capital</u>.

The Partnership shall not pay any interest upon any Capital Contribution or upon undistributed or reinvested Profits.

    5.5.   <u>No Third Party Rights</u>.

The obligations or rights of the Partnership or of Partners to make or require any Capital Contribution under this Agreement or the Funding Agreement shall not grant any rights to, or confer any benefits upon, any Person who is not a Partner.  The making of nonrecourse loans to the Partnership shall not make the lender a Partner.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0137

5.6.   Operating Deficits and Payment of Partnership Expenses.

(a)   The General Partner shall be required to advance funds to the Partnership to pay Operating Deficits as they arise. Any funds so advanced shall be deemed a loan from the General Partner and shall be evidenced by an unsecured nontransferable promissory note bearing interest at a rate per annum equal to the lesser of (a) ten percent (10%) or (b) the maximum amount allowed by law. Any such loan shall be repayable only from Cash From Refinancing and Cash From Sales. Any amounts advanced by the General Partner to pay real estate taxes owed by the Partnership shall not reduce the amount of the General Partner's obligation under this paragraph. The General Partner's obligation under this Section 5.6(a) shall be guaranteed by the Developer pursuant to the Operating Deficit Guaranty Agreement.

(b)   Except if otherwise approved by the Limited Partner, the General Partner shall use all cash revenues from operation of the Project to pay for Partnership Expenses prior to any other use. The General Partner shall pay or cause the Partnership to pay all Partnership Expenses relating to the period after the Limited Partner Date in accordance with Article 4 of the Trust Indenture (except if the Partnership is in good faith disputing any of such Partnership Expenses and provides the Limited Partner evidence reasonably satisfactory to it of such dispute and the basis therefor). In addition, the General Partner shall pay, and indemnify and hold the Partnership harmless from, all Partnership Expenses relating to the period prior to the Limited Partner Date which are not described in Section 7.14(t), or reflected in the Economic Projections approved by the Limited Partner or covered by the Partnership's insurance, including, without limitation, costs and expenses arising out of tax audits or payments due as a result thereof, and shall not receive reimbursement therefor from the Partnership nor shall any such amount be

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0138

deemed to be Partnership Expenses for purposes of calculating Operating Deficits or be deducted in the calculation of Excess Cash.

5.7.   Loans from Partners.

To the extent that the Partnership requires funds in addition to the capital and loans provided for in Sections 5.1, 5.2 and 5.6 above, a Partner may lend such funds in cash to the Partnership.  Any loan shall be evidenced by an unsecured nontransferable promissory note bearing interest at a rate per annum equal to the lesser of (a) the reference rate announced by Wells Fargo Bank, N.A. plus 3% or (b) the maximum amount allowed by law.  Any such loan shall be repayable only from Cash From Refinancing and Cash From Sales.  If more than one Partner desires to loan the Partnership the funds required under this Section 5.7, each such Partner may loan that portion of the total amount required equal to the ratio of a lending Partner's Percentage Interest to the sum of the Percentage Interests of all lending Partners.

5.8.   Capital Accounts.

A Capital Account shall be maintained for each Partner in accordance with Treasury Regulations Section 1.704-1(b) including the following requirements:

(a)   Each Partner's Capital Account shall be credited with (i) the amount of the Partner's Capital Contribution, (ii) the Partner's distributive share of Profits, (iii) the Partner's distributive share of any item in the nature of income or gain pursuant to Section 6 hereof, (iv) the fair market value of any property contributed by the Partner, and (v) the amount of any Partnership liabilities that are assumed by such Partner or which are secured by any Partnership property distributed to such Partner.

(b)   Each Partner's Capital Account shall be charged with (i) the amount of money distributed to the Partner, (ii) the fair market value of any Partnership property distributed

January 4, 1999
::ODMA\PCDOCS\LA\378904\6
PARTNERSHIP AGREEMENT

A0139

to the Partner, (iii) the Partner's distributive share of Losses, (iv) the Partner's distributive share of any items in the nature of expenses or deductions pursuant to Section 6 hereof, and (v) the amount of any liabilities of such Partner assumed by the Partnership or which are secured by any property contributed by such Partner to the Partnership.

(c)      To each Partner's Capital Account there shall be debited or credited such other adjustments as are required by Treasury Regulations Section 1.704-1(b)(2)(iv)(g) to the extent not already reflected as a consequence of the foregoing.

(d)      If any interest in the Partnership is transferred in accordance with this Agreement, and subject to the provisions of Section 10.3.1 hereof and of the Funding Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(e)      If the General Partner determines, with advice of legal counsel, that, under Treasury Regulations Section 1.704-1(b), it is necessary or desirable to modify the manner in which the Capital Accounts are determined or maintained, it shall make the appropriate modification subject to the approval of the Limited Partner.  Any such modification to this Agreement made by the General Partner in reliance upon the advice of counsel and approved by the Limited Partner shall be deemed to be made pursuant to the General Partner's fiduciary obligation to the Limited Partner and no such modification shall give rise to any claim or cause of action by the Limited Partner.

5.9.    Use of Revenues from Certain Sources.

Funds advanced under Section 5.6 of this Agreement (or under the Operating Deficit Guaranty Agreement) shall be used to pay Partnership Expenses of the Project other than debt service on the Loans.

<div align="center">22</div>

A0140

ARTICLE 6:

PROFITS AND LOSSES; CREDITS; DISTRIBUTIONS

6.1.    Allocations of Profits and Losses.

(a)    Profits and Losses.  Subject to Section 6.2 and after giving effect to the

allocations in Sections 6.1(b) through (k) hereof, Profits and Losses of the Partnership shall be

determined by the General Partner and shall be allocated to the Partners pro rata in accordance

with their Percentage Interests; provided, however, that any Profits (remaining after giving effect

to the allocations in Sections 6.1(b) through (k)) generated by an event giving rise to Cash From

Sales shall be allocated as follows: (a) first, to the Limited Partner if it has a negative balance in

its Capital Account in excess of the Limited Partner's Allocable Share of Minimum Gain until

the sum of the balance of the Limited Partner's Capital Account plus the Limited Partner's

Allocable Share of Minimum Gain is zero; (b) second, to the General Partner if it has a negative

balance in its Capital Account in excess of the General Partner's Allocable Share of Minimum

Gain until the sum of the balance of the General Partner's Capital Account plus the General

Partner's Allocable Share of Minimum Gain is zero; and (c) thereafter to the Partners according

to their Percentage Interests.

(b)    Minimum Gain Chargeback.  Subject to the exceptions set forth in

Treasury Regulations Section 1.704-2(f), if there is a net decrease in Partnership Minimum Gain

during a Partnership taxable year, all Partners shall be specially allocated items of income and

gain for such year (and, if necessary, for subsequent years) an amount equal to such Partner's

share of the net decrease in Partnership Minimum Gain during such year that is allocable to the

disposition of Partnership property subject to one or more Nonrecourse Debts of the Partnership

(which share of such net decrease shall be determined under Treasury Regulations Section 1.704-

23

2(g)(2)).  It is intended that this Section 6.1(b) shall constitute a "minimum gain chargeback" as provided by Treasury Regulations Section 1.704-2(f) and such section of the Treasury Regulations shall control in the event of a conflict between such section and this Section 6.1(b).

      (c)    <u>Chargeback Attributable to Partner Nonrecourse Debt</u>.  Subject to the exceptions set forth in Treasury Regulations Section 1.704-2(i)(4), if there is a net decrease in Partner Nonrecourse Debt Minimum Gain during a Partnership taxable year attributable to a Partner Nonrecourse Debt, any Partner with a share of Partner Nonrecourse Debt Minimum Gain attributable to such debt at the beginning of such year, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of income and gain for such year (and, if necessary, for subsequent years) in an amount equal to such Partner's share of the net decrease in Partner Nonrecourse Debt Minimum Gain attributable to such Partner Nonrecourse Debt (which share of such net decrease shall be determined under Treasury Regulations Sections 1.704-2(i)(4) and 1.704-2(g)(2)).  It is intended that this Section 6.1(c) shall constitute a "chargeback of partner nonrecourse debt minimum gain" as provided by Treasury Regulations Section 1.704-2(i)(4) and such section of the Treasury Regulations shall control in the event of a conflict between such section and this Section 6.1(c).

      (d)    <u>Qualified Income Offset</u>.  If the Limited Partner unexpectedly receives any adjustments, allocations or distributions described in Treasury Regulations Section 1.704-1(b)(2)(ii)(d)(4) through (6) which results in an Adjusted Capital Account Deficit, the Limited Partner shall be allocated items of income and book gain in an amount and manner sufficient to eliminate such Adjusted Capital Account Deficit as quickly as possible.  It is intended that this Section 6.1(d) shall constitute a "qualified income offset" as provided by Treasury Regulations

Section 1.704-1(b)(2)(ii)(d) and such section of the Treasury Regulations shall control in the event of a conflict between such section and this Section 6.1(d).

(e)     <u>Limitation on Loss Allocations</u>.  Notwithstanding anything in Section 6.1(a) to the contrary, Losses shall not be allocated to the Limited Partner if they would create an Adjusted Capital Account Deficit in the Limited Partner's Capital Account, and such Losses shall be reallocated under this Section 6.1(e) to the General Partner.  For purposes of the foregoing sentence, any depreciation shall be allocated to the Partners under Section 6.2 to the extent possible without causing an Adjusted Capital Account Deficit of the Limited Partner and, then, Losses comprised of items of deduction other than depreciation shall be allocated among the Partners pursuant to this Section 6.1(e) to the extent possible without causing an Adjusted Capital Account Deficit of the Limited Partner.

(f)     <u>Nonrecourse Deductions</u>.  Nonrecourse Deductions for any Partnership taxable year, or portion thereof, shall be allocated to the Partners in proportion to their respective Percentage Interests.

(g)     <u>Partner Nonrecourse Deductions</u>.  Items of Partnership loss, deductions or Code Section 705(a)(2)(B) expenditures that are attributable to a Partner Nonrecourse Debt ("Partner Nonrecourse Deductions") shall be allocated among the Partners who bear the Economic Risk of Loss for such Partner Nonrecourse Debt in the ratio in which they share Economic Risk of Loss for such Partner Nonrecourse Debt.  This provision is to be interpreted in a manner consistent with the requirements of Treasury Regulations Section 1.704-2(i)(1).

(h)     <u>Special Allocation of Loss</u>.  If, during any year, the Partnership incurs a Loss in excess of the loss shown as the Net Taxable Income projection in the Economic Projections for the year and such excess Loss arises from expenses paid or to be paid with

January 4, 1999
::ODMA\PCDOCS\LA1\378946
PARTNERSHIP AGREEMENT

A0143

proceeds of Capital Contributions or loans from a General Partner, from withdrawals from

Reserves, or from amounts paid pursuant to the Operating Deficit Guaranty Agreement, then, at

the end of each such year, there shall be calculated the Limited Partner's Capital Account and

Allocable Share of Minimum Gain at the end of each year from the date of the calculation

through the last year of the projected Credit Period of the Partnership.  If such calculation

indicates that the Limited Partner would incur an Adjusted Capital Account Deficit in any such

year, then the portion of the Loss derived from the expenses described in the first sentence of this

paragraph (h) shall be allocated to the General Partner to the extent of such projected Limited

Partner's Adjusted Capital Account Deficit.

     (i)    <u>Unanticipated Losses</u>.  Notwithstanding the foregoing, if during any year

the Partnership incurs any Unanticipated Losses which could, in any year, impair the Limited

Partner's ability to claim the Low Income Housing Credits, such Unanticipated Losses shall be

allocated solely to the General Partner.

     (j)    <u>Curative Allocation</u>.  The allocations set forth in Sections 6.1(b), (c), (d),

(e), (f) and (g) hereof (the "Regulatory Allocations") are intended to comply with certain

requirements of Treasury Regulations Section 1.704-2.  Notwithstanding any other provision of

this Section 6, other than the Regulatory Allocations, the Regulatory Allocations shall be taken

into account in allocating other Profits, Losses and items of income, gain, loss and deduction to

the Partners so that, to the extent possible, the net amount of such allocations of Profits and

Losses and other items shall be equal to the amount that would have been allocated to each

Partner if the Regulatory Allocations had not occurred.

     (k)    <u>Special Allocation of Gross Income</u>.   In the event that any fee payable to

the General Partner or any of its affiliates shall instead be determined to be a non-deductible, non

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0144

capitalizable distribution from the Partnership to a Partner for federal income tax purposes, then there shall be allocated to the General Partner an amount of gross income equal to such distribution.

     6.2.   <u>Low Income Housing Credits</u>.

     (a)   Notwithstanding anything to the contrary contained in this Section except the Regulatory Allocations, depreciation deductions shall be allocated to the Partners according to their Percentage Interests.

     (b)   Low Income Housing Credits shall be allocated to the Partners according to their Percentage Interests.

     (c)   Any recapture of any Low Income Housing Credits shall be allocated among the Partners in the same manner in which the credits were allocated to the Partners.

     6.3.   <u>Distributions</u>.

     (a)   <u>Distributable Cash</u>.  The Partnership shall distribute Distributable Cash as follows to the Partners, at least once annually, in proportion to their Percentage Interests.  If and to the extent the General Partner is entitled to a distribution under this Section 6.3(a) but the General Partner then owes the Limited Partner amounts under the Indemnification Agreement and/or the Completion Guaranty and/or amounts due because of the Limited Partner's payment of any Partnership Expenses, the amounts otherwise distributable to the General Partner under this Section 6.3(a) and Section 7.5 shall be treated as distributed to the General Partner, but paid to the Limited Partner first to reduce the General Partners' liability under the Indemnification Agreement and/or the Completion Guaranty, then to reimburse the Limited Partner for the payment of any Partnership Expenses, and thereafter to pay any Partnership obligations then owing and not included in computing Partnership Expenses.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0145

(b)     Cash From Sales or Cash From Refinancing.  Within sixty (60) days of

receipt, the Partnership shall distribute Cash From Refinancing to the Partners in proportion to

their percentage Interests; provided, however, the Partners agree it is reasonable for the Limited

Partner to disapprove a refinancing if counsel to the Limited Partner determined that the

distributions contemplated by this Section 6.3(b) in the event of such refinancing may have

adverse tax consequences to the Limited Partner, or will cause gain to be allocated to the Limited

Partner in excess of the eleven and one-half percent (11.5%) allocation made by this section.

Within sixty (60) days of receipt, the Partnership shall distribute Cash From Sales (other than

Cash from Sales available when the Partnership is to be liquidated in which event distributions

shall be in accordance with Section 11 below) ninety-nine percent (99%) to the Limited Partner

and one percent (1%) to the General Partner.  Notwithstanding the foregoing, (1) if such sales

event occurs before the termination of the credit period as defined in Section 42 of the Code and

no General Partner Default has occurred, then such Cash From Sales (before the termination of

the credit period) shall be distributed first to the Limited Partner until it receives the amount

necessary so that (i) the sum of (A) such amount discounted to the Limited Partner Date using an

annual discount rate of eleven and one-half percent (11.5%), plus (B) the aggregate amount of

Actual Benefits (as defined in the Indemnification Agreement) received by the Limited Partner

through the date of the distribution, with each of the Actual Benefits discounted to the Limited

Partner Date from the date of receipt using an annual rate of eleven and one-half percent

(11.5%), plus (C) the aggregate amount received by the Limited Partner under the

Indemnification Agreement through the date of distribution, with each amount, if any,

discounted from the date of receipt to the Limited Partner Date using an annual discount rate of

eleven and one-half percent (11.5%) equal (ii) the aggregate discounted amount of Capital

January 4, 1999
::ODMA\PCDOCS\LA1\378914\6
PARTNERSHIP AGREEMENT

A0146

Contributions paid by the Limited Partner through the date of the distribution, with each such

Capital Contribution discounted from the date of payment to the Limited Partner Date using an

annual discount rate of 11.5%; and second, ninety-nine percent (99%) to the Limited Partner and

one percent (1%) to the General Partner; and (2) if such sales event occurs after the termination

of the credit period and no General Partner Default has occurred, then Cash From Sales shall be

distributed ninety-nine percent (99%) to the General Partner and one percent (1%) to the Limited

Partner.

If and to the extent the General Partner is entitled to a distribution of Cash From

Sales or Cash From Refinancing under this Section 6.3(b) but the General Partner then owes (or

as a result of the sale or refinancing will owe) the Limited Partner or the Partnership amounts

under the Indemnification Agreement to which it is a party and/or amounts due because of the

Limited Partner's payment of any Partnership Expenses, the amounts otherwise distributable to

the General Partner under this Section 6.3(b) shall be treated as distributed to the General

Partner, but paid to the Limited Partner first to reduce the General Partner's liability under the

Indemnification Agreement to which it is a party, then to reimburse the Limited Partner for the

payment of any Partnership Expenses, and thereafter to pay any Partnership obligations then

owing and not included in the computation of Partnership Expenses.

6.4.    Effect of Distribution.

Notwithstanding anything to the contrary contained in this Article 6, the

Partnership shall not make a Distribution if, immediately after the Distribution, Partnership

liabilities (other than liabilities to Partners on account of their interests in the Partnership and

liabilities as to which the creditors' recourse is limited to Partnership property) would exceed the

fair market value of Partnership property; provided, however, that the fair market value of any

29

Partnership property that is subject to a liability as to which the creditors' recourse is limited to that Partnership property shall be included only to the extent that the fair market value of the Partnership property exceeds the liability. Any Partner who receives a Distribution made in violation of this Section 6 shall promptly return the Distribution to the Partnership.

6.5.   Form of Distribution.

No Partner shall have any right to receive any Partnership property other than cash upon a Distribution, except as specifically provided in this Agreement. A Partner shall not be compelled to accept a Distribution of Partnership property other than cash in lieu of a proportionate Distribution of cash being made to other Partners.

6.6.   Partnership Adjustment.

Any increase or decrease in the amount of any items of income, gain, loss, deduction or credit attributable to an adjustment to the basis of Partnership assets made pursuant to a valid election under Sections 743 and/or 754 of the Code, and pursuant to corresponding provisions of applicable state and local income tax laws, shall be charged or credited, as the case may be, and any increase or decrease in the amount of any item of credit or tax preference attributable to any such adjustment shall be allocated, to those Partners entitled thereto under such law.

6.7.   Allocation to Transferred Interest.

Profits, gains, losses, deductions and credits allocated to an interest in the Partnership assigned or reissued during a fiscal year of the Partnership shall be allocated to the Person who was the holder of such interest during such fiscal year based on the closing of the books method set forth in the Treasury Regulations under Section 706 of the Code, using the date a partner is admitted to the Partnership. For purposes of this Section 6.8, a partner admitted

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0148

to the Partnership on or before the 15th of the month shall be deemed admitted as of the first day of that month and a partner admitted to the Partnership on or after the 16th of the month shall be deemed admitted to the Partnership on the 16th day of that month.

6.8.   Allocations of Distributions.

Distributions of Distributable Cash, Cash From Sales and Cash From Refinancing shall be made to the Partner of record on the date of the Distribution without regard to the length of time the record holder has been such and without regard to the period to which the Distribution relates.

6.9.   Sharing of Excess Nonrecourse Liabilities.

To determine the Partners' share of the excess Nonrecourse Liabilities of the Partnership for purposes of Treasury Regulations Section 1.752-3(a), the Partners' interests in Profits as determined pursuant to Treasury Regulations Section 1.752-3(a)(3) shall be one percent (1%) for the General Partner and ninety-nine percent (99%) for the Limited Partner.

6.10.   Federal and State Income Tax Allocations.

(a)   In accordance with Code Section 704(c) and the Treasury Regulations thereunder, income gain, loss, and deduction with respect to any property contributed to the capital of the Partnership shall, solely for tax purposes, be allocated among the Partners so as to take account of any variation between the adjusted basis of such property to the Partnership for federal income tax purposes and its initial fair market value as initially reflected in the Capital Accounts.

(b)   In the event the book value of any Partnership asset as reflected in the capital accounts is adjusted pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(f), subsequent allocations of income, gain, loss, and deduction with respect to such asset shall take

31

account of any variation between the adjusted basis of such asset for federal income tax purposes and its book value as so adjusted in the same manner as under Code Section 704(c) and Treasury Regulations thereunder.

(c)     Any elections or other decisions relating to such allocations shall be made by the Limited Partner in any manner that reasonably reflects the purpose and intention of this Agreement; provided, that the Partnership shall elect to utilize the "remedial method" set forth in Treasury Regulation Section 1.704-3(d). Allocations pursuant to this Section 6.10 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Partner's Capital Account or share of Profits, Losses, or other items, or distributions pursuant to any provision of this Agreement.

6.11.  Certain Definitions.

For purposes of this Section 6, the following terms shall have the following definitions:

(a)     Adjusted Capital Account Deficit. The deficit balance, if any, in such Partner's Capital Account at the end of any Fiscal Year, with the following adjustments: (i) credit to such Capital Account any amount that such Partner is obligated to restore under Treasury Regulations Section 1.704-1(b)(2)(ii)(c), as well as any addition thereto pursuant to the next to last sentences of Treasury Regulations Sections 1.704-2(g)(1) and (i)(5) after taking into account thereunder any changes during such year in Partnership Minimum Gain and in Partner Nonrecourse Debt Minimum Gain; and (ii) debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(2)(ii)(d)(4) through (6). The foregoing definition of Adjusted Capital Account Deficit is intended to comply with the provisions of Treasury Regulations Section 1.704-1(b)(2)(ii)(d) and shall be interpreted consistently therewith.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0150

(b)   <u>Allocable Share of Minimum Gain</u>.  At any point in time, with respect to each Partner, the sum of (i) such Partner's share of Partnership Minimum Gain (determined in accordance with Treasury Regulations Section 1.704-2(g)(1)), and (ii) such Partner's share of Partner Nonrecourse Debt Minimum Gain  (determined in accordance with Treasury Regulations Section 1.704-2(i)(5)).

(c)   <u>Economic Risk of Loss</u>.  The determination of whether a Partner bears the economic risk of loss with respect to any Partnership liability shall be made in accordance with Treasury Regulations Sections 1.704-2(b)(4) and 1.752-2 (without regard to whether those Sections apply to such liability).

(d)   <u>Partnership Minimum Gain</u>.  With respect to each Nonrecourse Debt of the Partnership, the amount of gain (of whatever character) that would be realized by the Partnership if it disposed of each piece of the Partnership property subject to each such liability in a taxable transaction in full satisfaction of each such liability (and for no other consideration), and by then aggregating the amounts so computed.  It is further understood that Partnership Minimum Gain shall be determined in a manner consistent with the rules of Treasury Regulations Section 1.704-2(d)(1) including, without limitation, the requirement that if the book value of property subject to one or more Nonrecourse Debt differs from its adjusted tax basis, Partnership Minimum Gain shall be determined with reference to such book value.

(e)   <u>Nonrecourse Debt</u>.  Any Partnership liability that is considered to be nonrecourse under Treasury Regulations Sections 1.704-2(b)(3) and 1.752-1(a)(2).  Subject to the preceding sentence, "Nonrecourse Debt" means liabilities of the Partnership (or portion thereof) for which no Partner or no person having a relationship to a Partner described in Treasury Regulations Section 1.752-4(b) bears the Economic Risk of Loss.

<div align="center">33</div>

(f)   Profits and Losses.  An amount equal to the Partnership's taxable income or loss for each taxable year or period shall be determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, deduction or loss required to be separately stated pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), except that taxable income shall be adjusted to (i) include income exempt from federal taxation and not otherwise included in Profits and Losses; (ii) treat as a deduction expenditures described in Code Section 705(a)(2)(B) or treated as Section 705(a)(2)(B) expenditures pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(i) and not otherwise included in Profits and Losses; and (iii) exclude Partnership income, gain, deduction and loss which are specifically allocated under Sections 6.1(b) through (k) and Section 6.2.  If the Partnership's taxable income or loss as so adjusted is a positive amount, such amount shall be the Partnership's Profit for such taxable year or period; if negative, such amount shall be the Partnership's Loss for such taxable year or period.  It is further provided that if the book value (i.e., the value at which property is reflected on the books of the Partnership in accordance with the provisions of Treasury Regulations Sections 1.704-1(b) and 1.704-2) of property differs from its adjusted tax basis (due to the revaluations of Partnership property), depreciation and gain or loss on such property, for purposes of computing Profit or Loss, shall be computed with reference to the book value of such property, but otherwise in accordance with the method used and based on the useful lives or recovery periods for such property used for federal income tax purposes.

(g)   Partner Nonrecourse Debt.  Any Nonrecourse Debt of the Partnership for which any Partner (or a party related to such Partner) bears the Economic Risk of Loss determined in accordance with Treasury Regulations Section 1.704-2(b)(4).

January 4, 1999
::ODMA\PCDOCS\LA\13789\16
PARTNERSHIP AGREEMENT

A0152

(h)    Partner Nonrecourse Debt Minimum Gain.  An amount of gain characterized as "partner nonrecourse debt minimum gain" under Treasury Regulations Sections 1.704-2(i)(2) and 1.704-2(i)(3).  Subject to the preceding sentence, "Partner Nonrecourse Debt Minimum Gain" means an amount, with respect to each Partner Nonrecourse Debt, equal to the Partnership Minimum Gain that would result if such Partner Nonrecourse Debt were treated as a Nonrecourse Debt.

## ARTICLE 7:

## MANAGEMENT

7.1.    Control in General Partner.

Subject to the applicable rights of the Limited Partner specified elsewhere in this Agreement and the limitations on the General Partner's actions contained herein, the General Partner shall have exclusive control over the Partnership's business and shall have all of the rights, powers and authority generally conferred by law or necessary, or advisable, and consistent with, accomplishing the Partnership's purpose.  Without limiting the generality of the foregoing, the General Partner shall have the right, subject to the applicable rights of Limited Partner specified elsewhere in this Agreement and the limitations on the General Partner's actions contained herein:

(a)    To acquire, hold, sell, lease, exchange or convey real and personal property or any interest therein on the Partnership's behalf upon such terms as it deems advisable;

(b)    To borrow money on the Partnership's behalf, to mortgage or otherwise encumber Partnership property, upon such terms as it may deem necessary or advisable;

35

A0153

(c)      To prepay in whole or in part, refinance, increase, modify or extend any agreement, note, lease, mortgage, deed of trust or other obligation affecting Partnership property;

(d)      To delegate duties to and employ from time to time, at the Partnership's expense, any Persons necessary or advisable for the management and operation of the Partnership's business, including property managers, on-site personnel, insurance brokers, leasing agents, real estate consultants, accountants, attorneys, architects and engineers, on terms and for compensation as are reasonable and customary for similar services;

(e)      To pay all Partnership Expenses;

(f)      To negotiate, enter into and execute notes, deeds, deeds of trust, contracts, leases, assignments and other instruments and to take any other actions necessary or desirable on the Partnership's behalf in connection with any of the rights of the General Partner set forth in this Section 7.1; and

(g)      To take any other action incidental to any of the foregoing or consistent with the purposes of the Partnership.

7.2.   <u>Limitations on General Partner's Authority</u>.

The General Partner shall not have authority to and shall not:

(a)      Do any act or cause the Partnership to act, or allow any Affiliate to act in contravention of this Agreement;

(b)      Do any act or cause the Partnership to act, or allow any Affiliate to act in contravention of (i) the Tax Credit Documents, (ii) the Regulatory Agreements, (iii) the Mortgages and the loan documents related thereto, or (iv) any other agreement relating to the Project;

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0154

(c)     Possess Partnership property or assign rights in Partnership property, in either case, other than for the Partnership's purpose;

(d)     Borrow from the Partnership; or

(e)     Confess a judgment against the Partnership.

(f)     Take any act or cause the Partnership to take any act that would cause the Partnership to be considered other than a Partnership for federal income tax purposes.

7.3.   <u>No Liability; Indemnification of Partners.</u>

(a)     The General Partner will not be liable to the Partnership or any Limited Partner for any action or inaction of the General Partner in connection with the business or affairs of the Partnership, so long as the General Partner acted in good faith on behalf of the Partnership and in a manner reasonably believed by such person to be in the best interests of the Partnership, but only if the action or inaction does not constitute gross negligence, willful misconduct, a material breach of this Agreement or an illegal act.  The Partnership shall indemnify and hold harmless the General Partner against any claim, liability, damage, loss or expense (including, without limitation, investigating and defending any claims and lawsuits and settlement thereof, and legal and accounting costs in connection therewith) incurred by it solely by virtue of the performance by the General Partner of its duties as general partner in connection with the Partnership's business, so long as the General Partner acted in good faith on behalf of the Partnership and in the manner reasonably believed by the General Partner to be in the best interest of the Partnership, but only if the course of conduct does not constitute gross negligence, willful misconduct, a material breach of this Agreement or an illegal act; provided that such indemnification or agreement to hold harmless shall be recoverable only out of assets of the Partnership and not from the Limited Partner.  Notwithstanding the above, the Partnership shall

37

A0155

not be obligated to indemnify and defend the General Partner for claims relating to a material breach of this Agreement, an illegal act, the personal injury of employees of the General Partner occurring in the course of their employment or matters covered by insurance for which the General Partner actually receives insurance proceeds. The General Partner shall indemnify and defend the Partnership against and hold the Partnership harmless from any and all claims, liabilities, damages, losses and expenses (including, but not limited to, investigating and defending any claims and lawsuits and settlement thereof, and legal and accounting costs in connection therewith), which may be made or imposed upon the Partnership by reason of any gross negligence, willful misconduct, a material breach of this Agreement or illegal act by the General Partner or any action by the General Partner if the General Partner did not act in good faith and in a manner reasonably believed by the General Partner to be in the best interests of the Partnership.

(b)    The Partnership shall not incur the cost of the portion of any insurance, other than public liability insurance, which insures any party against any liability the indemnification of which is herein prohibited.

(c)    Advances from Partnership funds to the General Partner for legal expenses and other costs incurred as a result of a legal action or any dispute involving the Partnership may be made only if the following three conditions are satisfied even if the General Partner is named as a defendant in any lawsuit or dispute: (1) the legal action or dispute relates to the performance of duties or services by the General Partner on behalf of the Partnership, after the Limited Partner Date, for which indemnification is permitted under this Agreement; (2) the legal action or dispute does not involve any claim against the General Partner or any Affiliate thereof by the Partnership or a Partner; and (3) the General Partner covenants and agrees to repay any advanced

January 4, 1999
::ODMA\PCDOCS\LA\137894\6
PARTNERSHIP AGREEMENT

A0156

funds to the Partnership if the General Partner is ultimately determined that it is not entitled to indemnification. Nothing contained herein shall limit or impair any obligation of any insurance company to defend the General Partner for any claim covered by the Partnership's insurance. Without limiting the generality of the foregoing, the Partnership is not obligated to advance funds to pay or reimburse the General Partner for legal expenses and costs unless the above conditions are satisfied, even if the General Partner is named as a defendant in a lawsuit.

(d)     The Partnership shall indemnify, hold harmless and pay all expenses, costs or liabilities of Limited Partner incurred by reason of Limited Partner, for the benefit of the Partnership, paying any obligation or curing any default of the Partnership.

(e)     Nothing contained in this Section 7.3. shall be deemed to modify, limit or impair any of the rights and obligations of the Partnership, the General Partner, the Developer, or the Limited Partner, as applicable, under the Indemnification Agreement, Operating Deficit Guaranty Agreement, the Completion Guaranty Agreement and the Management Agreement.

7.4.    <u>Devotion of Skill and Time</u>.

The General Partner shall cause its officers and employees diligently to pursue and apply their general skills in operation of low income housing to the Partnership's business and devote as much time as is reasonably necessary to manage and operate the Partnership and its business in the best interests of the Partners. Provided the General Partner fulfills its obligations under this Agreement, officers and employees of the General Partner shall not be required to devote a major part of their time to Partnership affairs and may engage in other businesses, including businesses identical or similar to the Partnership's business.

7.5.    <u>Fees and Reimbursement of General Partner and Affiliates</u>.

(a)     <u>Base Management Fee</u>. As defined in Article 1 above.

January 4, 1999
::ODMA\PCDOCS\LA1\378941\6
PARTNERSHIP AGREEMENT

A0157

(b)     Incentive Management Fee. As defined in Article 1 above.

(c)     Development Fee. As compensation for the services of the Developer in connection with the development of the Project, the Partnership shall pay to the Developer a development fee, as set forth in the Development Services Agreement and the Developer Fee Note. On or before ten years from the date of this Agreement, the General Partner shall contribute to the Partnership sufficient funds to pay any outstanding balance of the Development Fee or Developer Fee Note.

(d)     Property Management Fee. The fee paid to the Manager for management of the Property pursuant to the Management Agreement.

(e)     Compliance Monitoring Fee. As defined in Article 1 above.

(f)     No Other Amounts to General Partner or Affiliates. The amounts set forth in this Section 7.5 represent all of the amounts due the General Partner and Affiliates, and except for amounts allowed under Section 7.8, no other amounts shall be due to the General Partner or Affiliates by the Partnership unless approved by the Limited Partner.

7.6.    Fiduciary Duty of General Partner.

The General Partner shall have a fiduciary responsibility to the Limited Partner for the safekeeping and use of all Partnership property, whether or not in its immediate possession or control, and shall not employ Partnership property in any manner except for the Partnership's exclusive benefit. The General Partner shall not contract away its fiduciary duties under the common law of agency.

7.7.    Investment Opportunities.

The General Partner shall not be obligated to present any investment opportunity to the Partnership, even if the opportunity is of a character that could be taken by the Partnership

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0158

if presented to it. Subject to the limitations in <u>Section 7.14(k)</u>, the General Partner shall have the right to take for its own account, or to recommend to others, any investment opportunity presented to it.

    7.8.   <u>General Partner or Affiliates Dealing With the Partnership</u>.

In addition to those contracts set forth in Section 7.5, the General Partner and any of its Affiliates shall have the right to contract or otherwise deal with the Partnership for the sale of goods or services to the Partnership if (i) compensation paid or promised for the goods and services is reasonable (i.e., at fair market value), is paid only for goods and services actually furnished to the Partnership, and does not exceed a total of Fifty Thousand Dollars ($50,000), increasing annually by the CPI Increase, for all such contracts in any one calendar year, (ii) the goods or services to be furnished are reasonable for and necessary to the Partnership, (iii) the fees, terms and conditions of the transactions are at least as favorable to the Partnership as would be obtainable in an arm's-length transaction, (iv) no agent or contractor who is also employed on a full-time basis by the General Partner or any Affiliate shall be compensated by the Partnership for its services, and (v) any necessary lender or governmental consent is obtained. Except as permitted by Section 7.5 or this Section 7.8, neither the General Partner nor any Affiliate shall enter into any contract or agreement with the Partnership without the Limited Partner's consent.

Any contract between the Partnership and the General Partner or its Affiliate shall be in writing and shall contain a clause allowing termination by the Partnership without penalty on thirty (30) days notice. Any payment made to the General Partner or any Affiliate for the goods and services shall be fully disclosed to the Limited Partner in the reports required under Section 9. Neither the General Partner nor its Affiliates shall circumvent the provisions of this

<div align="center">41</div>

Section 7.8 by making payments to any other Person for disbursement by that other Person to the General Partner or its Affiliate.

7.9.    Tax Matters Partner.

The General Partner shall be the tax matters partner ("TMP") as provided in Section 6231(a)(7) of the Code, subject to the following terms and conditions:

(a)    Subject to the approval of the Limited Partner as provided in Section 9.5 below, the TMP shall file all necessary federal, state and local partnership returns for the Partnership in a timely manner and furnish the Limited Partner with schedules consistent with the treatment of all items on those returns.

(b)    The TMP shall keep the Limited Partner informed of, and shall consult in good faith with the Limited Partner concerning any audit, administrative or judicial proceedings for the adjustment of Partnership items.

(c)    If notice of an administrative proceeding under Section 6223 of the Code is received by the Limited Partner, the Limited Partner promptly shall notify the TMP of the treatment of any Partnership item on the Limited Partner's federal income tax return which is or may be inconsistent with the treatment of that item on the Partnership return.

(d)    Any Partner who enters into a settlement agreement with the Internal Revenue Service with respect to any Partnership item shall notify the TMP of the terms of the agreement within sixty (60) days from its date, and the TMP shall notify the other Partners of that settlement within thirty (30) days of receipt of notification by the Partner entering into the settlement.

(e)    Subject to the request and approval of the Limited Partner, the TMP shall initiate judicial proceedings challenging the tax treatment of any Partnership item within ninety

January 4, 1999
::ODMA\PCDOCS\LA1\378946
PARTNERSHIP AGREEMENT

A0160

(90) days from the date of issuance of a statutory notice of deficiency or thirty (30) days from denial of an administrative adjustment.

(f)    The TMP, on its own or at the request of the Limited Partner, shall file a request for administrative adjustment on behalf of the Partnership if the Limited Partner agrees to the requested adjustment.

(g)    The TMP shall not extend the period of limitations for making assessments of any tax with respect to any Partnership item or enter into any settlement agreement without the approval of the Limited Partner.

(h)    The TMP shall not take any actions in connection with the resolution of any issue for income, franchise or property tax purposes relating to the Partnership without the approval of the Limited Partner.

(i)    The Limited Partner may be represented by legal counsel at the Limited Partner's expense in connection with any contest of the treatment of any Partnership item.

7.10.    General Partner's Obligation to Operate the Project In Accordance with All Requirements.

(a)    The General Partner shall operate the Project or cause the Project to be operated in accordance with the terms of this Agreement and (i) the Mortgages, and any documents related thereto, (ii) all applicable statutes, rules and regulations with respect to the Project, and (iii) any other agreement relating to the Project, including without limitation the Tax Credit Documents and the Regulatory Agreements.

(b)    In addition to the requirements of paragraph (a) above, the General Partner shall operate or cause to be operated all residential units of the Project in accordance with the requirements of (i) the Low Income Housing Credits for a term of not less than the 15-year

43

compliance period as defined in Section 42 of the Code and otherwise so as to qualify for, and avoid any recapture of, the Low Income Housing Credits and (ii) the Regulatory Agreements for the applicable compliance periods.

(c)     The General Partner hereby authorizes the Limited Partner, upon five (5) business days notice, to meet with and obtain information from any lender if the Limited Partner reasonably believes the Partnership has defaulted or may default upon any loan to the Partnership or the Partnership has received a notice of default with respect to the loan to the Partnership. Provided the Limited Partner has not received satisfactory evidence that the General Partner will promptly cure such default or the General Partner is in good faith disputing the basis of such default, all costs and expenses, including, without limitation, reasonable attorneys' fees, incurred by the Limited Partner in connection with investigating and remedying such defaults or potential defaults shall be paid by the General Partner upon demand and, except for expenses that if paid by the Partnership would have been Partnership Expenses, shall not be deducted in calculating Operating Deficits.

7.11.   Reports to Lenders and Government Agencies.

The General Partner shall furnish or cause to be furnished the information regarding the Project (a) requested or required from time to time by those agencies that provide financing to the Partnership under the Mortgages, and (b) required with respect to the Low Income Housing Credits, including without limitation the Regulatory Agreements. The General Partner shall send to the Limited Partner, at the same time, copies of any such information provided to lenders and government agencies.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0162

7.12.  Fund Balance of the General Partner.

The General Partner shall maintain throughout the term of the Partnership a fund balance of not less than 10% of total Capital Contributions, plus at least 10% of the total capital contributions of all other limited partnerships in which it is the sole corporate general partner, which fund balance shall be exclusive of its interests in this or other limited partnerships in which it is the sole corporate general partner as of the date of this Agreement.

7.13.  Establishing and Maintaining the Reserves.

On or before the date on which the Limited Partner is required to make the Completion Capital Contribution to the Partnership in accordance with the Funding Agreement, the Partnership shall establish and maintain a Replacement Reserve Fund which shall be used for capital expenditures for repairs and replacement necessary to maintain the Project in safe, decent and habitable condition.  The Partnership shall fund the Replacement Reserve Fund in the manner set forth in the Trust Indenture.  The General Partner shall give the Limited Partner prior written notice of any disbursement of proceeds in the Replacement Reserve Fund for expenditures which are (a) in excess of Twenty-Five Thousand Dollars ($25,000), and (b) not included in the approved annual budget for the applicable calendar year.

On or before the Final Funding Date, the Partnership shall establish (i) an Operating Reserve Fund which shall be initially capitalized and maintained as set forth in the Trust Indenture.

All such funds shall be deposited in the manner set forth in Article 4 of the Trust Indenture and shall be used and applied solely for the purposes set forth therein.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0163

7.14.   Representations and Warranties of the General Partner.

The General Partner represents, warrants and covenants to the Partnership and the

Limited Partner that:

(a)   the Project is in compliance with the Mortgages, the Regulatory

Agreements and all applicable requirements of governmental entities, including, without

limitations, all laws, rules, and regulations relating to the relocation of existing tenants;

(b)   all appropriate roadways and public utilities are available to the Project

and the General Partner will cause the Partnership to keep all public utilities necessary to the

operation of the Project operating in working condition;

(c)   the Property is properly zoned for the Project and the Project and its

contemplated use conform to all applicable federal, state and local zoning, use and

environmental laws and regulations affecting the Project;

(d)   good and marketable title to the Project is held by the Partnership subject

to the security interests of all Mortgagees and a new ALTA owner's title policy shall be issued on

or before Limited Partner's funding of its Initial Capital Contribution pursuant to the Funding

Agreement by Lawyers Title Company in the amount of approximately $11,901,272.00 ("Title

Policy"), which Title Policy shall include all reasonable and customary endorsements thereto,

including, without limitation, (i) a Partnership "Fairway" (or successor insured or policy

continuation) endorsement; (ii) a Partnership "non-imputation" endorsement; and (iii) a non-

encroachment endorsement;

(e)   there is no material default under any agreement, contract, lease, or other

commitment, nor is any claim, demand, litigation, proceeding or governmental investigation

46

A0164

pending or to the best knowledge of the General Partner threatened against or related to the business or assets of the Partnership, the General Partner, the Developer, or the Project;

(f)   the execution of this Agreement and the other documents executed in connection herewith, the incurrence of the obligations set forth in this Agreement and the other documents executed in connection herewith, and the consummation of the transactions contemplated by this Agreement and other documents executed in connection herewith do not violate any order or ruling of any court binding on the General Partner, the Developer or the Partnership or any provision of any indenture, agreement, or other instrument to which the Partnership, the General Partner or the Developer is a party or by which the Partnership, the Developer or the Project is affected;

(g)   all insurance policies which will be for the benefit of the Partnership including, but not limited to general liability and casualty, are in full force and effect, and all insurance policies in favor of the Partnership are in at least the amounts required by this Agreement, the Mortgages, and the Regulatory Agreements;

(h)   all rental charges and security deposits with respect to dwelling units in the Project are and will be in compliance with any applicable governmental regulations, with the Regulatory Agreements, and with Section 42 of the Code;

(i)   the Partnership is a limited partnership, duly organized and validly existing under the laws of the State of Delaware, in accordance with all requirements of the Act with full power and authority to operate and maintain the Project in accordance with the requirements of this Agreement;

(j)   except as disclosed in the Title Policy, there are not currently pending any special assessments of any nature with respect to the Project or any part thereof, nor has the

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

Partnership received any notice of any special assessments or public improvements which might result in such being contemplated. As of this date there are no federal, state or local tax liens encumbering the Partnership's interest in the Project other than the liens for taxes and assessments not yet due and payable;

        (k)     the sole General Partner of the Partnership is Wilmington Revitalization Corporation, Inc., a non-profit Delaware stock corporation.  The Developer and General Partner are each duly organized, validly existing and in good standing under the laws of the State of Delaware, and each has all requisite power and authority to conduct its present business and perform all of its obligations under this Agreement and the other documents executed in connection herewith; General Partner shall have no direct or indirect interest in any projects or developments other than the Project;

        (l)     all of (i) the fixtures, maintenance supplies, tools, equipment and the like now owned by the Partnership or to be appurtenant to, or to be used in the operation of the Project, as well as (ii) the rents, revenues and profits earned from the operation of the Project, are free and clear of all security interests and encumbrances except for the Mortgages, the Regulatory Agreements and any security agreements under them;

        (m)     all materials, documents and information furnished to the Limited Partner are true and complete in all material respects and no material fact or document has not been furnished to the Limited Partner;

        (n)     it has disclosed to the Limited Partner all material facts related to the Project and the use and operation thereof and all material transactions in connection with the Project;

<div align="center">48</div>

A0166

(o)     it has set-aside two hundred (200) residential units for low income households with incomes and at rents as specified in the Regulatory Agreements and Section 42 of the Code, if lower, so that the applicable fraction, as defined in Section 42, is one (1);

(p)     it will operate and maintain or cause to be operated and maintained, the Project in accordance with the requirements of Section 42 of the Code, and it will take no action with respect to the business and property of the Partnership which is not reasonably related to the achievement of the purpose of the Partnership;

(q)     the Project has received the requested (i) an allocation of tax-exempt bonds from City of Wilmington in an amount of $8,725,000 and (ii) a reservation of federal Low Income Housing Credits from the Delaware State Housing Authority in an amount not less than $368,784 annually for federal credits under Section 42 of the Code;

(r)     there are no mechanic's liens recorded against the Project;

(s)     except as provided on Schedule B attached hereto, other than contracts incurred in the ordinary course of business which individually do not require payment in any calendar year in excess of $50,000 and which in the aggregate do not require payments in any calendar year in excess of $50,000, the Partnership has no material outstanding obligations, including, but not limited to, General Partner loans, except for (i) the Bonds in the amount of Eight Million Seven Hundred Twenty Five Thousand Dollars ($8,725,000) (ii) the fees due pursuant to Section 7.5 and 9.7; and (iii) the Management Agreement;

(t)     neither the entry into nor the performance of, nor compliance with, this Agreement, or other documents executed in connection herewith has resulted or will result in any violation of, or conflict with, or invalidate, cancel or make inoperative, or interfere with, or result in the creation of any lien, encumbrance or any other charge upon the Project pursuant to, or

January 4, 1999
::ODMA\PCDOCS\LA1\378941\6
PARTNERSHIP AGREEMENT

A0167

constitute a default under, any charter, bylaw, partnership agreement, trust agreement, mortgage, deed of trust, indenture, contract, credit agreement, franchise, permit, judgment, decree, order, easement, restriction or other charge, right or interest applicable to the Partnership, to the General Partner, the Developer, or the Project;

(u)     except with respect to the Bonds, neither the Partnership nor any Person related to a Partner within the meaning of Treasury Regulations Section 1.752-4(b) has or will have any direct or indirect personal liability as maker, guarantor, partner or otherwise with respect to the payment of debt service on any loans of which the Partnership is the obligor, or has or will have provided collateral securing the payment of such loans, and in the event of default thereon, the sole recourse of all lenders under the Mortgages shall be to the Project and pledged collateral;

(v)     the General Partner will use its best efforts and will cause its Affiliates that are engaged by it or the Partnership in connection with the Project to use their best efforts to realize the results anticipated by the Economic Projections and shall not make or fail to make any elections for tax purposes without the written consent of the Limited Partner which effect would be to reduce the tax benefits to the Limited Partner;

(w)     the initial limited partner has withdrawn from the Partnership and as a partner has no further interest in, or claim against, the Partnership;

(x)     the Partnership has no employees and shall have none;

(y)     there is no action, proceeding or investigation, pending or, to the General Partner's best knowledge, threatened (or any basis therefor), which questions, directly or indirectly, the validity or enforceability of this Agreement or any of the other documents executed in connection herewith, the Title Policy or any permit, approval, or environmental

January 4, 1999
::ODMA\PCDOCS\LA\13789416
PARTNERSHIP AGREEMENT

A0168

impact statement, and/or negative declaration, or any action taken pursuant hereto or thereto that individually, or in the aggregate, might adversely affect the Project or use or operation thereof or the Partnership or that might result in any material adverse change in the condition or business of the Partnership, and, to the best of the General Partner's knowledge, there is no default by any party under the above documents;

(z)     the Partnership has received no notice of any pending condemnation proceedings, and to the best knowledge of the General Partner no condemnation is contemplated, with regard to all or any part of the Project;

(aa)     the Project is structurally sound and complies with, and conforms to, all applicable subdivision, zoning, building, use, environmental, and other laws, ordinances, codes, rules, regulations and requirements for all federal, state, municipal and other governmental entities and any applicable private requirements, and in conformance with all permits, approvals and other requirements of all such entities applicable to the Project; and there is no violation of any restriction, condition, covenant or agreement concerning the Project or the use thereof contained in any instrument of record or any municipal or other governmental permit, rule, or regulation applicable to the Project;

(bb)     to the best of the General Partner's knowledge, the Partnership has obtained all permits required for the use or occupancy of the Project and each such permit is in full force and effect and there are no conditions or facts which could cause the termination of the right to use such permit;

(cc)     it has no actual knowledge of any title defect, lien, encumbrance, adverse claim, or other matter relating to title or title insurance coverage (other than inchoate mechanic's

January 4, 1999
::ODMA\PCDOCS\LA1\378941\6
PARTNERSHIP AGREEMENT

liens relating to construction of the Project) that has not been disclosed in writing to the title company or is not shown by the public records;

(dd)     there has been no material casualty or other damage to the Project or any portion thereof.  The General Partner does not know of the existence of any threatened or contemplated actions, claims or proceedings or of the existence of any facts which might give rise to any such actions, claims or proceeding that will not be fully covered except for regular deductibles by the Partnership's insurance coverage;

(ee)     it will timely complete IRS Form 8609 and submit a copy of it with its federal income tax return to the Internal Revenue Service for each year for the first 15 years that the Partnership operates the Project.  The General Partner on behalf of the Partnership will claim the Low Income Housing Credits and provide the information required as set forth in Section 42(1) of the Code and Temporary Treas. Reg. 1.42-1T(h);

(ff)     it and the Developer will report fees earned from the Partnership in accordance with the accrual method of accounting;

(gg)     it will use its best efforts to ensure that each and every covenant, representation and warranty in this Agreement shall continue to be true and correct throughout the term of the Partnership;

(hh)     the Partnership's sole purpose will be to operate the Project pursuant to Section 2.3 above;

(ii)     all of the tenant amenities are comparable for all of the units;

(jj)     except for the Bonds, none of the Project costs has been paid for, directly or indirectly, from a grant of federal funds pursuant to Section 42(d)(5)(A) or with the proceeds of a "below market federal loan" as defined in Section 42(i)(2)(D) of the Code;

January 4, 1999
::ODMA\PCDOCS\LA1\378946
PARTNERSHIP AGREEMENT

A0170

(kk)    except as provided in the rehabilitation budget approved by the Limited

Partner, there are no outstanding contracts made by the Partnership or the General Partner, nor

any other labor or materials supplied, for any improvements to the Project which have not been

fully paid for, except for those items incurred in the ordinary course of business which are not

yet due and payable and have been disclosed to the Limited Partner, and for which there are

readily available funds and except for punch list construction items;

(ll)    at least fifty percent (50%) of the costs relating to rehabilitation of the

Project will be financed through tax-exempt bonds;

(mm)   it will operate the Project in accordance with (i) the Regulatory

Agreements, (ii) Section 42 of the Code; income and rents in all cases shall be adjusted by

household size, and (iii) any and all laws, regulations and rules applicable to the Project, such

that 100 percent of the units will qualify for Low Income Housing Credits;

(nn)    this offering and sale of limited partnership interests in the Partnership

will not be considered integrated with other offerings and sales of securities made by the General

Partner under applicable federal and state securities laws;

(oo)    no offer or solicitation of offer in the form of a general solicitation or

advertisement has been made with regard to the offer of limited partnership interests in the

Partnership;

(pp)    the Form of Tax Credit Regulatory Agreement attached hereto as Exhibit

E shall be the form that shall be timely recorded against the Project by the Delaware State

Housing Authority;

(qq)    without limiting the generality of any other statement in this Section 7.14,

all apartment units in the Project will be constructed and available for use by the general public,

January 4, 1999
::ODMA\PCDOCS\LA1\378941\6
PARTNERSHIP AGREEMENT

A0171

will be suitable for occupancy and will be used other than on a transient basis; all apartment units in the Project will be of approximately the same quality standard within the meaning of Section 42(d)(3) of the Code; all of the amenities of the Project will be available to all of the apartment units in the Project, without separate charge; there will not be any medical, nursing, psychiatric, food or other additional significant services other than those services provided by the Partnership to the tenants of the apartment units in the Project pursuant to the Regulatory Agreements or other agreements shown or disclosed to the Limited Partner; none of the apartment units in the Project will be leased to students other than students permitted to be tenants without disqualifying their units as low-income units under Section 42 of the Code; and all tenants occupying apartment units in the Project will comply with the income limitations and other restrictions necessary to cause such units to comply with the tenant occupancy and rent restriction requirements of Section 42 of the Code and the Regulatory Agreements;

(rr)   to the extent the Partnership owns personal property, such personal property is incidental to making apartment units available as living accommodations;

(ss)   all costs incurred in connection with the development and rehabilitation of the Project will be includible in eligible basis pursuant to Section 42(d)(1) and 42(d)(4) of the Code. The eligible basis of the Project will not include any costs incurred in connection with nonresidential rental property or in connection with any residential unit which is not a low-income unit and which is above the average quality standard of low-income units in the Property; and

(tt)   no event has occurred that has caused, and the General Partner will not take any action that would cause, the Partnership to not be classified as a partnership for federal income tax purposes.

54

7.15.   <u>Section 754 Election.</u>

The General Partner shall make an election under Section 754 of the Code only upon the request of a transferor or transferee Limited Partner and the transferee Limited Partner shall bear any reasonable costs related to such election.

7.16.   <u>Notice of Litigation.</u>

Immediately upon receiving notice thereof, the General Partner shall give, or cause to be given, written notice to the Limited Partner of (a) any action or proceeding instituted by or against the General Partner, the Developer, or the Project in any court or before any commission or regulatory body, federal, state or local, foreign or domestic, or (b) any such proceeding that is threatened against the Partnership, the General Partner, the Developer, or the Project, which, for either (a) or (b), if adversely determined, could have a material adverse effect upon the business, operations, properties, assets, management, nature of ownership or condition (financial or otherwise) of such party or the Project, or (c) any event or condition, whether or not notice thereof has been delivered to the Partnership or General Partner by a third party, which constitutes a default or breach by the Partnership, General Partner, or any Affiliate under any Mortgage, Regulatory Agreements or any other agreement binding upon the Partnership or such parties relating to the Project or (d) the commencement of any case or proceeding (whether voluntary or involuntary) under any applicable bankruptcy, insolvency or similar law now or hereafter in effect by or against the Partnership, the General Partner or any Affiliate thereof or the commencement of any other case or proceeding (whether voluntary or involuntary) which seeks a receiver, liquidator, sequestrator, trustee, custodian or other officer having powers over any of such entities or over all or a substantial part of their property, an assignment for the benefit of creditors by any of said entities, or the declaration of an inability to pay its debts when

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0173

they become due (or words of similar import) by any of said entities, or (e) any other event that constitutes a default under Section 8.3(a). With respect to those matters set forth in clauses (a) through (d), regardless of whether the Limited Partner receives notice thereof from the General Partner, the Limited Partner shall have the right, but not the obligation, upon five (5) business days notice and provided the Limited Partner has not received satisfactory evidence that the General Partner will promptly cure such default or breach or the General Partner is in good faith disputing the basis of such default or breach, to investigate and take such action as it deems appropriate in light of such matters, and all costs and expenses incurred by the Limited Partner, including, without limitation, reasonable attorneys' fees, in connection therewith shall be paid by the General Partner upon demand and, except for expenses that if paid by the Partnership would have been Partnership Expenses, shall not be deducted in calculating Operating Deficits.

7.17. <u>Obligation to Repair or Rebuild</u>.

Notwithstanding anything to the contrary contained in this Agreement, in the event of any damage to the Project from a casualty required to be covered by insurance hereunder, the General Partner shall repair or rebuild the Project regardless of the amount of insurance proceeds, unless the Limited Partner consents not to repair or rebuild; provided, however, in addition to insurance proceeds, the General Partner may apply toward the cost of repairing or rebuilding, with the consent of lenders and the Limited Partner, which Limited Partner's consent shall not be unreasonably withheld, Partnership funds, including Reserves, to the extent not required for foreseeable operating or repair or replacement costs for the Project.

January 4, 1999
::ODMA\PCDOCS\LA1\378946
PARTNERSHIP AGREEMENT

A0174

ARTICLE 8:

APPROVAL RIGHTS OF THE LIMITED PARTNER

8.1.   Approval.

The Limited Partner shall not participate in the control of the Partnership's

business. The Limited Partner shall not have the right to vote on any matters except as

specifically provided in this Agreement.

(a)      Except as provided in Section 8.2, the Limited Partner shall have the right

to approve or disapprove the following matters:

(1) The dissolution and winding up of the Partnership as provided in Section 4.

(2) The sale (other than a sale under the Option Agreement), lease (except in the

ordinary course of business and in compliance with all of the requirements hereunder), exchange,

mortgage, pledge or other transfer of all of the Project or any part thereof or interest therein.

(3) The incurring of indebtedness other than (A) normal trade debt incurred in the

ordinary course of business and (B) the loans described in Section 5.7; provided, however,

indebtedness shall not be deemed "in the ordinary course of business" if incurred pursuant to a

contract with an Affiliate or if in excess of Fifty Thousand Dollars ($50,000) annually.

(4) The issuance of letters of credit on account of or in favor of the Partnership, or

the selection of any escrow agent.

(5) The refinancing or prepayment of any of the Mortgages.

(6) A material change in the nature of the Partnership's business or any act that

would make it impossible to carry on the Partnership's ordinary business.

(7) The material modification or amendment of (i) the Mortgages and the loan

documents related thereto, (ii) the Management Agreement, (iii) any Tax Credit Documents, (iv)

<div align="center">57</div>

the Regulatory Agreements, (v) the Indemnification Agreement, (vi) the Completion Guaranty, (vii) the Operating Deficit Guaranty, (viii) the Partnership Administration and Guaranty Agreement, (ix) the Development Services Agreement, (x) the Compliance Monitoring Agreement or (xi) any other notes or material contracts relating to the Project.

(8) The filing of any voluntary petition for the Partnership under the federal Bankruptcy Act, the making of an assignment for the benefit of creditors, the seeking of a receiver or the protection of any other federal or state bankruptcy or insolvency law or debtor relief statute, or the declaration of the Partnership's inability to pay its debts when they become due (or words of similar import).

(9) The admission of any additional limited partners.

(10)   Selection of an accountant and legal counsel for the Partnership. The Limited Partner has approved the selection of Heller, Blosky & Dabagian, P.C., as Accountants, and Dermot F. Kennedy, Esq. as counsel for the Partnership. The contract with the Accountants shall not be for a term of greater than one year, and any extension thereof shall require the Limited Partner's approval which shall not be unreasonably withheld.

(11)   Selection of a property manager for the Project or removal of a property manager other than pursuant to the terms of the Management Agreement, and any management agreement with any replacement property manager. The Limited Partner has approved the Wilmington Housing Authority as Manager of the Project.

(12)   Selection of an appraiser if the option under the Option Agreement is exercised.

(13)   A loan of Partnership funds.

January 4, 1999
::ODMA\PCDOCS\LA1\378946
PARTNERSHIP AGREEMENT

A0176

(14)   Any amendment to this Agreement or any other document executed in connection herewith.

(15)   Any act in contravention of this Agreement or which makes it impossible to carry out the purposes of the Partnership as set forth in Section 2.3.

(16)   The form of commercial lease and any amendment to the standard form of lease used in the leasing of the residences in the Project.

(17)   Execution of any lease that does not comply with the requirements and regulations governing the Low Income Housing Credits or the Regulatory Agreements.

(18)   Construction of any new improvements on the Property in excess of $200,000 in any five (5) year period beginning with the date of this Agreement.

(19)   Selection or change of depreciation and accounting methods and making other decisions with respect to treatment of the transaction for state or federal income tax purposes (including, without limitation, the election of the tax year in which the Partnership shall begin to take the Low Income Housing Credits) or other financial purposes not otherwise specifically provided for in this Agreement.

(20)   The material change of any portion of the insurance program or any change in the insurer as provided in Exhibit C, provided that the General Partner shall be authorized to increase the limits and the coverage in a manner that is customary for housing developments similar to the Project.

(21)   The institution of any legal action involving a claim in excess of $25,000 or which, when added to all other claims, exceeds $50,000, settlement of a legal action for an amount in excess of $25,000 or which when added to all other settlements, exceeds $50,000.

January 4, 1999
::ODMA\PCDOCS\LA1\378941\6
PARTNERSHIP AGREEMENT

A0177

(22)     Making or revoking any election permitted the Partnership by any taxing authority.

(23)     Extending credit, making loans or becoming a surety, guarantor, endorser or accommodation endorser except in connection with negotiating checks or other instruments received by the Partnership.

(24)     Settlement of an insurance claim or condemnation action involving a claim in excess of $50,000 or which, when added to all other insurance or condemnation claims, exceeds $100,000.

(25)     A decision not to repair or rebuild in case of material damage to the Project, or any part thereof, arising out of a casualty or condemnation, subject to the terms of existing Mortgages, leases and other agreements previously approved by the Partners.

(26)     Altering the primary purpose of the Partnership as set forth in Section 2.3 above.

(27)     The acquisition of any land or other real property or interest therein other than the Project.

(28)     The use of any Partnership property for other than a purpose of the Partnership as set forth in Section 2.3.

(29)     Possession of Partnership property or the assignment of rights in Partnership property, in either case, other than for the Partnership's purpose.

(30)     An increase in the amount of the Reserves beyond the amount required in Section 7.13, except as required under a Mortgage.

60

A0178

(31)     A modification of any agreement between the Partnership and the General Partner or an Affiliate of the General Partner, except to the extent such agreement, as modified, would not require the consent of the Limited Partner pursuant to Section 7.8(a).

(32)     The annual budget prepared by the Manager for the Project.

(33)     Any change order to the rehabilitation plans relating to the Project.

(34)     Any change in the construction budget or the construction schedule relating to the Project.

(35)     With regard to the commercial space at the Project, the rehabilitation plans and specifications, any architectural or construction contract, all certificates, approvals, permits and licenses appropriate to commence the rehabilitation of the commercial space, the method and source of financing the rehabilitation, any financing documents, and any amendments or modifications thereto.

(36)     Any other action that requires the approval of the Limited Partner under this Agreement.

The General Partner shall not do any act or cause or permit any act to be done which requires the Limited Partner's approval pursuant to this Section 8.1(a) without having obtained the Limited Partner's written approval.

(b)     The Limited Partner shall have the right to remove the General Partner, in accordance with the requirements of Section 8.3.

(c)     The Limited Partner shall have the right to:

(1) Elect to continue the Partnership's business and admit a new General Partner after the removal of a sole General Partner.

61

A0179

(2) Admit a General Partner or elect to continue the Partnership's business after a General Partner ceases to be a General Partner (other than by removal) where there is no remaining or surviving General Partner.

8.2.    Consent of General Partner; Effect of Approval.

Any action specified in Section 8.1(a) that the Limited Partner has approved shall be taken by the General Partner only if the General Partner consents thereto.  Upon the approval of any Partnership matter as provided in this Section 8.2, the General Partner shall be authorized and directed to conclude any transactions so approved, and all Partners, including Partners who may have been opposed to the transaction, shall be bound by the terms of any such transaction.

8.3.    Removal of the General Partner.

(a)    The Limited Partner may remove the General Partner for the following defaults ("General Partner Default"):

(1) subject to Section 8.3(b), any breach of any of the General Partner's material obligations under this Agreement (other than Section 5.6), applicable law, or any other material agreement (other than the Indemnification Agreement to which it is a party) that could cause a material detriment (financial, reputational or otherwise) to the Limited Partner, the Partnership or the Project, including, without limitation, a material breach of any representation, warranty or covenant contained in the Funding Agreement or Section 7.14 of this Agreement;

(2) subject to Section 8.3(b), any default by the General Partner under Section 5.6, the Indemnification Agreement or the Completion Guaranty to which it is a party, or by the Developer under the Indemnification Agreement to which it is a party or the Operating Deficit Guaranty Agreement;

<div align="center">62</div>

A0180

(3) without derogating the terms of clause (1) above and subject to Section 8.3(b), any other act or failure to act by the General Partner that in the opinion of counsel for the Partnership could reasonably trigger recapture of more than five percent (5%) of the Low Income Housing Credits or loss of material financial benefits as projected under the Economic Projections. For purposes of this Section 8.3(a)(3), counsel for the Partnership that is rendering an opinion with respect to the recapture of the Low Income Housing Credits or loss of material financial benefits must be approved specifically for that purpose by the Limited Partner and by the General Partner. If the General Partner and the Limited Partner are unable jointly to select counsel for that purpose within five (5) working days after the Limited Partner's request therefor, either the Limited Partner or the General Partner may, upon written notice to the other, request that the appointment be made by the then President of the Wilmington, Delaware Chapter of the American Arbitration Association or his or her designee; or

(4) without derogating the terms of clause (1) above and subject to Section 8.3(b), any default by the General Partner or the Partnership under any Mortgage, Tax Credit Documents, or any other material agreement of the Partnership, irrespective of whether the other party thereto has given a notice of default, unless the other party has waived in writing the default.

(b) The General Partner shall have thirty (30) days from receipt of notice of default from the Limited Partner of a default described in Section 8.3(a) (other than a default described in clause (4)) to cure such a default if:

(1) such default is capable of being cured,

(2) the General Partner provides the Limited Partner reasonably adequate assurance of its ability to cure such default, and

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0181

(3) the General Partner promptly commences the cure and diligently proceeds to complete the cure within thirty (30) days.

At the request of the General Partner, the Limited Partner shall grant an additional thirty (30) days for General Partner to cure nonmonetary defaults provided the General Partner is diligently proceeding to cure such default and the Limited Partner determines that such additional time will not trigger recapture of any Low Income Housing Credits and shall not materially affect the use, occupancy or operation of the Project or the amount of financial benefits as projected under the Economic Projections. If the General Partner fails to cure such default within such thirty (30) or sixty (60) day period, as applicable, the Limited Partner may notify the General Partner of the proposed effective date of its removal. Notwithstanding anything to the contrary in this Section 8.3(b), regardless of whether the Limited Partner has notified the General Partner of a default described in Section 8.3(a), with respect to any breach of any agreement with a party other than the Limited Partner, the General Partner shall not have any right to notice from the Limited Partner or to a cure period to the extent the effect thereof would extend the General Partner's cure right beyond the date that is five (5) days prior to the expiration of the applicable cure period set forth in the agreement breached.

(c)     Upon the removal of the General Partner, the removed General Partner shall immediately cease to have any authority to act as a general partner for the Partnership. Any of the Partnership funds or other property in the possession of, or under the control of, such removed General Partner shall immediately be released and transferred to the successor General Partner. The removed General Partner shall cooperate in the orderly transition of affairs to the successor General Partner.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0182

(d)     In the event the General Partner is removed as general partner, it shall retain its Partnership interest in the capacity of a special limited partner of the Partnership with only those rights required to be given to a limited partner by law.  The removed General Partner's retention of its Partnership interest as a special limited partner shall be subject to the right of the Person elected as its successor General Partner to purchase the entire Partnership interest of the removed General Partner for the then present economic value of such Partnership interest (taking into account all rent and transfer restrictions affecting the Project).  Such purchase price shall be paid in cash at the closing of such purchase.

If the removed General Partner and its successor General Partner cannot agree on the present economic value of such Partnership interest, the question shall be resolved pursuant to Section 8.3(f)(1) below.  The successor General Partner shall waive its right to purchase the Partnership interest of the removed General Partner unless it shall, within sixty (60) days of becoming a successor General Partner, give to the removed General Partner notice of its intent to exercise such right.

(e)     If a General Partner is removed, the Partnership shall pay to it that portion of all the fees set forth in Section 7.5 of this Agreement or any other permitted agreement between the Partnership and the General Partner earned by such General Partner as of the effective date of its removal as a General Partner, less any amounts then owed by the General Partner or the Developer to the Partnership and/or the Limited Partner.  Such amount shall be paid to the removed General Partner no later than thirty (30) days after the effective date of removal.  Any contract between the Partnership and the removed General Partner (or an Affiliate of such removed General Partner) entered into pursuant to Section 7.8 shall be terminated as of the effective date of the removal.  Such termination shall not affect any liability, claim or

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0183

obligation which shall have accrued under such terminated contracts prior to the date of such termination, including but not limited to any liability for loss or damage on account of default. The removal of the General Partner under this Section 8.3 shall not release the Developer from its obligations under the Operating Deficit Guaranty Agreement or the Indemnification Agreement to which it is a party.

(f)     If a removed General Partner (the "Seller") and the successor General Partner (the "Purchaser") cannot agree on the present economic value of the Partnership interest of the Seller, (the "Appraised Interest"), the dispute in question shall, at the request and expense of the Seller be resolved by the appraisal procedures set forth in this Section 8.3(f)(1):

(1)     the Seller shall, in a written notice to the Purchaser, deliver to the Purchaser no later than the twentieth day immediately succeeding the day on which the Seller became obligated to sell the Appraised Interest, state that it elects to have the amount of the purchase price to be paid to it determined by the appraisal procedures set forth herein and the name of its appraiser. Within ten (10) days after receipt of such notice from the Seller, the Purchaser shall notify the Seller of the name of its appraiser. Upon the appointment of the two appraisers as hereinabove provided, said two appraisers shall be sworn faithfully and fully to determine the question at issue. The determination to be made by the appraisers shall be: "What was the fair market value (taking into account all rent and transfer restrictions affecting the Project) of the Appraised Interest on the date the Seller became obligated to sell the Appraised Interest?" Such arbitration shall be conducted in accordance with the rules of the American Arbitration Association for commercial arbitration. The two appraisers shall, with all possible speed, make their respective determinations in writing and shall give notice to all of the Partners. If there is a variance of less than five percent (5%) (determined by dividing the amount of the variance by the

January 4, 1999
::ODMA\PCDOCS\LA1\378946
PARTNERSHIP AGREEMENT

A0184

larger of the two appraisals) in the fair market values determined by the two appraisers, the average of the values so determined shall be controlling and shall be binding upon the Seller and the Purchaser. If there is a variance of more than five percent (5%) in the fair market values determined by the two appraisers, said appraisers shall forthwith and within 10 days after both of said appraisers have made their determination, appoint in writing a third appraiser and give written notice of such appointment to each of the Seller and the Purchaser. If in the event the two appraisers shall fail to appoint or agree upon such third appraiser within said 10-day period, a third appraiser shall be selected by the Seller and the Purchaser if they so agree upon such third appraiser within a further period of 10 days. If any appraiser shall not be appointed or agreed upon within the time herein provided, then the Seller or the Purchaser may apply to the appropriate Court in the Wilmington, Delaware metropolitan area for the appointment of such appraiser. Said appraiser shall be sworn faithfully and fairly to determine, pursuant to the procedures set forth above, the question at issue. The third appraiser's determination of value shall be controlling unless it is (i) higher than the higher of the determinations of value of the original appraisals, in which case such previous high determination will be controlling and binding upon the Seller and the Purchaser, or (ii) lower than the lower of the determinations of value of the two original appraisals, in which case such previous low determination of value will be controlling and binding upon the Seller and the Purchaser;

(2) each Partner shall pay the fees and expenses of the appraiser he, she or it appoints, and the fees and expenses of the third appraiser and any general expenses incurred by the panel of appraisers in connection with the appraisal shall be borne equally;

(3) in the event any appraiser appointed as aforesaid shall thereafter die or become unable to unwilling to act, such appraiser's successor shall be appointed in the same

<div align="center">67</div>

A0185

manner as provided in this Section 8.3(f) for the appointment of the appraiser so dying or becoming unable or unwilling to act;

(4) any appraiser appointed hereunder shall have no less than five years' experience in the appraisal of real property of the type owned by the Partnership and shall hold the professional designation of M.A.I. or its equivalent.

ARTICLE 9:

RECORDS, REPORTS AND ACCOUNTS

9.1.   Books and Records.

The General Partner shall maintain complete books, invoices and records in accordance with generally accepted accounting principles.  The General Partner shall keep at the Partnership's principal executive office all of the following Partnership documents:

(a)     A current list of the full name and last known business or residence address of each Partner, together with the Capital Contributions and Percentage Interest of each Partner.

(b)     A filed copy of the Partnership's certificate of limited partnership and all certificates of amendment thereto, together with executed copies of any powers of attorney pursuant to which any certificate has been executed.

(c)     Copies of the Partnership's federal, state and local income tax or information returns and reports, if any, for the six most recent taxable years.

(d)     An original copy of this Agreement and all amendments hereto.

(e)     Financial statements of the Partnership for the six most recent taxable years.

68

A0186

(f)      The Partnership's books and records for at least the current and past five taxable years.

(g)      Copies of all reports to government agencies provided pursuant to Section 7.11 of this Agreement for the six most recent taxable years.

(h)      Monthly operating statements for the six most recent taxable years.

(i)      All tenant files and due diligence documents will be kept until six (6) years after the Compliance Period.

9.2.      <u>Delivery to Limited Partner.</u>

Upon the request of the Limited Partner, the General Partner shall promptly deliver to the Limited Partner, at the Partnership's expense, a copy of the information required to be maintained by subparagraphs (a), (b) or (d) of Section 9.1.

9.3.      <u>Inspection by Limited Partner.</u>

(a)      The Limited Partner has the right, upon reasonable request, (a) to inspect and copy during normal business hours any of the Partnership records and documents and (b) to obtain from the General Partner, promptly after becoming available, a copy of the Partnership's federal, state and local income tax or information returns for each year.

(b)      If the General Partner is not willing or able to provide any books or records, then the Limited Partner shall have the right to obtain such books and records directly from the Manager, lenders and/or any other third party which may have such books and records in its possession, custody or control.

(c)      The Limited Partner shall have the right, upon reasonable notice, to inspect the Property.

<div align="center">69</div>

A0187

9.4.   <u>Reports</u>.

The General Partner shall send or cause to be sent to each Partner within thirty

(30) days after the end of each calendar quarter, quarterly operating statements, including an

income and expense statement, a balance sheet (or if a balance sheet is not prepared by the

Manager or the Partnership, the balance in the various Partnership bank and reserve accounts),

the amount of the guarantor's remaining liability under the Operating Deficit Guaranty

Agreement, a rent roll (or if the rent roll is not prepared by the Manager or the Partnership, the

number of vacant units as of the end of the quarter and the number of evictions completed or in

process) and, not later than March 15 after the close of each Partnership taxable year, an audited

financial report of the Partnership containing a balance sheet and statements of income and cash

flows as of and for the taxable year then ended prepared in accordance with generally accepted

accounting principles.  The General Partner shall also send or cause to be sent to each Partner

any reports provided by Manager pursuant to Section 15 of the Management Agreement, the

preventive maintenance schedule, and any material amendments to the management plan.  At the

same time the annual report of the Partnership is provided, the General Partner shall also send or

cause to be sent to the Limited Partner (1) the annual financial report of the General Partner, in

form reasonably satisfactory to the Limited Partner, and (2) a certification containing (a) the

outstanding balance in each of the Reserves, (b) the amount available under the Operating

Deficit Guaranty Agreement and (c) a representation that an officer of the General Partner has

reviewed the activities of the Partnership and General Partner and that, to the best knowledge of

said person, the Partnership and General Partner have performed all of their material obligations

under this Agreement and the other agreements executed in connection herewith, that no material

default exists hereunder or thereunder as of the date of such certificate (or if such defaults exist,

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

what action the Partnership or General Partner has taken or proposes to take) and that all

representations and warranties in this Agreement and the other agreements executed in

connection herewith are true and correct in all material respects as of the date of such certificate

(or if not true and correct, said person shall describe the exceptions).

The General Partner shall also send or cause to be sent to each Partner sixty (60)

days prior to the close of each calendar year an operating budget for each quarter of the

following calendar year. The quarterly operating budgets should include all items of revenues,

expenses, costs, fees and funding of reserves which the General Partner reasonably believes will

occur in the operation of the Project.

The General Partner shall also send or cause to be sent to the Limited Partner,

within seventy-five (75) days after the end of the General Partner's fiscal year, the annual audited

financial report of the General Partner, in form reasonably satisfactory to the Limited Partner.

9.5.    Tax Returns.

The General Partner shall send to each Partner, on or before March 15 following

the end of each taxable year, the information necessary for the Partner to complete its federal,

state and local income tax returns, including a form K-1 and a copy of the Partnership's federal,

state and local income tax or information returns for the taxable year. The tax returns must be

approved by the Limited Partner before those returns may be filed by the Partnership. The

Limited Partner shall notify the General Partner of any items the Limited Partner disputes on any

such return not later than ten (10) business days after receipt of such returns. If the Limited

Partner fails to approve such return, the General Partner shall file timely an application for

extension of time to file.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0189

9.6.   <u>Bank and Money Market Accounts.</u>

The Partnership shall keep its cash funds in bank or money market accounts in its name at one or more banks or funds that the General Partner may select.  Each bank account shall be fully insured by the Federal Deposit Insurance Corporation.  The funds in any account may be withdrawn on the signature of the individuals designated by the General Partner.  Partnership funds shall not be commingled with funds of any other Person and shall be used only for Partnership purposes.

9.7.   <u>Asset Management.</u>

ARTICLE 10:In connection with the review and audit of materials to be provided to the Limited Partner pursuant to the terms of this Agreement, the Partnership shall pay to the Limited Partner an asset management fee ("Asset Management Fee") of Five Thousand Dollars ($5,000) annually in arrears, which fee shall escalate at the rate of three percent (3%) per annum and shall be payable only to the extent of Excess Cash.  The performance of the review and audit functions described herein shall be performed by the Limited Partner solely for its own benefit and not for the benefit of the General Partner, the Partnership, or any other Person or entity.

<div align="center">DISPOSITION OF PARTNERSHIP INTERESTS</div>

10.1.   <u>Generally.</u>

No Partner shall withdraw from the Partnership or transfer any interest therein, voluntarily or by operation of law, and no Person shall become an Assignee or be admitted to the Partnership as a substituted Limited Partner, except as provided in this Section 10.  Any Transfer made in violation of this Section 10 shall be void.  In no event shall a General Partner's interest be converted into that of a Limited Partner (other than in connection with the removal of the General Partner).

<div align="center">72</div>

10.2.   General Partner.

10.2.1. Transfers.

(a)      A General Partner may Transfer its Partnership Interest only if:

(i)     the General Partner is not in default under this Agreement or the Indemnification Agreement, the Completion Guaranty or any other contract to which it is a party, and the Developer is not in default under the Operating Deficit Guaranty Agreement, the Completion Guaranty, the Indemnification Agreement or any other contract to which it is a party and the General Partner transfers its entire interest in the Partnership;

(ii)     the transferee or assignee of the General Partner's interest shall agree in writing to become a substitute General Partner of the Partnership;

(iii)    the Limited Partner has agreed to the transfer of the General Partner's Partnership interest;

(iv)     the substitute General Partner represents and provides the Partnership with evidence satisfactory to counsel for the Partnership that the substitute General Partner satisfies the net worth obligations of the transferor General Partner contained in this Agreement;

(v)      counsel for the Partnership shall have rendered an opinion that the withdrawal and the substitution of the General Partner will not violate the Act or other applicable law, will not cause the termination or dissolution of the Partnership, will not cause it to be classified other than as a partnership for federal income tax purposes and will not affect the Limited Partner's tax benefits under the Economic Projections;

January 4, 1999
::ODMA\PCDOCS\LA\137894\6
PARTNERSHIP AGREEMENT

A0191

(vi)     the Agency, the mortgagees under the Mortgages and any other party with the right to approve have approved the substitute General Partner, if their approval is required;

(vii)    the Person to be substituted as a General Partner shall have accepted and agreed to be bound by all the terms of this Agreement, by executing an amendment to this Agreement and any other documents or instruments that may be required to effect the admission of the Person as the General Partner, and all other actions required in connection with the admission shall have been performed, including filing a certificate of amendment of limited partnership;

(viii)   the substitute General Partner shall have provided the Partnership with evidence satisfactory to counsel for the Partnership of its authority to become a General Partner and to be bound by the terms of this Agreement; and

(ix)     the substitute General Partner shall have demonstrated ability in the operation and management of housing developments, including low-income housing projects.

(b)      In the event a General Partner transfers its interest pursuant to Section 10.2.1, it shall be and shall remain liable for all obligations and liabilities incurred by it as general partner before the effective date of the Transfer, but shall be relieved of any obligation or liability as a general partner incurred on account of the Partnership thereafter.  The substitute General Partner shall be obligated to pay any increase in real property taxes or transfer taxes owed by the Partnership that are triggered by the Transfer, which amount shall not be reimbursable by the Partnership.

January 4, 1999
::ODMA\PCDOCS\LA1\378946
PARTNERSHIP AGREEMENT

A0192

10.2.2. Terminating Events.

(a)     Upon the occurrence of a Terminating Event with respect to the General Partner, the Partnership shall redeem the Partnership interest of the General Partner for its Fair Market Value.  Fair Market Value shall be determined as follows:  the remaining or successor General Partner shall select an appraiser to appraise the Project (taking into account any rent or transfer restrictions affecting the Project) (the "Appraised Value").  Not later than thirty days after receipt of the appraiser's report, the remaining or successor General Partner shall furnish to the withdrawn General Partner a calculation of the amount that the withdrawn General Partner would receive upon a distribution pursuant to Section 11 (assuming the General Partner has a 1% interest in liquidation proceeds) upon the liquidation of the Partnership after sale of the Project by the Partnership for an amount equal to the Appraised Value and allocation of the resulting gain or loss pursuant to Section 6.3 (the "Fair Market Value").  The closing of the redemption by the Partnership of the withdrawn General Partner's interest shall take place at the office of the remaining or successor General Partner not later than fifteen days after notice of the Fair Market Value, or at such other time and place as the parties may agree.  Payment of the purchase price at closing shall be in the form of a promissory note bearing interest at the reference rate of Wells Fargo Bank, N.A. in effect on the date of the note, and payable on the earliest to occur of sale of the Project, dissolution of the Partnership, or five (5) years from the date of the note. Notwithstanding anything to the contrary contained in this Section 10.2.2, if the General Partner then owes the Limited Partner or the Partnership amounts under this Agreement, the Indemnification Agreement, the Completion Guaranty or the Operating Deficit Guaranty to which it is a party and/or amounts due because of the Limited Partner's payment of any Partnership Expenses, any amounts otherwise owed to the General Partner under this Section

75

A0193

10.2.2(a) shall be treated as distributed to the General Partner, but paid to the Limited Partner

first to reduce the General Partner's liability under the Indemnification Agreement, the

Completion Guaranty or the Operating Deficit Guaranty to which it is a party, then to reimburse

the Limited Partner for the payment of any Partnership Expenses, and thereafter to pay any

Partnership obligation then owing and not included in the computation of Partnership Expenses.

    10.3.   Limited Partner.

      10.3.1. Transfers.

        The Limited Partner may Transfer its Partnership interest to any Partner or to any

Person of its choice, in whole or in part, provided that the Limited Partner remains obligated to

fund the amounts required under the Funding Agreement, and only in accordance with this

Section 10.3.1. Nothing contained in this Section 10.3.1 or any other provision of this

Agreement shall be deemed or construed to grant to the General Partner any right to approve or

consent to transfers of partnership interests (or admission of partners) in the Limited Partner.  If

the General Partner receives a notice of assignment signed by both the transferring Limited

Partner and its Assignee, the Assignee shall become entitled to receive the transferring Limited

Partner's share of Profits, Losses, Low Income Housing Credits and Distributions, and shall have

the transferring Limited Partner's Capital Account as of the day following the notice of

assignment.  Profits and Losses shall be allocated in accordance with Section 6.1.

      10.3.2. Effect of Bankruptcy of the Limited Partner.

        If the Limited Partner becomes bankrupt, the trustee or receiver of its

estate, if any, shall become a substitute Limited Partner in the place of the terminated Limited

Partner as of the end of the day in which the General Partner receives certified evidence of the

successor's authority and a copy of this Agreement executed by the successor.

<div align="center">76</div>

A0194

10.4.   <u>Binding on Successors</u>.

Subject to the provisions of this Section 10, the rights and obligations of the Partners under this Agreement shall inure to the benefit of and bind their respective successors and assigns.

10.5.   <u>Conditions to Substitutions</u>.

An Assignee shall not be entitled to vote on Partnership matters and shall not have any other rights of a Partner other than its right to Profits, Losses, Low Income Housing Credits, and Distributions, unless and until the General Partner admits the Assignee as a substituted Partner pursuant to this Section 10.5. The General Partner shall admit the Assignee upon the date that the Assignee (a) pays all legal expenses of the Partnership incurred in connection with his substitution; (b) submits a duly executed instrument of assignment (i) specifying the Partnership interest assigned to it, and (ii) setting forth the assigning Partner's intention that the Assignee succeed to the assigning Partner's Partnership interest; and (c) executes a copy of this Agreement.

10.6.   <u>No Release or Waiver</u>.

Neither the provisions of, nor consummation of the transactions contemplated by, this Section 10 shall constitute a release or waiver of any claims or rights which the Partnership or any Partner may have against the Partnership or any of the Partners as a consequence of a breach of this Agreement.

ARTICLE 11:

<u>DISTRIBUTIONS ON DISSOLUTION</u>

Upon the Partnership's dissolution, the Partnership's business shall be immediately wound up. Any gain or loss on the disposition of Partnership property during the

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0195

Partnership's liquidation shall be credited or charged to the Partners in accordance with Section 6.1(a). The Limited Partner shall have the right to receive distributions in cash. Any Partnership assets distributed in kind in the liquidation shall be valued and treated as though the assets were sold and the cash proceeds were distributed.

(a)    Prior to any distributions to the Partners, Partnership assets in the course of the liquidation shall be applied and distributed in the following order:

(i)    payment to creditors of the Partnership excluding debts and liabilities of the Partnership to the General Partner or its Affiliates;

(ii)    payment of any loans from Partners other than Operating Deficit loan; and

(iii)    payment of fees owing to the General Partner and its Affiliates.

In the reasonable discretion of the General Partner, reasonable reserves may be established to meet any contingent obligations or liabilities and, if and when those contingencies shall cease to exist (as determined by the General Partner and subject to the approval of the Limited Partner any time after one (1) year after dissolution), any remaining assets in the reserves shall be distributed as provided in this Section 11.

(b)    Distributions to the Partners shall be in accordance with positive Capital Account balances. Upon dissolution of the Partnership, after any allocations under Section 6.1 and the distributions pursuant to this subparagraph (b), the General Partner shall contribute to the capital of the Partnership its negative Capital Account balance, if any, and shall have no other obligation to contribute to the capital of the Partnership to return any positive Capital Account balance of the Limited Partner. Amounts so contributed shall be distributed to the Partners as additional liquidation proceeds pursuant to this subparagraph (b).

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0196

For purposes of distributions to Partners, Capital Account balances shall be determined after taking into account all Capital Account adjustments for the fiscal year in which the liquidation occurs, and payment by the Partnership with respect to these balances shall be made by the end of that fiscal year or, if later, within ninety (90) days after the date of the liquidation. For this purpose, a liquidation of the Partnership shall be deemed to occur on the earlier of the date on which (i) the Partnership is terminated under Code Section 708(b)(1); or (ii) the Partnership ceases to be a going concern. Notwithstanding anything to the contrary contained in this Section 11, if and to the extent the General Partner or any Affiliate is entitled to a distribution under this Section 11 (either subparagraph (a) or (b)), but the General Partner, said Affiliate or the Developer then owes the Limited Partner under the Indemnification Agreement, the Completion Guaranty or the Operating Deficit Guaranty, any distribution to the General Partner or said Affiliate under this Section 11 (either subsection (a) or (b)) shall be treated as distributed to the General Partner or said Affiliate, as applicable, but paid to the Limited Partner to reduce the General Partner's and/or said Affiliate's liability under the Indemnification Agreement.

## ARTICLE 12:

### MISCELLANEOUS

12.1.   <u>Headings</u>.

The headings used in this Agreement are intended principally for convenience and shall not, by themselves, determine the Partners' rights and obligations.

12.2.   <u>Notices</u>.

Any notice or other communication required or permitted to be given under this Agreement shall be in writing and shall be personally delivered including but not limited to

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0197

overnight delivery or deposited in the certified U.S. mail, return receipt requested, first class and

postage prepaid, addressed to each party at the following addresses or such other address as may

be designated by a notice pursuant to this Section:

| | |
|---|---|
| The Partnership: | Electra Arms Senior Associates, L.P. |
| | c/o Wilmington Revitalization Corporation, Inc.<br>400 Walnut Street<br>Wilmington, Delaware 19801<br>Attn:  Charlie H. Smith, Jr. |
| With a copy to: | Dermot F. Kennedy, Esq.<br>332 W. Broad Street<br>Quakertown, PA  18951 |
| Limited Partner: | Edison Capital Housing Investments<br>18101 Von Karman Avenue, Suite 1700<br>Irvine, CA 92715-1046<br>Attn:  Asset Manager |

Any notice provided in accordance with this Section shall be deemed to have been given on the

delivery date or the date that delivery is refused by the addressee, as shown on the return receipt.

12.3.    <u>Time of Essence</u>.

All times and dates in this Agreement shall be of the essence.

12.4.    <u>Entire Agreement</u>.

This Agreement (including its Exhibits), together with the Funding Agreement,

the Indemnification Agreement, the Completion Guaranty and the Operating Deficit Guaranty

comprises the entire understanding and agreement among the Partners with respect to the subject

matter of this Agreement and supersedes all prior discussions, negotiations, agreements and

communications among any of the Partners, whether oral or written, with respect to the subject

matter of this Agreement.

January 4, 1999<br>::ODMA\PCDOCS\LA1\378941\6<br>PARTNERSHIP AGREEMENT

A0198

12.5.   Amendment.

This Agreement may be amended or rescinded only with the written consent of the Partners.

12.6.   Governing Law; Choice of Forum.

This Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (except its choice of law provisions) as applied to contracts among residents of Delaware wholly to be performed within the State. The parties agree that any dispute arising in connection with this Agreement shall be resolved in the state or federal courts located in Los Angeles, California.

12.7.   Attorneys' Fees.

If any Partner seeks to enforce his rights under this Agreement by legal proceedings, arbitration, or otherwise, the non-prevailing party shall pay the prevailing party's costs and expenses, including without limitation reasonable attorneys' fees.

12.8.   Severability.

If any provision of this Agreement is determined to be unenforceable for any reason, it shall be adjusted rather than voided, if possible, to achieve the intent of the parties. In any event, all of the other provisions shall be deemed valid and enforceable to the greatest possible extent.

12.9.   Terminology.

In this Agreement, the masculine, feminine or neuter gender, and the singular or plural number, shall each include the others whenever the context so indicates.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0199

12.10. <u>Notices</u>.

Any notice or other communication required or permitted to be given under this Agreement shall be in writing and shall be personally delivered or deposited in the U.S. mail, first class return receipt requested and postage prepaid. Notices to the Partnership shall be addressed to the Partnership at its principal executive office, and notices to the Partners shall be addressed to the Partners at their respective addresses below their signatures. Notice shall be deemed duly given upon delivery or the date delivery is refused by the addressee as shown on the return receipt. The foregoing addresses may be changed by notice given as provided in this Agreement. Limited Partner promptly shall notify the General Partner at the Partnership's principal executive office of any change in the Limited Partner's address as it last appears on the Partnership records.

12.11. <u>Counterparts</u>.

This Agreement may be signed in counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same agreement.

12.12. <u>Further Assurances</u>.

Each Partner shall execute, with acknowledgment or affidavit if required, all documents and writings reasonably necessary or desirable for the continuation of this Partnership and the achievement of its purpose. Each individual signing this Agreement hereby personally represents and warrants that he or she is duly authorized to execute and deliver this Agreement on behalf of the party for whom or which he or she is signing.

12.13. <u>No Partition</u>.

No Partner nor any legal representative, successor, heir or assignee of any Partner shall have the right to partition the Project or any part thereof or interest therein, or to file a

A0200

complaint or institute any proceeding at law or in equity to partition the Project or any part

thereof or interest therein. Each Partner, for himself and his legal representatives, heirs,

successors and assigns, hereby waives any such rights. The Partners intend that, during the term

of this Agreement, the rights of the Partners and their successors in interest, as among

themselves, shall be governed solely by the terms of this Agreement and by the Act.

12.14.  Waiver.

No waiver of any provision of this Agreement shall be deemed effective unless

contained in a writing signed by the party against whom the waiver is sought to be enforced. No

failure or delay by any party in exercising any right, power or remedy under this Agreement shall

operate as a waiver of any such right, power or remedy, and no waiver of any breach or failure to

perform shall be deemed a waiver of any subsequent breach or failure to perform or of any other

right arising under this Agreement.

12.15.  Not for Benefit of Creditors.

The provisions of this Agreement are intended only for the regulation of relations

among Partners and the Partnership. This Agreement is not intended for the benefit of non-

Partner creditors and does not grant any rights to or confer any benefits on non-Partner creditors

or any other Person who is not a Partner.

12.16.  Binding on Successors.

Subject to the provisions of this Agreement concerning Transfer, the rights and

obligations of the Partners under this Agreement shall inure to the benefit of, and bind their

respective heirs, successors and assigns.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6
PARTNERSHIP AGREEMENT

A0201

12.17.  Insurance.

The Partnership shall carry and maintain in force insurance satisfying the requirements set forth in Article 6 of the Loan Agreement.  All insurance shall be issued by companies with a rating of A or better in Best's Insurance Reports -Property - Casualty or any equivalent rating adopted by Best's.  Each liability policy shall name Limited Partner, among others, as an additional insured.  At least thirty (30) days prior to the expiration of each required policy, Limited Partner shall receive evidence reasonably satisfactory to Limited Partner of the payment of premium and the renewal or replacement of said policy continuing the insurance coverage required by this Section 12.16.

12.18.  Liability of Limited Partner.

No Limited Partner shall be liable for the debts, liabilities, contracts or any other obligations of the Partnership.

[signature page follows]

84

A0202

IN WITNESS WHEREOF, each of the Partners has executed this Agreement as of the date first written above.

GENERAL PARTNER:

WILMINGTON REVITALIZATION
CORPORATION, INC.,
a Delaware non-profit corporation

By: Charlie H. Smith, Jr.
    Its: President

Address:
400 Walnut Street
Wilmington, Delaware 19801
Attention: Charlie H. Smith, Jr.

LIMITED PARTNER:

EDISON CAPITAL HOUSING INVESTMENT,
a California corporation

By: _____
    Its: _____

Address:
18101 Von Karman Avenue
Suite 1700
Irvine, California 92612
Attention: Asset Manager

S-1

A0203

IN WITNESS WHEREOF, each of the Partners has executed this Agreement as of the date first written above.

GENERAL PARTNER:

WILMINGTON REVITALIZATION
CORPORATION, INC.,
a Delaware non-profit corporation

By: Charlie H. Smith, Jr.
   Its: President

Address:
400 Walnut Street
Wilmington, Delaware 19801
Attention: Charlie H. Smith, Jr.

LIMITED PARTNER:

EDISON CAPITAL HOUSING INVESTMENT,
a California corporation

By: _____
   Its: _Vice President & Treasurer_

Address:
18101 Von Karman Avenue
Suite 1700
Irvine, California 92612
Attention: Asset Manager

S-1

EXHIBIT A
Legal Description

ALL that certain lot, piece or parcel of land with the building thereon erected, situate in the City of Wilmington, New Castle County and State of Delaware, known as No. 1800 NORTH BROOM STREET, being more particularly bounded and described as follows, to-wit:-

BEGINNING at a point in the Northeasterly side of Eighteenth Street (at 50 feet wide), said point of Beginning being distant North 32 degrees, 08 minutes West, 100 feet measured along the said side of Eighteenth Street from the intersection thereof with the Northwesterly side of North Franklin Street (at 50 feet wide); thence from the said point of Beginning by the said side of Eighteenth Street, North 32 degrees, 08 minutes West, 185 feet to the intersection thereof with the Southeasterly side of North Broom Street (at 60 feet wide); thence by said side of North Broom Street, North 57 degrees, 51 minutes East, 255 feet 6 inches to the intersection thereof with the Southwesterly side of Nineteenth Street (at 50 feet wide); thence thereby South 32 degrees, 08 minutes East, 185 feet to a point; thence parallel to North Franklin Street, South 57 degrees, 51 minutes West, 255 feet 6 inches to the place of Beginning.

BEING a part of the same lands and premises which Electra Arms Apartment and Medical Center Foundation, Inc., a Delaware Corporation by Deed dated January 31, 1968 and of record in the office of the Recorder of Deeds in and for New Castle County, Delaware in Deed Record F, Volume 80, Page 442 did grant and convey unto Wilmington Housing Authority, a public body corporate and politic, organized and existing under the laws of the State of Delaware.

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6

EXHIBIT B
Economic Projections

See TAB 48

January 4, 1999
::ODMA\PCDOCS\LA1\37894\6

EXHIBIT C
Insurance


See TAB 58

A0207

EXHIBIT D
Withdrawal of Initial Limited Partner

WITHDRAWAL OF INITIAL LIMITED PARTNER FROM
ELECTRA ARMS SENIOR ASSOCIATES, L.P.
A DELAWARE LIMITED PARTNERSHIP

Charlie H. Smith, Jr., the initial limited partner of Electra Arms Senior Associates, L.P., a Delaware limited partnership ("Partnership"), hereby withdraws from the Partnership as initial limited partner, effective as of the date of the execution of this withdrawal.

Execution of this document shall constitute acknowledgement by the undersigned that he has withdrawn as a limited partner and has relinquished all rights to which he would be entitled in his capacity as a limited partner.

NOTWITHSTANDING SECTION 1542 OF THE CALIFORNIA CIVIL CODE WITH PROVIDES THAT "[A] GENERAL RELEASE DOES NOT EXTEND TO CLAIMS WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT TO EXIST IN ITS FAVOR AT THE TIME OF EXECUTING THE RELEASE, WHICH IF KNOWN BY IT, MUST HAVE MATERIALLY AFFECTED ITS SETTLEMENT WITH THE DEBTOR", AND NOTWITHSTANDING ANY SIMILAR PROVISION UNDER DELAWARE LAW, THE UNDERSIGNED HEREBY RELEASES ALL CLAIMS WITH RESPECT TO THE ABOVE MATTERS, WHETHER KNOWN, UNKNOWN, FORESEEN OR UNFORESEEN, WHICH THE UNDERSIGNED HAS, OR MAY ACQUIRE FROM OTHER PARTIES, AGAINST THE PARTNERSHIP OR ANY PARTNER THEREIN.  THE UNDERSIGNED UNDERSTANDS AND ACKNOWLEDGES THE SIGNIFICANCE AND CONSEQUENCE OF SUCH SPECIFIC WAIVER OF THE PROVISIONS OF SECTION 1542 AND OF ANY SIMILAR PROVISION UNDER DELAWARE LAW AND HEREBY ASSUMES FOR HIMSELF FULL RESPONSIBILITY FOR ANY INJURIES, DAMAGES OR LOSSES HE MAY SUSTAIN IN CONNECTION WITH ANY AND ALL OF THE ABOVE MATTERS.

The undersigned initial limited partner represents and warrants that he has not assigned any claims that he may have had against the Partnership or any partner therein.

Date October 9, 1998

Charlie H. Smith, Jr.

D-1

A0208

EXHIBIT E
Form of Tax Credit Regulatory Agreement

See TAB 53

E-1

A0209

# EXHIBIT

# C

*STATE OF DELAWARE*
*SECRETARY OF STATE*
*DIVISION OF CORPORATIONS*
*FILED 09:00 AM 07/24/1998*
*981292302 — 2925598*

## STATE OF DELAWARE
## CERTIFICATE OF INCORPORATION
## A STOCK CORPORATION

**FIRST:**   The name of the Corporation is Wilmington Revitalization Corporation, Inc.

**SECOND:**   Its Registered Office in the State of Delaware is to be located at 400 North Walnut Street, in the City of Wilmington, County of New Castle, Zip Code 19801. The Registered Agent in charge thereof is Charlie H. Smith, Jr., 400 Walnut Street, Wilmington, DE 19801.

**THIRD:**   The purpose of the corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of Delaware. This corporation shall be a nonprofit corporation.

This corporation will specialize in low-income housing development and operation.

**FOURTH:**   The amount of the total authorized capital stock of this corporation is Fifty Thousand Dollars ($50,000.00) divided into 50,000 shares of One Dollar ($1.00) each.

**FIFTH:**   The name and mailing address of the incorporator are as follows:

> Charlie H. Smith, Jr.
> 400 Walnut Street
> Wilmington, DE 19801

**I, THE UNDERSIGNED,** for the purpose of forming a corporation under the laws of the State of Delaware, do make, file, and record this Certificate, and do certify that the facts herein stated are true, and I have accordingly hereunto set my hand this 15th day of June, A.D., 1998.

Incorporator

A0211

# EXHIBIT

# D

# PROPERTY MANAGEMENT AGREEMENT

**THIS AGREEMENT** is made effective as of the 9th day of October, 1998, among Electra Arms Senior Associates, L.P., a Delaware limited partnership ("Owner"), and Wilmington Housing Authority ("Property Management Agent"), hereinafter collectively referred to as the Principal Parties.

## RECITALS

A.    Owner owns the Property commonly known as Electra Arms Senior Apartments, together with all improvements, appurtenances and equipment located thereon, (the "Project").

B.    Owner wishes to obtain the services of Property Management Agent in connection with the management of the Project subject to the terms and provisions of this Agreement and the First Amended and Restated Limited Partnership Agreement; and Property Management Agent wishes to perform such services in exchange for the Project Management Fee provided herein.

**NOW, THEREFORE**, in consideration of the covenants and agreements herein contained, the parties hereto mutually agree as follows:

## ARTICLE 1

## APPOINTMENT AND ACCEPTANCE

Owner hereby appoints Property Management Agent to manage, operate,

maintain and otherwise be responsible for renting the residential units in the Project and Property Management Agent hereby accepts the appointment, subject to the terms and conditions set forth in this Agreement.

## ARTICLE 2

## TERM

This Agreement shall become effective on the date hereof and shall continue in full force and effect until October 1, 2003 and automatically renew each year thereafter for the full term of the Compliance Period,  unless mutually terminated earlier in writing by Owner or Property Management Agent or pursuant to Article 8 below.

## ARTICLE 3

## SERVICES OF Property Management Agent

3.1    **Standard of Conduct.**  Property Management Agent represents that it is experienced in professional management of Project of the character and nature similar to the Project and Property Management Agent agrees to manage the Project in accordance with professional standards for such Project.

3.2    **Rentals.**  Property Management Agent shall offer for rent and shall rent the housing units in the Project in accordance with all Requirements (as defined below), a rent schedule approved in writing by Owner and the leasing guidelines and form of lease referred to below.

2

A0214

Pursuant to its rental responsibilities, Property Management Agent shall:

(a)     show housing units for rent in the Project to all prospective Qualified Tenants;

(b)     take and process applications for rentals, including prospective Qualified Tenant interviews and credit checks.  If an application is rejected, the applicant shall be advised of the reason for rejection.  The rejected application, together with the written notice of the rejection and any other related correspondence, shall be kept on file for three years following the rejection;

(c)     comply with the leasing and other requirements contained in Section 42 of the Code with respect to housing units eligible for the low-income housing tax credit and requirements contained in any documents executed by Owner in connection with the acquisition, financing and ownership of the Project (the "Requirements"), including, but not limited to, the First Amended and Restated Limited Partnership Agreement, the  Loan Documents, Lock Box Agency Agreement and other Project Documents, which are incorporated herein by reference.

(d)     comply with the leasing guidelines attached hereto as Exhibit A and by this reference made a part hereof, and use for each lease a form of lease to be provided by Property Management Agent (a "Lease"), which Lease form shall be subject to the approval of Owner and shall be consistent with the Requirements, unless otherwise agreed by Owner and Property Management Agent in writing;

3

(e)   be responsible for or assist Owner in the certification and re-certification of Qualified Tenants.

(f)   execute all Leases in Property Management Agent's name, identified thereon as agent for Owner, subject to prior written approval by Owner of any deviation from Owner's approved rent schedule, Lease form and leasing guidelines;

(g)   negotiate and execute any commercial leases and concession agreements in Property Management Agent's name, identified thereon as agent for Owner, subject to prior written approval by Owner of all terms and conditions;

(h)   collect, deposit and disburse security deposits, if required, in accordance with the terms of each lease, Sections 6.1 and 6.2 hereof and the Lock Box Agency Agreement.  The amount of each security deposit shall be held by Property Management Agent in an account, separate from all other accounts and funds.  Such account shall be in the name of the Property Management Agent and designated of record as "Security Deposit Account." Interest on security deposits shall be paid according to law;

(i)   maintain a current list of acceptable prospective Qualified Tenants and undertake all arrangements necessary and incidental to the acceptance of rental applications and the execution of Leases.  Property Management Agent shall exercise its best efforts (including, but not limited to, placement of advertising, interview of prospective Qualified Tenants, assistance and counseling in completion of rental applications and execution of Leases, processing of documents and credit and

4

employment verifications, and explanation of the program and operations of Owner), to effect the leasing of dwelling units, renewal of Leases and, in accordance with the terms of each Lease and the requirements, subleasing of dwelling units in the Project, so that the Project is occupied as fully as possible;

(j)      perform such other acts and deeds requested by Owner as are reasonable, necessary and proper in the discharge of Property Management Agent's rental duties under this Agreement;

(k)      prorate the first month's rent collected from Qualified Tenant should the Lease term commence on any other day than the first day of the month.  If the Lease term occurs after the twentieth (20th) day of the month, the prorated amount, plus the next month's rent, shall be collected on or before the first day of the Lease term; and

(l)      participate in the inspection of each dwelling unit identified in the Lease together with the Qualified Tenant prior to move-in and upon move-out, and shall record in writing any damage to the unit at the time the Qualified Tenant moved in and any damage occurring during the Qualified Tenant's occupancy.

**3.3    Qualified Rental Use.**

(a)      **Low Income Housing Tax Credit Requirements.  Property** Management Agent acknowledges that Owner is required to use its best efforts to lease all of the residential housing units in the Project to Qualified Tenants, as such term is defined in the  First Amended and Restated Limited Partnership Agreement,

5

A0217

whose income and rent levels qualify such apartments for inclusion in determining federal low-income housing tax credits (the "Credits") for the Project pursuant to Section 42 of the Code.

      (b)    Property Management Agent shall require each prospective tenant to certify, on the Lease application or Lease, the amount of such tenant's annual family income, family size, and any other information required to enable Owner to obtain the Credits or otherwise reasonably requested by Owner.  Property Management Agent shall require Qualified Tenants to certify in writing as to such matters on an annual basis, prior to such time as the information is required for reporting purposes.

      (c)    Property Management Agent shall from time to time furnish Owner with a written schedule of maximum rents for the apartments which complies with the Requirements, for Owner's (and any lender's, if required) approval.  Without Owner's (or any lender's, if required) express prior written consent, Property Management Agent shall not enter into any lease on behalf of Owner at a rental amount exceeding the applicable maximum.

      (d)    Property Management Agent shall maintain and preserve all written records of Qualified Tenant family income and size, and any other information necessary to comply with the Requirements or otherwise reasonably requested by Owner throughout the term of this Agreement, and shall turn all such records over to Owner upon the termination or expiration of this Agreement.

      (e)    If requested by Owner, Property Management Agent shall prepare

A0218

reports of low-income leasing and occupancy and other matters related to Property Management Agent's obligations hereunder and to the operation of the Project in form suitable for submission in connection with the Credits and in compliance with the Requirements.

**3.4    Collection of Rents and Other Receipts.** Property Management Agent shall collect, when due, all rents, charges and other amounts receivable on Owner's account in connection with the management and operation of the Project. Such receipts shall not be commingled with other funds and shall be paid over to the Trustee pursuant to the Lock Box Agency Agreement and Section 4.2 of the Trust Indenture.

**3.5    Enforcement of Leases.** Property Management Agent shall secure full compliance by each Qualified Tenant with the terms of such Qualified Tenant's Lease. Voluntary compliance will be emphasized and Property Management Agent shall counsel Qualified Tenants and make referrals to community agencies in cases of financial hardship or under other circumstances deemed appropriate by Property Management Agent, to the end that involuntary termination of tenancies may be avoided to the maximum extent consistent with sound management of the Project. Nevertheless, Property Management Agent may, and shall if requested by owner, lawfully terminate any tenancy when, in Property Management Agent's judgment, sufficient cause for such termination occurs under the terms of Qualified Tenant's Lease, including, but not limited to, nonpayment of rent.

**3.6    Maintenance and Repairs.** Property Management Agent shall, at

A0219

Owner's expense, maintain the Project in a decent, safe and sanitary condition and in a rentable state of repair, all in accordance with the Project rules and regulations, local codes, and Property Management Agent shall otherwise maintain the Project at all times in a condition acceptable to Owner, including but not limited to cleaning, painting, decorating, plumbing, carpentry, grounds care, and such other maintenance and repair work as may be necessary pursuant to Sections 7.5 and 7.8 of the First Amended and Restated Limited Partnership Agreement. ~~of the~~ The prior written approval of Owner will be required for any contract which exceeds one year in duration or expenditure which exceeds Twenty Five Hundred Dollars ($2,500.00) in any one instance for labor, materials, or otherwise in connection with the maintenance and repair of the Project, except for emergency repairs involving manifest danger to persons or Project, or required to avoid suspension of any necessary service to the Project. In the event of emergency repairs, Property Management Agent shall notify Owner of the facts promptly, and in no event later than 72 hours from the occurrence of the event.

3.7 **Records and Reports.** In addition to any requirements specified in this Agreement, Property Management Agent shall have the following responsibilities with respect to records and reports:

(a) Property Management Agent shall establish and maintain a system of records, books, and accounts in a manner satisfactory to Owner which is consistent with and for the durations mandated by the Requirements. All records, books, and accounts shall be subject to examination at reasonable hours upon reasonable notice

8

by any authorized representative of Owner.

      (b)    Property Management Agent shall prepare a monthly report in accordance with the Requirements and in form satisfactory to Owner, and any other reports which are necessary to conform to the Requirements and are consistent with Manger's duties hereunder, containing and including at least the following: (i) a statement of income and expenses and accounts receivable and payable for the preceding month, including an itemized list of all delinquent rents as of the tenth (10th) day of the current month, as well as a report on action taken thereof by Manger; (ii) a rent roll/cash receipts form for the previous month; (iii) a disbursements summary for the previous month; (iv) current bank statements with reconciliation of the operating and security deposit accounts; (v) copies of paid bills and invoices for the previous month; and (vi) a narrative of any unusual actions taken or emergencies responded to, and a full report of any accidents, claims and potential claims, for the previous month and any other information required by the Requirements.  Manger shall submit each such report to Owner on or before the fifteenth (15th) day of each month and shall send all reports that are required to be sent to any lenders to Owner for Owner's prior approval, which approval shall not be unreasonably withheld or delayed; provided, however, that Owner shall have two weeks to review such reports prior to submission to any lender.

    **3.8**    **Owner Communications.**  Property Management Agent shall be available for communications with Owner and shall keep Owner advised of items

9

materially affecting the Project.

## ARTICLE 4

## MANAGEMENT AUTHORITY

**4.1    Authority.**  Property Management Agent's authority is expressly limited to the provisions contained herein as they may be amended in writing form time to time in accordance with the provisions of this Agreement.

**4.2    Compliance with Law.**  Property Management Agent shall comply fully with all federal, state, county, municipal and special district laws, ordinances, rules, regulations and orders relative to the leasing, use, operation, repair and maintenance of the Project.  Property Management Agent shall remedy promptly any violation of any such law, ordinance, rule, regulation or other which comes to its attention and shall notify Owner by the end of the next business day after Property Management Agent becomes aware of any violation for which Owner may be subject to penalty.

## ARTICLE 5

## OWNER'S RIGHT TO AUDIT

**5.1    Owner's Right to Audit.**  Owner reserves the right to conduct or to appoint others to conduct examinations, at Owner's expense, without notification, of the books and records maintained for Owner by Property Management Agent and to perform any and all additional audit tests relating to Manger's activities hereunder.

A0222

**5.2    Correction of Discrepancies.**  Should Owner's employees or appointees discover either weaknesses in internal control or errors in record keeping, Property Management Agent shall correct such discrepancies either upon discovery or within a reasonable period of time.  Property Management Agent shall inform Owner in writing of the action taken to correct such audit discrepancies.

## ARTICLE 6

## REMITTANCE OF FUNDS

**6.1    Deposit of Funds.**  Property Management Agent shall deposit immediately upon receipt all security deposits in a separate account designated as such by the Property Management Agent for Owner (the "Security Deposit Account") and shall deposit all rents and other funds collected from the operation of the Project, including any and all advance funds, with the Trustee pursuant to the Lock Box Agency Agreement of Electra Arms Senior Associates, L,P., ("Revenue Fund").

**6.2    Security Deposits.**  Property Management Agent shall maintain detailed records of all security deposits and such records shall be open for inspection by Owner's written approval prior to the return of such security deposit to any particular Qualified Tenant when the amount of such return, in any single instance, exceeds $250.00, and is not part of an ordinary refund of a security deposit to a Qualified Tenant upon a Qualified Tenant's vacating a unit in a voluntary move and leaving the unit in satisfactory condition.

11

A0223

**6.3    Expenditures.** Any disbursements made by Property Management Agent pursuant to this Agreement shall be made out of the Operating Fund.  Pursuant to Section 4.2 of the Trust Indenture.  Property Management Agent shall not be obligated to make any advance to the Operating Fund or to pay any amount except out of funds in the Revenue Fund advanced for the purposes stated above by the Trustee, nor shall Property Management Agent be obligated to incur any extraordinary liability or obligation unless Owner and/or Trustee shall furnish Property Management Agent with the necessary funds for the discharge thereof.  If Property Management Agent shall voluntarily advance any amount of its own funds on behalf of Owner for the payment of any obligation or necessary expense connected with the maintenance or operation of the Project or otherwise, Owner shall not be required except as stated above to reimburse the Property Management Agent therefor.

## ARTICLE 7

## COMPENSATION

The Property Management Agent will be compensated for its services under this Agreement by monthly fees, to be paid out of the Operating Fund and treated as Project Partnership expenses.  Such fees will be payable on the first day of each month of the Agreement.  Each such monthly fee will be six percent (6%) of the net rental of the partnership for the term of this Agreement subject to the limitations set forth in section 5.11 of the Loan Agreement, which is incorporated herein by reference.

12

## ARTICLE 8

## TERMINATION

**8.1    Sale of Project.** This Agreement shall be terminated automatically and immediately upon destruction, condemnation, sale, exchange or other disposition (excluding any mortgage or refinancing) of the Project.

**8.2    Other Termination.** This Agreement may be terminated by Limited Partner or Owner at any time, for with or without cause, by giving Thirty (30) days' written notice of intent to terminate to the Property Management Agent.  Property Management Agent may terminate this Agreement by giving Thirty (30) days written notice if Owner does not make available sufficient funds to maintain the Project in compliance with applicable building codes.  This Agreement will also terminate by mutual written consent of Property Management by Owner for cause Agent and Owner or upon the occurrence of any of the following events which shall be considered a default.

The failure of Property Management Agent  to perform, keep or fulfill any of its duties hereunder or to comply with the covenants, undertakings, obligations or conditions set forth in this Agreement, and the continuance of any such default for a period of ten (10) days after notice of such failure (except in the event of Property Management Agents, willful misconduct, in which case no notice shall be required).

Upon any such event of default, the Owner may, without prejudice to any other recourse at law which it may have, give to the Property Management Agent notice of its intention to terminate this Agreement and the term of this Agreement shall expire.

A0225

Within five (5) days after the termination of this Agreement, Property Management Agent shall close all accounts and pay the balances or assign all certificates of deposit regarding the Project to Owner.  Within ten (10) days after the termination of this Agreement, Property Management Agent shall deliver to Owner all plans and surveys of the Project in its possession and all books and records, keys, reports, files, leases, contracts, and all other written material and Project concerning the Project.  Within thirty (30) days after the termination of this Agreement, Property Management Agent shall submit to Owner all reports required under Section 3.14 hereof to the date of such termination, and Property Management Agent and Owner shall account to each other with respect to all matters outstanding as of the date of all contracts requested by Owner concerning the Project, to the extent permitted by such contracts, and shall cooperate (at no expense to Property Management Agent) with Owner in connection with the transition to a new Property Management Agent.

8.3    **Final Accounting.**  Upon termination of this Agreement for any reason, Property Management Agent shall deliver to owner immediately upon termination (or upon Property Management Agent's subsequent receipt or acquisition) the following with respect to the Project:

(a)    Any Qualified Tenant security deposits or other monies belonging to Owner held by Property Management Agent on Owner's behalf; and

(b)    All records, contracts, leases, receipts for deposits, unpaid bills and other papers or documents relating to the Project.

14

## ARTICLE 9

### CONSENT

Whenever in this Agreement the consent or approval of Property Management Agent or Owner is required such consent or approval shall not be unreasonably withheld or delayed. Such consent shall be in writing and shall be duly executed by an authorized officer or agent for the party granting such consent or approval; provided, however, notwithstanding anything in this Agreement to the contrary, if such consent or approval would be required for Property Management Agent to comply with the Requirements, Property Management Agent shall not be responsible for a failure to comply with the Requirements as a result of Owner's refusal or unreasonable delay to so consent or approve.

The terms and conditions in Exhibit B are incorporated herein by reference.

## ARTICLE 10

### MISCELLANEOUS

**10.1 Assignment.** Property Management Agent shall not assign its rights under this Agreement without the prior written consent of Owner and any purported assignment without Owner's prior written consent shall be of no effect.

**10.2** Incorporated herein by reference is Exhibit B which, in addition to the terms and conditions set forth herein will also bind the Principal Parties.

15

A0227

10.3   **Amendments.** This Agreement, subject to the First Amended and Restated Limited Partnership Agreement, Trust Indenture, Loan Agreement, Lock Box Agency Agreement and other Project Documents constitute the entire Agreement between Property Management Agent and Owner and no amendment, alteration, modification or addition to this Agreement shall be valid or enforceable unless expressed in writing and signed by the party or parties to be bound thereby.

10.4   **Headings.** All headings herein are inserted only for convenience and ease of reference and are not to be considered in the construction or interpretation of any provision of this Agreement.

10.5   **Amendment.** This Agreement may be amended by the parties hereto only with the consent of the Limited Partner; provided, however, no amendment to this Agreement shall be effected which is inconsistent with the First Amended and Restated Partnership Agreement unless the latter is simultaneously amended in accordance with the provisions thereof.

10.6   **Waiver.** The waiver of any of the terms and conditions of this Agreement on any occasion or occasions shall not be deemed as waiver of such terms and conditions on any future occasion.

10.7   **Illegality.** If any provision of this Agreement shall prove to be illegal, invalid or unenforceable, the remainder of this Agreement shall not be affected thereby.

10.8   **Binding Effect.** This Agreement shall be binding upon and inure to the benefit of Owner, its successors and permitted assigns, and shall be binding upon and

A0228

inure to the benefit of Property Management Agent, its successors and its permitted assigns.

**10.9   Governing Law.**   This Agreement shall be governed by the interpreted in accordance with the laws of the State of Delaware.

**10.10 Defined Terms.**   Except as expressly provided herein, terms used in this Agreement with initial capital letter shall have the meanings as set forth in the First Amended and Restated Limited Partnership Agreement Loan Agreement, Trust Indenture, Lock Box Agency Agreement or other Project Documents where they appear and as executed on the date hereof.

**10.11 Enforceability.**   The invalidity of any clause, part or provision of this Agreement shall not affect the validity of the remaining portions thereof. Owner's remedies under this Agreement are cumulative, and the exercise of one remedy shall not be deemed an election of remedies nor foreclose the exercise of Owner's other remedies. No waiver by Owner of any breach of this Agreement shall be deemed to be a waiver of any other or subsequent breach. Owner or Property Management Agent may apply to any court, state or federal, for specific performance of this Agreement, for an injunction against any violations of this Agreement or for such other relief as may be appropriate, since the injury arising from a default under any of the terms of this Agreement would be irreparable and the amount of damage would be difficult to ascertain.

**10.12 Execution of Counterparts.**   For the convenience of the parties, this Agreement may be executed in multiple counterparts, each of which shall constitute a

A0229

complete original of this Agreement, which may be introduced in evidence or used for any other purpose without the production of any other counterparts.

    **10.13. Successors and Assigns.** This Agreement shall inure to the benefit of and constitute a binding obligation upon Owner and Property Management Agent and their respective successors and assigns; provided, however, that Property Management Agent shall not assign this Agreement or any of its duties hereunder, without the prior written consent of Owner. In the event Owner's current general partner or any successor general partner of Owner is removed as general partner in accordance with the First Amended and Restated Limited Partnership Agreement, any successor general partner selected in accordance with such partnership Agreement shall have authority to act hereunder on behalf of Owner.

WILMINGTON REVITALIZATION CORPORATION, INC.,
as General Partner for Electra Arms Senior Associates, L.P.

By: _____
    Charlie H. Smith, Jr., President


Wilmington Housing Authority

By: _____
    Charlie H. Smith, Jr., Executive Director
                        Property Management Agent

18

A0230

EXHIBIT A
LEASING GUIDELINES

**A.    Screening Process**

1.    **Application.** Each prospective Qualified Tenant must complete and sign a written application for lease, containing detailed personal information, previous residences and landlords for several years, information on employment, income, assets, and credit, proposed occupants (including ages) and pets, and references, and containing such other information and statements as will enable Property Management Agent to screen the prospective Qualified Tenant or as is otherwise proper and advisable for the management of the Project in accordance with professional standards.

2.    **Interview.** Property Management Agent shall interview each proposed adult occupant of the housing unit to be leased in order to help determine the character of such persons.

3.    **Employment.** Property Management Agent shall verify the employment and income information give by the prospective Qualified Tenant.

4.    **Credit.** Property Management Agent shall have conducted a responsible credit agency check of the prospective Qualified Tenant, and shall personally check with one or more of the Qualified Tenant's previous landlords, if possible, with respect to past rent payment history.

5.    **Housekeeping.** If possible, Property Management Agent shall check with one or more previous landlords of the proposed Qualified Tenant and other occupants with respect to their ability to maintain an apartment in good condition and to abide by building rules.  If verbal information is vague or questionable, Property Management Agent shall visit the proposed occupants' present residence(s).

6.    **Other.** If advisable, Property Management Agent shall check other referenced and perform other screening of the proposed Qualified Tenant.

7.    **Approval.** Property Management Agent shall approve the proposed Qualified Tenant's lease application only if, in Property Management Agent's best professional judgment, the proposed Qualified Tenant is qualified to pay rent when due and all proposed occupants are likely to maintain properly the dwelling unit, abide by reasonable rules, and otherwise be suitable occupants of the Project. Also, without Owner's prior written consent, Property Management Agent shall not approve any lease application unless the Qualified Tenant and other proposed occupants meet the rental

A-1

guidelines contained in the Requirements.

**B.     Lease**

1.      **Application.**  Prior to leasing any dwelling unit, Property Management Agent shall have screened the prospective Qualified Tenant and all other proposed occupants in accordance with Section A hereof, and shall have approved the lease application as described above.

2.      **Lease Form.**  In leasing dwelling units, Property Management Agent shall use only the form of lease approved in writing by Owner from time to time, without material changes unless approved in writing by Owner.

3.      **Approved Rent.**  Property Management Agent shall not lease any dwelling unit for a rental amount other than as specified in the rent schedule included as part of Owner's approved operating budget or otherwise approved by Owner in writing.

4.      **Security Deposit.**  Property Management Agent shall require not less than one (1) month's security deposit, and shall require such greater amount as circumstances warrant, but not more than the maximum allowed by law.  Property Management Agent shall also, if advisable, collect a key deposit, subject to applicable law.

5.      **Named Qualified Tenant: Occupants, Pets.**  Each adult occupant of the dwelling unit shall be named as Qualified Tenant in the Lease, and shall be jointly and severally liable for rental payments.  The Lease shall specify all other permitted occupants and pets, and it shall be a default if any non-permitted occupant resides in the dwelling units.

6.      **Term.**  Each Lease shall be for a term of one year.

7.      **Substitution of Unit.**  In the event rehabilitation or other plans for the Project will require that the housing unit to be leased to the Qualified Tenant be vacated or made available to another Qualified Tenant during any portion of the Lease term, the Lease shall contain a provision for substitution of another dwelling unit and relocation of the Qualified Tenant.

8.    **Certain Lease Provisions.**  The form of lease to be approved by Owner shall contain detailed provisions concerning the following matters of practical importance, including, but not limited to:

a.    **Condition of Unit.**  Acknowledgment of the condition of the dwelling unit as described in a unit inspection report.

b.    **Default Charges.**  Qualified Tenant's liability for the following default charges: late rent payment charges; returned check charges; lost keys; damage to the dwelling unit or the Project not caused by ordinary wear and tear; missing Project, fixtures or equipment; and costs of rent collection and eviction.

c.    **Security Deposit.**  Procedures concerning deductions from and return of security deposit, with interest to the extent required by law, and any key deposit.

d.    **Utilities and Other Charges.**  Qualified Tenant's responsibilities concerning utility services to the dwelling unit, other services to the dwelling unit, other services provided by Owner or Property Management Agent, and any parking or other charges.

e.    **Maintenance.**  Maintenance duties of Qualified Tenant and of Owner, respectively, separately listed.

f.    **Alterations.**  Requirement of Owner's or Property Management Agent's consent to alteration of the dwelling unit, listing examples, and to changes of keys and locks.

g.    **Use Restrictions.**  Restrictions on Qualified Tenant's use of the dwelling units, including hazards, noise, nuisance, etc.

h.    **Changes.**  Qualified Tenant's obligation to report changes in Qualified Tenant's household, employment status or income.

i.    **Rules.**  Qualified Tenant's and all other occupants' obligations to comply with any rules and regulations issued by Owner or Property Management Agent. A copy of any such rules shall be attached to the Lease.

j.    **Other.**  Other provision customarily included in apartment leases or advisable for the Project, and all provisions necessary to comply with the requirements.

    k.  **Attachments.** Acknowledgment of Qualified Tenant of any attachments to the Lease.

    9.  **Execution.** Property Management Agent shall execute each Lease as agent for Owner.

A-4

## EXHIBIT B

(A)     In the event that a petition in bankruptcy is filed by or against either of the Principal Parties, or either of the Principal Parties seeks relief under any of the chapters of the Federal Bankruptcy Act, or in the event that either of the Principal Parties makes an assignment for the benefit of creditors (whether by common law assignment or pursuant to specific provisions of State or Federal law), then the other Principal Party may terminate this Agreement.

(B)     In the event Owner determines that Property Management Agent has defaulted under this Agreement and either Property Management Agent disputes that determination or Property Management Agent contends that it has cured such default and Owner disputes such contention, this Agreement shall terminate upon three (3) days notice to Property Management Agent; provided, however, that if Property Management Agent elects to proceed with litigation to resolve such dispute and such dispute is resolved in favor of Property Management Agent, then this Agreement shall be reinstated effective as of the date of the favorable resolution.

A-5

(C) <u>Employees</u> - The number of "on-site" employees, their job descriptions and salaries shall be in accordance with the Management Plan which shall be submitted to and approved by Owner prior to December 15, 1998("Plan").  The personnel shall be hired, supervised, and discharged by Property Management Agent.  A resident Property Management Agent must reside on the premises and be in charge of the operation of the Development.

(D) This Agreement is not one of employment of Property Management Agent by Owner, but one in which Property Management Agent is engaged as an independent contractor in the business of managing properties.  All employment arrangements, therefore, are solely Property Management Agent's concern, and Property Management Agent shall have no authority to hire employees or establish an agency relationship on behalf of Owner. Property Management Agent agrees to comply in all material respects with all applicable laws and regulations concerning workers' compensation, social security, unemployment insurance, hours of labor, wages, working conditions, and like subjects affecting employers.

A0236

(D) Management Plan - The Property Management Agent shall comply with the obligations under the Plan including:

(a) Renting the units to senior low-income households in accordance with the Partnership Agreement Trust Indenture, Loan Agreement, in, and in accordance with regulatory agreement with the Delaware State Housing Authority(collectively, the "Regulatory Agreements")

(b) Assuring that occupancy shall be open to all individuals in accordance with Section 6 of this Exhibit B regarding nondiscrimination; and

(c) Assuring that tenant selection is carried out without favoritism or partiality.

(E) Insurance

(a)Property Management Agent shall procure workers' compensation insurance in accordance with the laws of the state of Delaware and employer's liability insurance applicable to and covering

all employees of Property Management Agent at Development and all persons engaged in the performance of any work required under this Agreement with limits of liability required by law.

(b) Property Management Agent shall procure and maintain insurance for the types of coverage and limits as required by Owner and set forth on Exhibit C to the First Amended and Restated Limited Partnership Agreement of Owner, as such coverage and limits may be increased by Owner or to comply with any requirements imposed by a lender.

(c) If any work under this Agreement is subcontracted, Property Management Agent shall include in each subcontract a provision that the subcontractor shall carry workers' compensation insurance in accordance with the laws of the State of Delaware. Property Management Agent shall also request evidence of such workers' compensation insurance.

(d) Property Management Agent shall promptly investigate and shall report in detail to Owner all accidents, claims for damage relating to the ownership, operation, or maintenance of the Development, and

A-8

A0238

any damage or destruction to the Property and the estimated costs of

repair, and shall prepare for approval by Owner all reports required by

an insurance company in connection with any such accident, claim,

damage, or destruction. Property Management Agent is authorized to

settle any claim covered by insurance not exceeding Five Hundred

Dollars ($500.00) and shall use reasonable efforts to obtain the best

possible settlement.  The Property Management Agent shall cooperate

with the Owner and insurers in the investigations and settlement of all

claims.

(F)     <u>Indemnifications</u>

(a) Property Management Agent shall indemnify and defend

Owner against and hold Owner harmless from any and all losses,

costs, damages, liabilities and expenses, including, without limitation,

reasonable attorneys' fees, arising directly or indirectly out of (i) any

intentional or material breach by Property Management Agent of this

Agreement, (ii) any negligence, willful misconduct or illegal acts of

Property Management Agent, or any of its officers, partners, directors,

agents, or employees, in connection with this Agreement or Property

Management Agent's service or work hereunder, whether within or

beyond the scope of its duties or authority hereunder, (iii) any claims

A-9

for personal injuries to employees incurred during the course of their employ if such claims are covered by workers' compensation insurance required herein, or (iv) all employment relations between Property Management Agent and its employees.

(b) Owner shall indemnify and defend Property Management Agent against and hold Property Management Agent harmless from any and all losses, costs, damages. Liabilities and expenses, including. Without limitation, reasonable attorneys' fees, arising directly or indirectly out of any matter related tot he Development, the conduct of the business of Owner, or any action taken by Property Management Agent within the scope of its duties or authority under this Agreement, excluding only such of the foregoing as result from (i) any intentional or material breach by Property Management Agent of this Agreement, (ii) any negligence, willful misconduct or illegal acts of Property Management Agent, or any of its officers, partners. directors, agents, or employees, in connection with this Agreement or Property Management Agent's services or work hereunder, (iii) any claims for personal injuries to employees incurred during the course of their employ if such claims are covered by workers' compensation insurance required herein, or (iv) all employment relations between Property

A-10

A0240

Management Agent and its employees by the General Partner.

The provisions of this Section 3 (a) and (b) shall survive the termination of this Agreement.

(4)     Annual Budget -Property Management Agent shall prepare and submit to the Owner on or before November 1 of each year during the term of this Agreement annual and quarterly, budget estimates for the next fiscal year (or partial fiscal year, as the case may be), for all operating and other expenses including (i) repairs and maintenance; (ii) utilities; (iii) cleaning and janitorial services; (iv) expenditures, if any - for repairs, alterations, rebuilding, replacements, additions, and/or improvements in and to the Development; (v) security services; (vi) compensation and related fringe benefits and expenses for personnel; and (vii) other costs and expenses to be incurred in operating the Development; all of which budget estimates shall be in a format approved by Owner and are collectively referred to as the "Annual Budget". The fiscal year as used in this Agreement shall be the calendar year.  The Annual Budget for 1998 and 1999 as shown in the Economic Projections shall be the "Annual Budget".

A-11

Owner shall accept or reject the proposed Annual Budget within fifteen (15) days after its receipt. If the proposed Annual Budget is not accepted or rejected within fifteen (15) days after receipt by Owner, it shall be deemed approved.

If Owner shall reject any proposed Annual Budget submitted by Property Management Agent as provided above, Property Management Agent shall submit to Owner for approval a new proposed Annual Budget satisfying Owner's objections, within ten (10) days after the date of rejection as aforesaid. If the proposed Annual Budget is not approved before the start of the new fiscal year, the Property Management Agent shall operate, to the extent possible, under the previous year's Annual Budget.

During the fiscal year (or partial fiscal year) covered by each particular Annual Budget, Property Management Agent, in the performance of its duties as provided in this Agreement, shall operate within that duties as provided in this Agreement, shall operate within that Annual Budget as approved by Owner. Notwithstanding any provisions of this Agreement to the contrary, the prior approval of the Owner will be required for any expenditure which exceeds Twenty Five Thousand Dollars ($25,000.00) for labor, materials, or otherwise in connection with the maintenance and repair of the Development,

A-12

A0242

except for recurring expenses within the limits of the Annual Budget or emergency repairs involving manifest danger to persons or Project, or repairs required to avoid suspension of any necessary service to the Development. In the latter event, the Property Management Agent will inform the Owner of the emergency and the necessary expenditures as promptly as possible.

The Property Management Agent shall have no right to contract or otherwise deal with related parties for services or goods except in compliance with the requirements of the Partnership Agreement.

In order to properly maintain the Project, the following actions shall be taken:

(a)  A preventative maintenance schedule shall be developed by Property Management Agent for approval by the Owner.  This schedule shall be incorporated into the Management Plan, which Plan shall be updated annually and shall be submitted to Owner for approval in conjunction with the review of the Annual Budget.

(b)  Subject to Owner's prior approval, Property Management Agent may contract with qualified independent contractors for the maintenance and repair of mechanical/electrical systems, etc., and other extraordinary repairs beyond the capability of regular maintenance employees.

A-13

(c) Property Management Agent shall systematically and promptly receive and investigate all requests for maintenance or repair from residents and subject to limits imposed by this Agreement, shall take action thereon as may be justified, and keep records of the same.  Emergency requests shall be received and services provided subject to limits imposed by this Agreement.. Property Management Agent shall inform tenants of procedures to obtain maintenance services if an emergency occurs after normal office hours. Property Management Agent shall maintain a log book containing all service requests and maintenance repairs provided, copies of which shall be subject to periodic inspection by Owner.

(d)  Subject to the Annual Budget and Section 4 of this Exhibit, Property Management Agent shall purchase all materials, equipment, tools, appliances, supplies, and services necessary to ensure proper maintenance and repair.

(e) Property Management Agent acknowledges receipt of a complete set of plans and specifications accurately reflecting the Development as built and copies of all guarantees and warranties pertinent to construction, fixtures, and equipment.  With the aid of this information and inspection by competent personnel, Property Management Agent acknowledges that it is familiar with

A-14

A0244

the character, location, construction, layout plan, and operation of the

Development and especially of the electrical, heating, plumbing, air

conditioning, and ventilating systems, the elevators, and all other mechanical

equipment and systems.

(5)     <u>Utilities and Services</u> Property Management Agent shall make

arrangements for all utilities, sewage, rubbish collection, vermin

extermination, decorating, laundry equipment, and telephone service.

Property Management Agent has the authority to execute such

contracts on behalf o f Owner as may be necessary to secure such

services, subject to the limitations of the Annual Budget and this

Agreement.

(6)     Nondiscrimination (Conform as Required) In the performance of its

obligations under this Agreement, Property Management Agent shall

comply with the provisions of all federal, state or local laws prohibiting

discrimination in housing on the basis of race, color, creed, ancestry,

religion, national origin, sex, marital status, children, sexual preference,

or physical handicap, including Title VI of the Civil Rights Act of 1964

(Public Law 88-352) and the regulations issued pursuant thereto (24

CFR Part I ), Executive Order 11063 and the regulations issued

A-15

pursuant thereto (25 CFR 570.601); Fair Housing Amendments Act of
1988 and the regulations issued pursuant thereto (24 CFR Part 14 et
al.) And Title VIII of the 1968 Civil Rights Act ( Public Law 90-384).

(7)    Inspection of Units  Property Management Agent shall inspect all units
in the Development at least annually and shall invite Owner to join in
the inspection.  Advance notice shall be given to residents as provided
in the Lease Agreements and subject to law.

(8)    Fidelity Bond   The Property Management Agent will furnish, as a
Development expense, a fidelity bond in an amount which is at least
equal to the gross potential income for two months and is to protect the
Owner and the Property Management Agent against misappropriation
of project funds by the employees of Property Management Agent.
Property Management Agent will furnish a fidelity bond for its central
office staff at Property Management Agent's expense.

(9)    Contracts with Third Parties  Property Management Agent shall not
enter into any contract for products or services that is for longer than a
period of one year unless such contract is terminable without any
penalty or premium with thirty (30) days notice.

A-16

(10)     <u>Bids, Discounts, Rebates, and Commissions</u> Property Management
Agent shall obtain contracts, materials, supplies, and services on the
most advantageous terms available to the Development, and is
authorized to solicit three (3) formal bids for each major item or service
required. Property Management Agent shall secure and credit to the
General Operating Account all discounts, rebates, or commissions
obtainable with respect to purchases, service contracts, and all other
transactions on Owner's behalf.

Any notice or other communication required or permitted to be given under this
Agreement shall be in writing and addressed to the address set forth below and shall
be given by any of the following means: (a) personal service; (b) communication,
whether by telex, telegram or telecopying (if confirmed in writing sent by registered
or certified, first class mail, return receipt requested); or (c) registered or certified,
first class mail, return receipt requested.  Such addresses may be changed by notice
to the other parties given in the same manner as provided above.  Any notice,
demand or request sent pursuant to either subsection (a) or (b) hereof shall be
deemed received upon such personal service or upon dispatch by electronic means,
and, if sent pursuant to subsection (c) shall be deemed received five (5) days
following deposit in the mail.

A0247

If to Owner:

Electra Arms Senior Associates L.P.

400 Walnut Street

Wilmington, DE 19801

with a copy to the Limited Partner at the following address:

Edison Capital Housing Investments

18101 Von Karman Avenue, Suite 1700

Irvine, California, 92715-1046

Attn: Asset Property Management Agent

and, if intended for Property Management Agreement, shall be addressed to:

Wilmington Housing Authority

400 Walnut Street

Wilmington, DE 19801

A-18

A0248

# EXHIBIT

# E

### THE PARK VIEW
Electra Arms Senior Associates, L.P., Owners

Managed by Wilmington Housing Authority
400 North Walnut Street, Wilmington, DE 19801
(302) 429-6701

LEASE/RENTAL AGREEMENT, made the _____ day of _____ year.

1. **PARTIES AND DWELLING UNIT:** The parties to this Agreement are The Park View, referred to as the Landlord, and _____, referred to as the Tenant. Landlord leases to the Tenant unit number _____, located at 1800 North Broom Street, Wilmington, DE 19802 in the community known as The Park View.

2. **LENGTH OF TIME (TERM):** The initial term of this Agreement shall begin on _____ and end on _____. If the initial term ends and the lease/rental agreement has not been renewed or terminated, then it shall continue to successive terms of one month each, subject to the modified rent.

3. **RENT:** The tenant agrees to pay _____ Dollars $_____ for the above lease term with payments as follows: $_____ for the partial month ending on _____ and $_____ per month for the duration of the lease term. This amount is due on the first day of the month at The Park View Management Office located at 1800 North Broom Street, Wilmington, DE 19802.

4. **CHARGES FOR: LATE PAYMENTS, LEGAL FEES AND RETURNED CHECKS:** If any rent payment is not received by the owner on or before the tenth (5) day of the month, the resident is responsible for paying a late charge of $10.00, which will be charged to the resident's account. The late fee will not exceed the amount allowed by law. The Landlord may collect a fee equal to the amount charged by the bank whenever a check is not honored for payment (bounces). The charges described in this paragraph are in addition to the regular monthly rent payable by the Tenant.

5. **CONDITION OF DWELLING UNIT:** By signing this Agreement, the Tenant acknowledges that the unit is safe, clean and in good condition. The Tenant agrees that all appliances and equipment in the unit are in good working order, except as described on the Unit Inspection Report, which is Attachment # 2 to this Agreement. The Landlord also agrees that the Landlord has made no promises to decorate, alter, repair or improve the unit, except as listed on the Unit Inspection Report.

6. **CHARGES FOR UTILITIES AND SERVICES:** The following chart describes how the cost of utilities and services related to occupancy of the unit will be paid. The Tenant agrees that this chart accurately describes the utilities and services paid by the Landlord and those paid by the Tenant. The Tenant must pay for the utilities checked in the column titled "Paid by Tenant". Payments should be made directly to the appropriate utility company. Failure to pay the cost of the utilities is grounds for termination of the rental agreement. The items in the column titled "Included in Tenant Rent" that are checked are included in the Tenant's rent.

| Type of Utility | Paid by Tenant | Included in Tenant Rent |
|---|---|---|
| Heat | ☐ | ☒ |
| Lights, Electric | ☐ | ☒ |
| Cooking | ☐ | ☒ |
| Water, Sewer | ☐ | ☒ |
| Trash Collection | ☐ | ☒ |

7. **SECURITY DEPOSITS:** The Tenant has deposited $_____ with the Landlord. The Landlord will hold this security deposit for the period the Tenant occupies the unit. Upon written request of the Tenant, the Landlord will provide the name of the bank where the deposit is held. After the Tenant has moved from the unit, the Landlord will determine whether the Tenant is eligible for a refund of any or all of the security deposit. The amount of the refund will be determined in accordance with the following conditions and procedures:
   a. After the Tenant has moved from the unit, the Landlord will permit the Tenant to participate in the inspection, if the Tenant so requests.

   b. The Landlord will refund to the Tenant the amount of the security deposit (plus interest, at the prevailing passbook rate, beginning on the original date of move-in) less any amount needed to pay the cost of:
   1) Unpaid rent;
   2) Damages that are not due to normal wear and tear and cannot be corrected by painting and ordinary cleaning and damages which were not listed on the Unit Inspection Report completed at time of move-in;
   3) Charges for late payment of rent and returned check charges, as described in paragraph 4;
   4) Charges for unreturned keys, as described in paragraph 8;
   5) Rental due for premature termination of the rental agreement by the tenant;
   6) Reimbursement for reasonable expenses incurred in renovating and reletting the premises caused by the premature termination of the rental agreement by the tenant.

   c. The Landlord agrees to refund the full amount of the security deposit stated in paragraph 7 if no charges are to be deducted from the deposit. The deposit will be refunded within the period required by State and local law, after the Tenant had permanently moved out of the unit, returned possession of the unit to the Landlord, and given his/her new address to the Landlord in writing. If any amount is deducted from the deposit, the Landlord will give the Tenant a written list of charges that were subtracted from the deposit within 20 days after the termination or expiration of the rental agreement.

   d. If more than one person rents the unit, the Tenants agree that they will work out the details of dividing any refund among themselves. The Landlord may pay the refund to any Tenant identified in paragraph 1 of this Agreement.

8. **KEYS AND LOCKS:** A tenant shall have the right to install a new lock at the Tenant's cost, on the condition that (1) the Tenant notifies the Landlord in writing and supplies the Landlord with a key to the lock; (2) the new lock fits into the system already in place; and (3) the lock installation does not cause damage to the door. When the agreement ends, the Tenant agrees to return all keys to the dwelling unit to the Landlord. The Landlord may charge a reasonable fee for each key not returned.

9. **MAINTENANCE:**
   a. The Landlord agrees to:
   1) Regularly clean all common areas of the project;
   2) Maintain the common areas and facilities in a safe condition;
   3) Arrange for collection and removal of trash and garbage;
   4) Maintain all equipment and appliances in safe and working order;
   5) Make necessary repairs with reasonable promptness;

Revised 01/2005

Page 1

A0250

6) Maintain exterior lighting in good working order;
7) Provide extermination services, as necessary; and
8) Maintain grounds and shrubs.

b. The Tenant agrees to:

1) Keep the unit clean;
2) Use all appliances, fixtures and equipment in a safe manner and only for the purposes for which they are intended;
3) Not litter the grounds or common areas of the project;
4) Not destroy, deface, damage or remove any part of the unit, common areas, or project grounds;
5) Give the Landlord prompt notice of any defects in the plumbing, fixtures, appliances, heating and cooling equipment or any other part of the unit or related facilities, notices or any complaints against the premises;
6) Remove garbage and other waste from the unit in a clean and safe manner; and
7) Abide by actions required under State and Local codes.

10. **DAMAGES:** Whenever damage is caused by carelessness, misuse, or neglect on the part of the Tenant, his/her family, guests/ invitees, the Tenant agrees to pay:
a. The cost of all repairs and do so within 30 days after receipt of the Landlord's demand for the repair charges; and
b. Rent for the period the unit is damaged whether or not the unit is habitable.

11. **RESTRICTIONS ON ALTERATIONS:** The Tenant agrees not to do any of the following without first obtaining the Landlord's written permission:
a. Change or remove any part of the appliances, fixtures or equipment in the unit;
b. Paint or install wallpaper or contact paper in the unit;
c. Attach awnings or window guards in the unit;
d. Attach or place any fixtures, signs, or fences on the building(s), the common areas, or the project grounds;
e. Attach any shelves, screen doors, or other permanent improvements in the unit;
f. Install washing machines and dryers (unless the unit is designed for their use), fans, heaters or air conditioners in the unit; or
g. Place any aerials, antennas or other electrical connections on the unit.

12. **GENERAL RESTRICTIONS:** The Tenant must live in the unit and the unit must be the Tenant's only place of residence. The Tenant shall use the premises only as a private dwelling for himself/herself and the individuals listed on the Application Certification and Recertification of Tenant Eligibility. The Tenant may not permit other individuals to reside in the unit unless he/she has obtained the prior written approval of the Landlord. No new additions to the household will be permitted prior to the initial lease ending unless extenuating circumstances deem this necessary as approved by management.

The Tenant agrees not to:
a. Sublet or assign the unit, or any part of the unit;
b. Use the unit for unlawful purposes;
c. Engage in or permit unlawful activities in the unit, in the common areas or the project grounds;
d. Have pets or animals of any kind in the unit without the prior written permission of the Landlord, but the landlord will allow the Tenant to keep an animal needed as a reasonable accommodation to the Tenant's disability, and will allow animals to accompany visitors with disabilities who need such animals as an accommodation to their disabilities; or
e. Make or permit notices or acts that will disturb the rights or comforts of neighbors. The Tenant agrees to keep the volume of any radio, phonograph, television or musical instrument at a level, which will not disturb the neighbors.

Any violation of the General Restrictions by the Tenant after having received notification to correct shall be grounds for termination of the lease/rental agreement.

13. **RULES:** The Tenant agrees to obey the House Rules, which is Attachment No. 3 to this Agreement. The Tenant agrees to obey additional rules established after the effective date of this Agreement if:

a. The rules are reasonably related to the safety, care and cleanliness of the building and the safety, comfort and convenience of the Tenant; and
b. The Tenant receives written notice of the proposed rule(s) at least 30 days before the rule is enforced.
c. Any violation of the Rules by the Tenant after having received notification to correct shall be grounds for termination of the lease/rental agreement.

14. **REGULARLY SCHEDULED RECERTIFICATION:** Every year approximately three to four months prior to the expiration of this lease, the Landlord will request the Tenant to report the income and composition of the Tenant's household and to supply any other information required for the purposes of determining the Tenant's eligibility for the rental benefits of the Section 42 Low Income Housing Tax Credit Program. The Tenant agrees to provide accurate statements of this information and to do so by the date specified in the Landlord's request. The Landlord will verify the information supplied by the Tenant and use the verified information to re-determine eligibility for the Low Income Housing Tax Credit Program. If any Tenant does not submit the required recertification information by the date specified in the Landlord's request, the Landlord may begin action to terminate the Lease Agreement.

15. **TRANSFERS:** The Tenant agrees that this rental agreement is only for the unit identified in this contract. Any request for a transfer will be considered in accordance with company policy. The Tenant agrees to move within 30 days after the Landlord notifies him/her that a unit of the required size is available within the project.

16. **ACCESS BY LANDLORD:** The Landlord agrees to enter the unit only during reasonable hours, and to provide forty-eight hours advance written notice of intent to enter the unit, except for emergencies and in accordance with local code requirements and exceptions:
a. The Tenant agrees to permit the Landlord, his/her agents or other persons, when authorized by the Landlord, to enter the unit for the purpose of making reasonable repairs and periodic inspections.
b. After the Tenant has given notice of intent to move, the Tenant agrees to permit the Landlord to show the unit to perspective tenants during reasonable hours.
c. If the Tenant moves before this Agreement ends, the Landlord may enter the unit to decorate, remodel, alter or otherwise prepare the unit for re-occupancy.

17. **DISCRIMINATION PROHIBITED:** The Landlord agrees not to discriminate based upon race, color, religion, creed, national origin, sex, age, handicap, familial status or membership in any other protected class as may be defined by Federal or State law.

18. **CHANGES IN RENTAL AGREEMENT:** The Landlord may change the terms and conditions of this Agreement. Any changes will become effective only at the end of the initial term or a successive term. The Landlord must notify the Tenant of any change and must offer the Tenant a new Agreement or an amendment to the existing Agreement. The Tenant must receive the notice at least 60 days before the proposed effective date of the change. The Tenant may accept the changed terms and conditions by signing the new Agreement or the amendment to the existing Agreement and returning it to the Landlord. The Tenant may reject the changed terms and conditions by giving the Landlord written notice that he/she intends to terminate the tenancy. The Tenant must give such notice at least 45 days before the proposed change will go into effect. If the Tenant does not accept the amended agreement the Landlord may require the Tenant to move from the project.

19. **TERMINATION OF TENANCY:**
a. If the Tenant elects to terminate this agreement at the expiration of the lease term addressed in paragraph 2, the Tenant must give the Landlord 60 day written notice before moving from the unit.
b. If the Landlord elects to not renew this Agreement at the expiration of the lease term, the Landlord agrees to give the Tenant written notice of the termination. Notices of the termination must be

given in accordance with any time frames set forth in State and Local law.

c.  Any termination of the Agreement by the Landlord must be carried out in accordance with State and Local law, and the terms of this Agreement. The Landlord may terminate this Agreement prior to the expiration of the lease for:

1)  The Tenant's material noncompliance with the terms of this lease including the general restrictions and rules;

2)  The Tenant's material failure to carry out obligations under any State Landlord and Tenant Act;

3)  Drug related criminal activity engaged in, near or on the premises, by any tenant, household member, guest, or by any other person under the Tenant's control;

4)  Landlord has determined that a household member is illegally using a drug;

5)  Landlord has determined that a pattern of illegal drug use interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents;

6)  Criminal activity by any tenant, household member, guest or by another person under the tenant's control that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents or by persons residing in the immediate vicinity of the premises.

7)  Tenant is fleeing to avoid prosecution, custody, or confinement after conviction or attempt to commit a crime that is considered to be a felony under the laws of the place from where the individual flees;

8)  Tenant is violating a condition of probation or parole under Federal or State law;

9)  Landlord has determined that a household member's abuse or pattern of abuse of alcohol threatens the health, safety, or right to peaceful enjoyment of the premises by other residents;

10)  Landlord has determined that the tenant, any household member, guest or any other person under the tenant's control has engaged in the criminal activity, regardless of whether an arrest or conviction for such activity has been made.

11)  Other good cause, which includes but is not limited to the Tenant's refusal to accept the Landlord's proposed change to this Agreement.  Terminations for 'other good cause' may only be effective as of the end of any initial or successive term.

Material noncompliance includes but is not limited to: nonpayment of rent beyond any grace period available under State law, failure to reimburse the Landlord within 30 days for repairs made under paragraph 10 of this Agreement; repeated late payments of rent; permitting unauthorized person(s) to live in the unit; serious or repeated damage to the unit or common areas; creation of a physical hazard or other hazards that will increase the project's insurance premium; serious or repeated violations of the rental agreement that disrupt the livability of the project, adversely affect the health or safety of any person or have an adverse financial effect on the project, interfere with the management of the project or interfere with the rights and quiet enjoyment of other tenants; giving the Landlord false information regarding income or other factors considered in determining the Tenant's eligibility and rent; failure of the Tenant to timely supply all required information on the income, composition, or eligibility factors of the Tenant's household as required by paragraph 14 of the lease.

20.  **HAZARDS:**  The Tenant shall not undertake or permit his/her family or guests to undertake, any hazardous acts or do anything that will increase the project's fire insurance premiums.  If the unit is damaged by fire, wind, or rain to the extent that the unit cannot be lived in and the damage is not caused or made worse by the Tenant, the Tenant will be responsible for rent only up to the date of the destruction.  Additional rent will not accrue until the unit has been repaired to a livable condition.  Tenant will pay pro-rata rent for any partial use of the property still permitted after a hazard.

21.  **PENALTIES FOR SUBMITTING FALSE INFORMATION:**  If the Tenant deliberately submits false information regarding income, family composition or other data in

which the Tenant's eligibility or rent is determined, the Landlord may begin action to terminate this rental agreement.  In addition, the Tenant could become subject to penalties available under law for providing false information.

22.  **CONTENTS OF THIS AGREEMENT:**  This Agreement and its attachments make up the entire agreement between the Tenant and the Landlord regarding the unit.  If any Court declares a particular provision of this Agreement to be invalid or illegal, all other terms of this Agreement will remain in effect and both the Landlord and the Tenant will continue to be bound by them.

23.  **FULL-TIME STUDENT CLAUSE:**  The Tenant certified that the household meets one of the following criteria at time of lease signing:

a.  All household members are NOT full-time students; or

b.  The household contains all students and at least one student is part-time or one household member meets one of the student exceptions:

i.  A student receiving assistance under Title IV of the Social Security Act or Temporary Assistance for Needy Families;

ii.  A student enrolled in a job training program and receiving assistance under the Job Training Partnership Act or under other similar Federal, State or local laws;

iii.  Housing unit is occupied entirely by full-time students and such students are single parents and his or her minor children and no other tenants are dependents of a third party;

iv.  Students married and filing a joint return.  (NOTE: Married students must have filed a joint tax return prior to moving into the unit or at the time of application.); or

c.  The household contains all full-time students and at least one child who is not a full-time student (children living in Tax Credit properties are considered to be full-time students when they enter first grade, unless Kindergarten is mandatory under state law).

24.  **ATTACHMENTS TO THIS AGREEMENT:**  The Tenant certified that he/she has received and read a copy of this Agreement and the following Attachments to this Agreement and understands that these Attachments are part of this Agreement.

- Attachment No. 1 – Rental Application and Certification of Tenant Eligibility for the Section 42 LIHTC Program
- Attachment No. 2 – Unit Inspection Report
- Attachment No. 3 – House Rules
- Attachment No. 4 – Anti-Drug Lease Addendum
- Attachment No. 5 – Occupancy Rules and Regulations
- Attachment No. 6 – Pet Ownership Rules
- Attachment No. 7 – Accessible Unit Addendum
- Attachment No. 8 – Summary of the State Landlord/Tenant Code (if required by code)

25.  **GOVERNING LAW:**  The Landlord Tenant Code of the State in which the rental unit is located, as it may be amended from time to time, shall govern this rental agreement.  Any amendments or revisions to the Landlord Tenant Code shall be effective as to this rental agreement at the earlier of renewal or as indicated in the legislation.

26.  **SIGNATURES:**

TENANT
BY:

1.  _____
                                    Date signed

2.  _____
                                    Date signed

LANDLORD
BY:

1.  _____
                                    Date signed

 The Park View does not discriminate on the basis of race, color, religion, sex, national origin, age, disability, or familial status.

Page 3

Revised 01/2005

A0252

**HOUSE RULES**
**LEASE ATTACHMENT NUMBER 3**

1. Exterior of grounds and any public area within the development shall be kept free of any personal property (including furniture).

2. Exterior plantings of any kind shall be subject to the approval of management.

3. Building management does not insure personal property. All residents are urged to obtain renter's insurance coverage through a private insurance company.

4. Vehicles not properly registered or in good working order are not permitted on the premises. Car repairs are not to be done on the premises. Washing of cars on the premises is not permitted. Only one (1) vehicle per licensed member of the family is allowed on the premises.

5. No flammable materials are permitted in the unit or in the storage areas.

6. Tenants will abide by all rules pertaining to common use activities rooms such as: hours and operations for laundry rooms, community rooms, workout rooms, etc.

7. All trash, garbage and other waste shall be disposed of in a clean/safe manner and deposited in the appropriate receptacle(s) as defined by management. Individual trash and garbage containers are not permitted in public halls (where applicable) or outside the buildings.

8. Tenants shall abide by the directions of management for the proper operation of heat, ventilation and air conditioning.

9. No signs, notices or advertising is permitted on any part of the building or unit without prior approval of management.

10. Tenants shall not shake from any window, door, or balcony any carpet, bed clothing or other articles or sweep any dirt or other matter from the rental unit into any entrance way or hall.

11. Only the customary bed and furniture is permitted. No water beds or jell beds or any other such bed or furniture is permitted without proof of liability insurance (updated annually).

12. Where tenant has been granted a utility allowance, the tenant is responsible to pay all applicable utility bills for the dwelling unit. Failure to pay utility bills which results in a cutoff or proposed cutoff of services shall be considered a threat to the dwelling unit and building and a cause for lease termination.

13. No playing of any kind (which shall include ball playing) is permitted in the parking areas or roadways. All play shall be in the areas designated by management.

14. Children (including visitor's children) must be properly supervised at all times. A curfew on the grounds of 10:00 p.m. is enforced for all children under the age of 18 or in accordance with applicable state/local laws.

15. Tenant must not disconnect smoke detector or carbon monoxide detector, remove batteries where applicable, or cover detector at any time. Tenants will notify management immediately if detectors malfunction/fail to operate and/or if fire extinguisher is used.

16. No accumulation of papers, rags, boxes, etc., will be permitted in any part of the unit.

17. Either residents or their guests shall not loiter or gather on the grounds. Visitors are restricted to the apartment, which they are visiting.

18. Landlord will provide Pest Control Services. Tenant agrees to permit the exterminator to enter the unit for inspection and treatment. The tenant agrees to abide by management's instruction(s) for preparing the unit for treatment. Repeated failure to cooperate according to the Landlord's instruction shall be considered material non-compliance with the lease and grounds for termination of the rental agreement.

19. Tenant will not allow anyone not included in Certification/Recertification to use his/her unit when tenant is not on premises nor allow anyone to use his/her address for the regular receipt of mail.

20. Tenant is responsible for the actions of friends/relatives/visitors while they are on premises. Any violation of restrictions (Lease and any addendum to Lease) by such visitor, friends, relatives, etc., with or without tenant's permission will be considered as material non-compliance and tenant accepts responsibility whether or not tenant is on premises at time of such violations.

21. All visitors must have their own separate legal residence. Guests and visitors are expected to follow all house rules. A "visit" of more than 14 days (consecutive or not) within any 45-day period constitutes unauthorized occupancy and is a violation of the lease.

    If management has any reason to suspect that a tenant is housing an unauthorized guest or guests, the tenant must prove to management that person has a permanent residence elsewhere. If a tenant doesn't provide acceptable proof within 14 days from the date of management's request, management may begin eviction proceedings for material noncompliance in accordance with the lease agreement. Acceptable proof may consist of (but is not limited to) the following:

    A. Valid lease with a valid rent receipt for the current month;
    B. Copy of a utility bill for the current month showing the person's name and address (electric, gas, phone, cable);
    C. Current paycheck stub showing name and address
    D. Current bank statement showing name and address
    E. Car registration showing name and address;
    F. Copy of a mortgage coupon showing name and address.

22. Any criminal offense under law committed by a tenant or tenant's guest(s), which impairs the physical and/or social environment and which occurs on or about the leased premises or on or about any location within the housing development shall be cause for management to terminate the lease. In addition, when any tenant is

A0253

incarcerated for any criminal act deemed to be of a potentially threatening nature to the community such tenant is in violation of Paragraph 13 of the lease (unit rented shall be the tenants only place of residence) and shall be cause for management to terminate lease.

23. Tenant shall be responsible for removal of any discards (furniture, mattresses, etc.) from the premises. Such discards shall not be placed in public areas (i.e., laundry room, community room, dumpster areas, etc.).

24. Tenant is not permitted to display or use any firearms, BB guns, pellet guns, slingshots, or other weapons on the premises.

25. The lease may be terminated by management for serious or repeated violation of material terms of the lease such as failure to fulfill the tenant obligations set forth in his/her lease or for other good cause.

Such violations of material terms shall include but not be limited to:

a) Repeated late payment of rent or other charges due by the fifth of the month. Repeated late payments of rent are defined as paying the full month's rent after the 5th of the month four or more times in any twelve-month period.

b) The unlawful use, sale or possession of drugs or drug paraphernalia in a unit and/or seizure of drugs in a unit by a law enforcement officer.

c) Conviction of any person(s) as defined in paragraph 19 and 20 above, of a crime related to illegal use, possession or trafficking of drugs while on the premises. (Premises included individual units, public areas, grounds and facilities held out for use by tenants generally throughout the development).

d) A fire resulting from carelessness, negligence, or unattended cooking (any fire directly caused by action(s) of tenant(s)).

26. Trailers, boats, campers, tractors and all terrain vehicles are not permitted on premises or common areas without prior consent of management.

27. Babysitting or any other business conducted out of the unit or on the premises is not permitted.

28. All tenant's guests or visitors who remain within the premises for a period in excess of twenty-four (24) hours must register with the management office and be granted consent. Prior to any additions to the household composition, the resident must obtain management's written approval. Any addition to the household composition that is an adult, age 62 or older, as defined by State or local law must fill out an application and be approved by management in accordance with the screening criteria prior to moving in.

29. Tenants are obligated to comply with all local recycling laws. If a fine is assessed to the property, it will be allotted equally to all residents unless the person or persons responsible are positively identified.

30. In the event a resident chooses to vacate the unit, they must comply with the following:

a) Notice must be in writing.

b) A 60-day notice is required. Any notice given after the first day of the month does not begin until the first of the following month. Example: notice given March 10th – 60-day notice begins April 1st.

c) Resident is responsible for the rent and any utilities through the expiration of the 60-day notice or until such time a replacement resident moves into the unit.

31. The resident agrees to cooperate with Management in all Landlord-Tenant related matters and resident agrees not to interfere with the management of the development. Cooperation includes, but is not limited to, signing all forms in the time frame required which relate to eligibility and residency, appearing at the scheduled time for interviews, recertification and other housing related appointments and answering all questions that relate to eligibility determination. Improper behavior such as abusive or threatening language or actions is not permitted. Failure to cooperate with Management shall be considered material non-compliance with the lease and is grounds for termination.

32. There is a $10 charge for lockouts after normal business hours until 11:00 p.m.; between the hours of 11:00 p.m. and 7:00 a.m. the lockout fee is $20.

33. Tenants will be properly attired when in common areas.

34. Door-to-door soliciting is not permitted within the apartment community. Residents are requested to notify management immediately when solicitors appear at the door.

_____     _____
Applicant Signature                                              Date

_____     _____
Spouse/co-head Signature                                    Date

_____     _____
Management Signature                                          Date

# EXHIBIT

# F

## WHA Firearms Policy

**Lease Modification**:

(Replaces Lease Part I § IX.P.)

Ownership, possession, transportation and use of firearms is governed by the Wilmington Firearms and Weapons Policy.

**Wilmington Housing Authority Firearms and Weapons Policy**:

The resident, members of the resident's household, and guests, shall be obligated:

1. To comply with local, state and federal legal requirements applicable to the ownership, possession, transportation, and use of firearms or other weapons. The term "firearm" includes, but is not limited to, all pistols, revolvers, other handguns, rifles, shotguns, BB guns, air guns, spring-action guns, automatic, and semiautomatic guns, and any other instrument that expels a metallic, partly metallic, or other hard projectile.

2. To refrain from the discharge, display, or use of any firearm or other weapons on WHA property except when done in self-defense.

3. To refrain from carrying a firearm or other weapon in any common area, except where the firearm or other weapon is being transported to or from the resident's unit.

4. To have available for inspection upon request, a copy of any permit or license required by state, local, or federal law for the ownership, possession, or transportation of any firearm or other weapon before bringing such firearm or other weapon onto WHA premises.

5. When applicable, to have available for inspection upon request, a copy of the license required by the State of Delaware under 11 *Del. C.* § 1441 for carrying a concealed deadly weapon before carrying a concealed deadly weapon on WHA premises.

6. To exercise reasonable care in the storage of loaded or unloaded firearms and ammunition or other weapons to insure that they are not within the reach or easy access of a minor under the age of 18.

Violation of this Policy by any resident, member of the resident's household, or guest, shall be grounds for immediate Lease termination and eviction.

# EXHIBIT

# G

### The Park View:  Amended House Rule 24

#### Rule 24

The resident, members of the resident's household, and guests, shall be obligated:

1. To comply with local, state and federal legal requirements applicable to the ownership, possession, transportation, and use of firearms or other weapons.  The term "firearm" includes, but is not limited to, all pistols, revolvers, other handguns, rifles, shotguns, BB guns, air guns, spring-action guns, automatic, and semiautomatic guns, and any other instrument that expels a metallic, partly metallic, or other hard projectile.

2. To refrain from the discharge, display, or use of any firearm or other weapons at The Park View property except when done in self-defense.

3. To refrain from carrying a firearm or other weapon in any common area, except where the firearm or other weapon is being transported to or from the resident's unit.

4. To have available for inspection upon request, a copy of any permit or license required by state, local, or federal law for the ownership, possession, or transportation of any firearm or other weapon before bringing such firearm or other weapon The Park View premises.

5. When applicable, to have available for inspection upon request, a copy of the license required by the State of Delaware under 11 *Del. C.* § 1441 for carrying a concealed deadly weapon before carrying a concealed deadly weapon on The Park View premises.

6. To exercise reasonable care in the storage of loaded or unloaded firearms and ammunition or other weapons to insure that they are not within the reach or easy access of a minor under the age of 18.

Violation of this Policy by any resident, member of the resident's household, or guest, shall be grounds for immediate Lease termination and eviction.