No. 12-3433

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

JANE DOE, et al.,

Plaintiffs-Appellants,

*v.*

WILMINGTON HOUSING AUTHORITY, et al.,

Defendants-Appellees.

On Appeal from the United States District Court for the District of Delaware,
No. 1:10-cv-00473 (Hon. Leonard P. Stark)

## BRIEF OF *AMICUS CURIAE* THE BRADY CENTER TO PREVENT GUN VIOLENCE IN SUPPORT OF DEFENDANTS-APPELLEES

JONATHAN E. LOWY
DANIEL R. VICE
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, N.W., Suite 1100
Washington, D.C. 20005
Tel.: (202) 289-7319
Fax: (202) 371-9615

November 30, 2012

ADAM K. LEVIN
S. CHARTEY QUARCOO
MATTHEW C. SULLIVAN
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel.: (202) 637-5600
Fax: (202) 637-5910

Counsel for *Amicus Curiae*

# RULE 26.1 CERTIFICATION

Pursuant to Federal Rule of Appellate Procedure 26.1, *amicus* the Brady Center to Prevent Gun Violence makes the following disclosure statement:

The Brady Center to Prevent Gun Violence is a § 501(c)(3) non-profit corporation and no publicly held corporation holds its stock.

1.    Is *amicus* a publicly held corporation or other publicly held entity?  No.

2.    Does *amicus* have any parent corporations?  No.

3.    Is 10% or more of the stock of *amicus* owned by a publicly held corporation or other publicly held entity?  No.

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Appellate Rule 26.1.1(b))?  No publicly held corporation or other publicly held entity has a direct financial interest in the outcome of this litigation due to the participation of *amicus*.

5.    Does this case arise out of a bankruptcy proceeding?  No.

/s/ Adam K. Levin
Adam K. Levin

**CONSENT TO FILE**

Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure, *amicus* requested consent from all parties to file this brief.  Defendants-Appellees consent.  Plaintiffs-Appellants consent, provided the brief is timely filed and they have an opportunity to respond.  No party's counsel authored this brief in whole or in part.  No party, party's counsel, or person other than *amicus*, its members, or its counsel, contributed money intended to fund preparation and submission of this brief.

/s/ Adam K. Levin
Adam K. Levin
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel.: (202) 637-5600
Fax: (202) 637-5910

# TABLE OF CONTENTS

**Page**

STATEMENT OF INTEREST OF *AMICUS CURIAE* ........................................... 1

INTRODUCTION ..................................................................................... 1

ARGUMENT ........................................................................................... 3

I. THE DELAWARE CONSTITUTION DOES NOT EXPAND THE RIGHT TO CARRY FOR SELF-DEFENSE IN THE HOME BEYOND THE SCOPE OF THE SECOND AMENDMENT.................................................................... 4

II. EVEN IF THE WHA POLICY DID IMPLICATE PROTECTED ACTIVITY, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY. ....................... 6

    A.    Strict Scrutiny Does Not Apply........................................... 7

    B.    The Statute Satisfies Appropriate Scrutiny.......................... 9

CONCLUSION ...................................................................................... 19

CERTIFICATE OF BAR MEMBERSHIP ........................................................ 20

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATIONS ..................................................................................... 21

CERTIFICATION OF COMPLIANCE WITH L.A.R. 31.1(c) ............................ 22

CERTIFICATE OF SERVICE........................................................................ 23

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Adderley v. Florida,*
    87 S. Ct. 242 (1966)................................................................2, 9, 10

*Bleiler v. Chief, Dover Police Dep't,*
    927 A.2d 1216 (N.H. 2007) ...............................................................8

*Commonwealth v. Robinson,*
    600 A.2d 957 (Pa. Super. Ct. 1991) .................................................17

*Commonwealth v. Romero,*
    673 A.2d 374 (Pa. Super. Ct. 1996) .................................................17

*Doe v. Wilmington Hous. Auth.,*
    2012 WL 3065285 (D. Del. July 27, 2012) ........................................4

*Daniel v. City of Tampa,*
    38 F.3d 546 (11th Cir. 1994)........................................................2, 12

*Dickerson v. State,*
    975 A.2d 791 (Del. 2009) ...................................................................6

*District of Columbia v. Heller,*
    554 U.S. 570 (2008)...................................................................*passim*

*Greer v. Spock,*
    96 S. Ct. 1211 (1976).........................................................................9

*Griffin v. State,*
    487 A.3d 487 (Del. 2012) ..........................................................6, 8, 9

*In re Application of Wolstenholme,*
    1992 WL 207245 (Del. Super. Ct. Aug. 20, 1992) ............................6

*Jackson v. State,*
    68 So.2d 850 (Ala. Ct. App. 1953).....................................................8

*Knolls Action Project v. Knolls Atomic Power Lab.,*
    771 F.2d 46 (2d Cir. 1985)..................................................................9

ii

*McDonald v. City of Chicago*,
130 S. Ct. 3020 (2010) ........................................................................ 1, 3, 5, 7

*People v. Mimes*,
953 N.E.2d 55 (Ill. App. Ct. 2011) ................................................ 15

*People v. Williams*,
964 N.E.2d 557 (Ill. App. Ct. 2011) ............................................... 15

*People v. Yarbrough*,
2008 Cal. App. LEXIS 2431 (Cal. Ct. App. Dec. 17, 2008) ........................... 15

*Richmond Tenants Org., Inc. v. Richmond Redev. & Hous. Auth.*,
751 F. Supp. 1204 (E.D. Va. 1990) ............................................... 12, 13

*Robertson v. City & County of Denver*,
874 P.2d 325 (Colo. 1994) ............................................................ 8

*Smith v. State*,
882 A.2d 762 (Del. 2005) .............................................................. 6

*State v. Cole*,
665 N.W.2d 328 (Wis. 2003) ........................................................... 8

*State v. Dawson*,
159 S.E.2d 1 (N.C. 1968) .............................................................. 8

*State v. Hamdan*,
665 N.W.2d 785 (Wis. 2002) ........................................................ 8, 9

*Thompson v. Ashe*,
250 F.3d 399 (6th Cir. 2001) ..................................................... 2, 12

*Trinen v. City of Denver*,
53 P.3d 754 (Colo. Ct. App. 2002) ................................................... 8

*United States v. Bjerke*,
796 F.2d 643 (3d Cir. 1986) ........................................................... 9

*United States v. Chester*,
628 F.3d 673 (4th Cir. 2010) .......................................................... 7

*United States v. Dorosan*,
    2009 WL 3294733 (5th Cir. Oct. 14, 2009).....................................................10

*United States v. Hayes*,
    555 U.S. 415 (2009)...........................................................................................1

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010)................................................................................7

*United States v. Masciandaro*,
    638 F.3d 458 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 756 (2011).....................2

*United States v. Reese*,
    627 F.3d 792 (10th Cir. 2010)...........................................................................7

*United States v. Skoien*,
    614 F.3d 638 (7th Cir. 2010) (en banc).............................................................7

*United States v. Walker*,
    380 A.2d 1388 (D.C. 1977)...............................................................................15

## STATUTES

24 C.F.R. 960.204(a) ..............................................................................................11

18 U.S.C. § 930 .....................................................................................................10

42 U.S.C. § 1437c-1(d)(14).....................................................................................11

## CONSTITUTIONAL PROVISIONS

Article I, § 20 of the Delaware Constitution.....................................................*passim*

## OTHER AUTHORITIES

Adam Winkler, *Scrutinizing the Second Amendment*, 105 MICH. L. REV. 683
    (2007) ..............................................................................................................8

Charles C. Branas *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 2034 (Nov. 2009) ..............................17

David Hemenway & Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses: Results From a National Survey*, 15 VIOLENCE & VICTIMS 257 (2000) ...................................................................................16

Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide: A Review of the Literature,* 9 AGGRESSION & VIOLENT BEHAV. 417 (2004)......16

Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001) ..........16

Matthew Miller *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000).....................16

Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States*, *1988–1997*, 92 AM. J. PUB. HEALTH 1988 (Dec. 2002)................................................................................16

Matthew Miller *et al.*, *State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001-2003*, 64 SOC. SCI. & MED. 656 (Feb. 2007) ......................................................16

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041 (2009) ............................17

Randy J. Holland, *The Delaware State Constitution: A Reference Guide* 67 (2002) ...........................................................................................................5

Firearms, Vehicle Towing, Guests, and Security Deposits on Leased Property, Tenn. Op. Att'y. Gen. No. 09-170 (Oct. 26, 2009), *available at* http://www.tn.gov/attorneygeneral/op/2009/op/op09-170.pdf.........................14

Possession of Firearms on Publicly Owned Property, Tenn. Opp. Att'y Gen. No. 04-020 (Feb. 9, 2004), *available at* http://www.tn.gov/attorneygeneral/op/2004/op/op20.pdf ................................10

Press Release, U.S. Conference of Mayors, The Nation's Mayors Oppose Thune Amendment, Actions to Weaken Gun Safety Laws (July 20, 2009), *available at* http://usmayors.org/pressreleases/uploads/ RELEASE NICKELSONTHUNEGUNAMENDMENT72009.pdf............14, 18

v

U.S. Dept. of Hous. & Urban Dev., *In the Crossfire: The Impact of Gun Violence on Public Housing Communities* (1999), *available at* https://www.ncjrs.gov/pdffiles1/nij/181158.pdf ................................... 11, 13, 18

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

*Amicus* Brady Center to Prevent Gun Violence is the nation's largest non-partisan, non-profit organization dedicated to reducing gun violence through education, research, and legal advocacy. Through its Legal Action Project, it has filed numerous *amicus curiae* briefs in cases involving firearms regulations, including *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3095 n.13, 3105 n.30, 3107 n.34 (2010) (Stevens, J., dissenting) (citing Brady Center brief), *United States v. Hayes*, 555 U.S. 415, 427 (2009) (citing Brady Center brief), and *District of Columbia v. Heller*, 554 U.S. 570 (2008). *Amicus* brings a broad and deep perspective to the issues raised here and has a compelling interest in ensuring that the Article I, § 20 of the Delaware Constitution does not impede reasonable governmental action to prevent gun violence.

## INTRODUCTION

The right to keep and bear arms is unique among constitutional rights in the risks that it presents. Guns are designed to kill, and gun possession and use subject others to a serious and often deadly risk of harm. While the United States and Delaware Supreme Courts have affirmed the limited right of law-abiding, responsible people to possess a gun in the home for self-defense, neither has ever recognized a broad right to carry or use guns in the common areas of state-owned or managed property. Nor have they recognized a constitutional right to use or

discharge firearms on such property for reasons *other* than self-defense. That restraint is well-founded. As this Court's sister Circuits have cautioned, the risks associated with gun carrying could "rise exponentially as one moved the right [to carry] from the home to the public square." *United States v. Masciandaro*, 638 F.3d 458, 465 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 756 (2011).

The District Court correctly upheld Wilmington Housing Authority ("WHA") restrictions on the carry of firearms in public housing common areas as constitutional under the Second Amendment of the United States Constitution and Article I, § 20 of the Delaware Constitution. First, its holding adhered to the well-established principle that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Adderley v. Florida*, 87 S. Ct. 242, 247 (1966). This includes the authority to maintain the safety of its grounds by restricting gun carrying in "government buildings," *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008), and to regulate use of public housing facilities in the interest of safety and crime prevention. *Thompson v. Ashe*, 250 F.3d. 399, 407 (6th Cir. 2001); *Daniel v. City of Tampa*, 38 F.3d 546, 550 (11th Cir. 1994). Second, it appropriately joined courts in Delaware and across the country in recognizing that the exercise of protected activity must be balanced against legitimate public interests—chief

among which is public safety. *McDonald v. City of Chicago*, 130 S. Ct. 3020, 3047 (2010); *Heller*, 554 U.S. at 626-27 & n.26.

While Appellants do not appeal the District Court's Second Amendment holding, they seek to mitigate its effect by arguing that the Delaware Constitution encompasses a right, not recognized under federal law, to carry guns on public housing common grounds, and that this Court should cede jurisdiction of such "state law" matters to the Delaware Supreme Court. No Delaware case supports this position, nor suggests that the Delaware Supreme Court would recognize such unprecedented rights. What law exists merely underscores that Article I, § 20 protects a core right to carry a firearm in the home for self-defense, co-extensive with the Second Amendment, and that restrictions on carrying outside the hearth and home remain constitutional. Moreover, even if the Delaware Constitution contemplated broader rights than those protected by the Second Amendment, requiring individuals to refrain from the use or carry of firearms on public housing common grounds remains a justified and permissible exercise of the state's police powers. This Court should affirm the judgment of the District Court.

## ARGUMENT

The WHA firearms policy is constitutional under Delaware law. First, neither Article I, § 20 of the Delaware Constitution, nor Delaware case law, expands the right to carry a firearm in the home for self-defense beyond the bounds

of the Second Amendment.  Second, even if it did, the WHA policy survives the

applicable level of scrutiny because it is well-tailored to further WHA's

compelling interest in preventing gun violence.

## I.    THE DELAWARE CONSTITUTION DOES NOT EXPAND THE RIGHT TO CARRY FOR SELF-DEFENSE IN THE HOME BEYOND THE SCOPE OF THE SECOND AMENDMENT.

The District Court correctly upheld the WHA policy restricting the use and

carry of firearms in common areas of public housing facilities as constitutional

under federal and state law.  It methodically reasoned that (1) public housing

common areas are "community spaces" that WHA has the right and obligation to

regulate; (2) restrictions on gun carrying in such spaces do not implicate the "core"

right to carry in defense of "hearth and home" under the Second Amendment; (3)

WHA had a substantial interest in protecting the safety of its tenants, employees,

and guests on its grounds; (4) a reasonable fit existed between WHA's interest and

its limited restrictions on common area carrying; and (5) those restrictions

remained constitutional under both federal and state law.  On the last point, Judge

Stark specifically noted the absence of any language or interpretation of the

Delaware Constitution that could portend a different conclusion under state law.

*Doe v. Wilmington Hous. Auth.*, 2012 WL 3065285, at *21 (D. Del. July 27, 2012).

Appellants now argue, in essence, that while the WHA policy is

constitutional under federal law, Article I, § 20 of the Delaware Constitution

4

provides a broader, albeit as yet unarticulated, right to use and carry firearms on public housing common grounds. They rely, as their sole basis, on the fact that Article I, § 20 references a right to bear arms for "defense of self, family, home and State, and for hunting and recreational use." Yet this is a distinction without relevance to the case at hand. The District Court considered, and rejected, the notion that mere reference to particular uses, such as "hunting and recreation[]," somehow imperil WHA's constitutional authority to restrict gun carrying in the common areas of its ground in the interest of public safety. *Id.* It does not.

In fact, Appellants do not cite a single Delaware case standing for the proposition they assert: that the Delaware Constitution affords more expansive gun rights than those under the Second Amendment, as articulated in *Heller* and *McDonald*,[1] let alone protects a broad right to carry firearms in public housing common areas. They concede that scant case law exists, yet interpret this as evidence that state courts have yet to articulate the right—not that it fails to exist.

_____

[1]     The only authority Appellants cite for this proposition, a solitary sentence in a 2002 reference guide to the Delaware Constitution, is inapposite. Appellants' Br. at 19 n.9 (citing Randy J. Holland, *The Delaware State Constitution: A Reference Guide* 67 (2002)). The Supreme Court's 2008 decision in *Heller* newly articulated the right to bear arms under the Second Amendment as a limited individual right not tied to militia use. Justice Holland's brief observation that Article I, § 20 "appear[s] to afford greater protections" long pre-dates *Heller*. At most, it may be read to likewise interpret the right under the Delaware Constitution as an individual right—wholly in keeping with, but not more expansive than, the right articulated in *Heller* and its progeny.

Reality dictates otherwise. Afforded the opportunity, Delaware Courts have refrained from broadly interpreting the right to bear arms under Article I, § 20, and instead held that restrictions on carrying generally, and outside the home specifically, remain constitutionally permissible. *See Dickerson v. State*, 975 A.2d 791, 796 (Del. 2009) (prohibiting concealed carry outside the home without license is permissible); *Smith v. State*, 882 A.2d 762 (Del. 2005) (table cite) (concealed carry of deadly weapon is a statutory privilege, not a constitutional right); *In re Application of Wolstenholme*, 1992 WL 207245, at *2 (Del. Super. Ct. Aug. 20, 1992) (no constitutional right to carry a concealed deadly weapon).

Even *Griffin v. State*, which Appellants cite extensively, states no more than that one has a constitutional right to carry a concealed weapon in the *home*—and even that right must ultimately be balanced "against the State's interest in public safety." 47 A.3d 487, 491 (Del. 2012). This, as the District Court correctly observed, is akin to the core right near universally articulated in Second Amendment jurisprudence. Appellants provide no grounds to expand it.

## II.  EVEN IF THE WHA POLICY DID IMPLICATE PROTECTED ACTIVITY, IT WOULD WITHSTAND THE APPROPRIATE LEVEL OF SCRUTINY.

Even if WHA's policy implicates constitutionally protected conduct, the District Court correctly upheld that policy under an intermediate scrutiny standard. This Court should reject Appellants' claim that strict scrutiny applies, and, in any event, the policy survives under any appropriate standard of review.

## A.	Strict Scrutiny Does Not Apply.

In *Heller*, the United States implicitly rejected any form of heightened

scrutiny that would require the government to ensure that firearms legislation has a

tight fit between means and ends.  The Court recognized that the Constitution

provides legislatures with "a variety of tools for combating" the "problem of

handgun violence," *Heller*, 554 U.S. at 636, and deemed a host of existing firearms

regulations to be "presumptively lawful" without subjecting those laws to any

analysis, much less heightened scrutiny.  *Id.* at 626-27 & n.26.  In the aftermath of

*Heller* and *McDonald*, this Circuit and a majority of others have rejected strict

scrutiny.  *See, e.g.*, *United States v. Marzzarella*, 614 F.3d 85, 98 (3d Cir. 2010);

*United States v. Skoien*, 614 F.3d 638, 641-42 (7th Cir. 2010) (en banc); *United

States v. Chester*, 628 F.3d 673, 682-83 (4th Cir. 2010); *United States v. Reese*,

627 F.3d 792, 802 (10th Cir. 2010).  The District Court wisely followed suit.

Appellants contend that the District Court erred in applying a "federal"

intermediate scrutiny standard of review to the state constitutional claims, and

should instead have applied strict scrutiny.  This argument fails for two simple

reasons.  First, Appellents cite no state case law, in Delaware or elsewhere,

applying strict scrutiny to the right to bear arms.   Second, if anything, their appeal

to "state" standards of review *weakens* their argument in favor of strict scrutiny.

Over forty states have constitutional right-to-keep-and-bear-arms provisions, and

despite significant differences in the text, timing, and political backdrop of these

provisions, the courts in these states have long applied a more deferential

"reasonable regulation" test. *See* Adam Winkler, *Scrutinizing the Second*

*Amendment*, 105 MICH. L. REV. 683, 686-87, n.12 (2007) (describing "hundreds of

opinions" by state courts with "surprisingly little variation" that have adopted the

"reasonableness" standard for right-to-bear-arms cases). By that test, a state "may

regulate the exercise of [the] right [to bear arms] under its inherent police power so

long as the exercise of that power is reasonable." *Robertson v. City & County of*

*Denver*, 874 P.2d 325, 328 (Colo. 1994). *See Jackson v. State*, 68 So. 2d 850, 852

(Ala. Ct. App. 1953) (same); *Bleiler v. Chief, Dover Police Dep't*, 927 A.2d 1216,

1223 (N.H. 2007) (same).[2]

And it bears note that in *Griffin v. State*, upon which Appellants place great

emphasis, the Delaware Supreme Court expressly (1) recognized the State's

interest in regulating the carry of deadly weapons *even in the home* and (2)

---

[2]     Though more deferential than intermediate scrutiny, the test is more
demanding than rational basis, and does not possess the fatal flaw in the "interest
balancing" test suggested by Justice Breyer's *Heller* dissent, because it does not
permit states to prohibit all firearm ownership. On the contrary, under "reasonable
regulation," laws that "eviscerate," *State v. Hamdan*, 665 N.W.2d 785, 799 (Wis.
2002), render "nugatory," *Trinen v. City of Denver*, 53 P.3d 754, 757 (Colo. Ct.
App. 2002), or result in the effective "destruction" of a Second Amendment right,
*State v. Dawson*, 159 S.E.2d 1, 11 (N.C. 1968), would be struck down. The test
focuses on whether "the restriction . . . is a reasonable exercise of the State's
inherent police powers." *State v. Cole*, 665 N.W.2d 328, 338 (Wis. 2003).

"adopted" the test the Wisconsin Supreme Court applied to review that state's right to bear arms provisions. *Griffin v. State*, 487 A.3d at 491 (citing *Hamdan*, 665 N.W.2d at 785). That test is the reasonable regulation test. *See Hamdan*, 665 N.W.2d at 820 ("[T]he right to bear arms is not absolute and is subject to reasonable regulation."). The District Court was correct; strict scrutiny does not apply.

## B.    The Statute Satisfies Appropriate Scrutiny.

By any measure, the WHA policy is constitutional. WHA has a substantial interest in protecting the safety of its tenants, employees, and guests on its grounds. First, the state's constitutional authority to regulate the use of its property is well-established. In *Adderley v Florida*, the Supreme Court expressly proclaimed "[t]he United States Constitution does not forbid a State to control the use of its own property for its own lawful nondiscriminatory purpose." 87 S. Ct. at 247. Upholding Florida's enforcement of state trespass laws, the Court articulated the state's authority, as landowner, to govern its grounds. It directly asserted that "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated." *Id.* at 242; *see also Greer v. Spock*, 96 S. Ct. 1211, 1217 (1976); *United States v. Bjerke*, 796 F.2d 643, 647 (3d Cir. 1986); *Knolls Action Project v. Knolls Atomic Power Lab.*, 771 F.2d 46, 50 (2d Cir. 1985).

Gun owners bear no special exemption from this authority. In fact, courts pre- and post-*Heller* have applied similar reasoning to uphold restrictions on gun carrying on government property. Most recently, the Fifth Circuit dismissed a challenge to regulations banning handgun carrying on Postal Service property. *United States v. Dorosan*, 2009 WL 3294733, at *1 (5th Cir. Oct. 14, 2009). The court did not merely rely on general principles of public safety. Rather, as in *Adderley*, it cited the government's additional proprietary interest in regulating its grounds. Thus, the court held that the Postal Service's permissible "restrictions on guns stemmed from its constitutional authority as property owner." *Id.*

Recognition of government authority to regulate gun carrying on its property is hardly novel. *Heller* highlighted it. Federal statutes codify it. *See* 18 U.S.C. § 930 (prohibiting gun carrying in work "building[s] or part[s] thereof owned or leased by the Federal government"). And state officials recognize it. As a 2004 Tennessee Attorney General's opinion stated, for instance:

> [State law] authorizes local, state, or federal government entities to prohibit anyone, *even persons with a valid handgun carrying permit*, from carrying weapons otherwise authorized to be possessed . . . at meetings conducted by, or on property owned, operated, managed by the entity, or under its control.

Possession of Firearms on Publicly Owned Property, Tenn. Opp. Att'y Gen. No. 04-020 (Feb. 9, 2004) (emphasis added), *available at* http://www.tn.gov/ attorneygeneral/op/2004 /op/op20.pdf

Appellants' reach for a constitutional right to carry and use guns on public housing property fails for a second reason.  Public housing authorities ("PHAs") in particular are statutorily empowered—and required—to impose conditions on the use of their grounds in the interests of safety and crime prevention.  Jointly overseen by the U.S. Department of Housing and Urban Development ("HUD") and state and local authorities, they bear responsibility for day-to-day management of their developments, and are required under federal law to design crime prevention plans in conjunction with local government.  *See* 42 U.S.C. 1437c-1(d)(14) (requiring PHAs to devise a "safety and crime prevention plan" that "shall provide, on a project-by-project or jurisdiction-wide basis, for measures to ensure the safety of public housing residents").  Contrary to Appellants' representation, they play a fundamental role in establishing public housing safety and crime prevention policy—without which the regulatory scheme would not function.  In that capacity, they enforce admission requirements to screen out persons with criminal backgrounds, including those engaged in illegal drug use or drug-related criminal activity and registered sex offenders.  *See* 24 C.F.R. 960.204(a).  And they have expended significant resources to prevent public housing crime.  *See* U.S. Dept. of Hous. & Urban Dev., *In the Crossfire: The Impact of Gun Violence on Public Housing Communities*, 21 (1999), *available at* https://www.ncjrs.gov/pdffiles1/nij/181158.pdf (recognizing that PHAs "spent well over $4 billion on

crime reduction and prevention efforts" over the span of a decade).  The assertion

that they lack authority to regulate gun use on their grounds fails to recognize

PHAs' statutory mandate, and the breadth of their efforts to prevent crime and

protect residents.

Furthermore, courts have repeatedly upheld states' constitutional authority to

enforce terms of use of their public housing facilities in the interests of safety.  *See*

*Thompson v. Ashe*, 250 F.3d. at 407 (recognizing the constitutionality and

"legitimate governmental purpose" and "goal" of policies aimed at "the

suppression and prevention of crime in public housing"); *Daniel v. City of Tampa,*

38 F.3d at 550 (upholding constitutionality of housing authority trespass

regulations as "a reasonable means of combating drug and crime problems on the

property").

That authority includes the right to enforce specific gun restrictions.  In

*Richmond Tenants Org., Inc. v. Richmond Redev. & Hous. Auth.*, for example, the

court held that a PHA ban on "the use and/or possession on Management's

property of guns, firearms (operable or inoperable), nunchucks, or similar

instruments" would be constitutional.  751 F. Supp. 1204, 1214 (E.D. Va. 1990).

In support, it explained:

> The prohibition on the use and/or possession of various firearms is
> rationally related to the strong [PHA] interest in reducing crime and
> violence.  There is substantial evidence that eliminating guns will
> reduce crime in the developments and reduce accidental death.

Despite conflicting expert testimony, this Court finds that a
prohibition of firearms from public housing is a reasonable lease term
within the meaning of [the Housing Act of 1937].

*Id.*

Indeed, gun violence has and continues to pose a unique threat to public

housing residents.  In a comprehensive analysis of public housing gun violence in

the late 1990s, HUD found that "public housing residents are suffering greatly

from the effects of firearm-related crimes and in numbers out of proportion to their

overall representation in society as a whole." U.S. Dept. of Hous. & Urban Dev.,

*Crossfire*, at 14.  The study noted that by decade's end, "66 of the Nation's 100

largest public housing authorities . . . [experienced an] average of nearly one gun-

related homicide per day."  *Id.*  Even as HUD and PHA anti-crime initiatives

helped foster a decline, the study concluded, gun violence persisted at

unacceptably high rates:

Public housing authorities and their residents, however, continue to
experience significant gun violence.  The widespread availability and
easy access to firearms particularly among youthful offenders, have
fueled crime rates in public housing communities that are higher than
national averages and are often higher than crime rates in the
surrounding municipalities. . . .  For too many of the nation's 2.6
million residents of public housing, the continuing high incidence of
gun-related violence imposes a devastating number of deaths, as well
as injuries and physical and physic trauma.  These effects are
particularly destructive for the over 1 million children and 360,000
elderly residents.

*Id.* at 5.

In light of these improving yet still troubling statistics, local officials nationwide have since rallied to support PHA regulations on gun use.  In 2009, the United States Conference of Mayors declared efforts to "bar public housing authorities from restricting gun ownership among public housing residents" a "mov[e] in the wrong direction" that would undermine "a practice that has been in place in some areas for a decade or more and has helped to make these projects a safer place to live."  Press Release, U.S. Conference of Mayors, The Nation's Mayors Oppose Thune Amendment, Actions to Weaken Gun Safety Laws (July 20, 2009), *available at* http://usmayors.org/pressreleases/uploads/RELEASE NICKELSONTHUNEGUNAMENDMENT72009.pdf; *see also* Firearms, Vehicle Towing, Guests, and Security Deposits on Leased Property, Tenn. Op. Att'y. Gen. No. 09-170 (Oct. 26, 2009) (noting generally that "[a] landlord can prohibit tenant, including those who hold handgun carry permits, from possessing firearms within the leased premises"), *available at* http://www.tn.gov/attorneygeneral/op/2009/op/op09-170.pdf.  This position is prescient.  The persistence of gun violence, and well-being of public housing residents, counsels *against* needless expansion of gun carrying on public housing grounds.

The dangers here are compounded, because Appellants not only seek a broad right to carry on public housing grounds, but to do so in common areas *outside* their apartments and more easily accessible to the public.  In other words, they do

not seek a limited right to use in the confines of their own individual homes.  This raises a separate concern, as courts post-*Heller* recognize, because gun carrying in more public spaces presents unique dangers:

> In his home, an individual generally may be better able to accurately assess a threat to his safety due to his familiarity with his surroundings and knowledge of his household's occupants.  In public, however, there is no comparable familiarity or knowledge, and, thus, an increased danger that an individual carrying a loaded firearm will jump to inaccurate conclusions about the need to use a firearm for self-defense.  The extensive training law enforcement officers undergo concerning the use of firearms attests to the degree of difficulty and level of skill necessary to competently assess potential threats in public situations and moderate the use of force.

*People v. Williams*, 964 N.E.2d 557, 571 (Ill. App. Ct. 2011)  (quoting *People v. Mimes*, 953 N.E.2d 55, 77 (Ill. App. Ct. 2011)); *accord People v. Yarbrough*, 2008 Cal. App. LEXIS 2431, at *16 (Cal. Ct. App. Dec. 17, 2008); *United States v. Walker*, 380 A.2d 1388, 1390 (D.C. 1977) (noting "inherent risk of harm to the public of such dangerous instrumentality being carried about the community and away from the residence or business of the possessor").   The carrying of firearms in public or common spaces poses a number of issues and challenges not presented by the possession of firearms in one's apartment.  Three issues, in particular, are worthy of note.

First, carrying firearms in common areas threatens a broader range of individuals.  Firearms kept in the home are primarily a threat to gun owners, and

their family members, friends, and houseguests.[3]   But firearms carried in common

areas present a danger to unrelated bystanders, including children, other tenants,

visitors, WHA and law enforcement officers, and random passersby.   Such guns

expose all members of society to great risks, as guns are "used far more often to

intimidate and threaten than they are used to thwart crimes."   David Hemenway &

Deborah Azrael, *The Relative Frequency of Offensive and Defensive Gun Uses:*

*Results From a National Survey*, 15 VIOLENCE & VICTIMS 257, 271 (2000).   States,

therefore, have a stronger need to protect their citizens from individuals carrying

guns in common areas, than they do individuals keeping guns inside their homes.

Second, carrying firearms in public is not an effective form of self-defense

and, in fact, repeatedly has been shown to *increase* the chances that one will fall

---

[3]     *See, e.g.*, Matthew Miller *et al.*, *State-Level Homicide Victimization Rates in the US in Relation to Survey Measures of Household Firearm Ownership, 2001- 2003*, 64 SOC. SCI. & MED. 656 (Feb. 2007) ("States with higher rates of firearm ownership had significantly higher homicide victimization rates."); Lisa M. Hepburn & David Hemenway, *Firearm Availability and Homicide:  A Review of the Literature*, 9 AGGRESSION & VIOLENT BEHAV. 417 (2004) ("[H]ouseholds with firearms are at higher risk for homicide, and there is no net beneficial effect of firearm ownership."); Matthew Miller *et al.*, *Rates of Household Firearm Ownership and Homicide Across US Regions and States*, *1988–1997*, 92 AM. J. PUB. HEALTH 1988, 1988 (Dec. 2002) ("[I]n areas where household firearm ownership rates were higher, a disproportionately large number of people died from homicide."); Mark Duggan, *More Guns, More Crime*, 109 J. POL'Y. ECON. 1086 (2001); Matthew Miller *et al.*, *Firearm Availability and Unintentional Firearm Deaths*, 33 ACCIDENT ANALYSIS & PREVENTION 477 (Jul. 2000) ("A statistically significant and robust association exists between gun availability and unintentional firearm deaths.").

victim to violent crime. One study, for instance, found that "gun possession by urban adults was associated with a significantly increased risk of being shot in an assault," and that "guns did not seem to protect those who possessed them from being shot in an assault." Charles C. Branas *et al.*, *Investigating the Link Between Gun Possession and Gun Assault*, 99 AMER. J. PUB. HEALTH 2034 (Nov. 2009). Likewise, another study found that:

> Two-thirds of prisoners incarcerated for gun offenses reported that the chance of running into an armed victim was very or somewhat important in their own choice to use a gun. Currently, criminals use guns in only about 25 percent of noncommercial robberies and 5 percent of assaults. If increased gun carrying among potential victims causes criminals to carry guns more often themselves, or become quicker to use guns to avert armed self-defense, the end result could be that street crime becomes more lethal.

Philip Cook *et al.*, *Gun Control After Heller: Threats and Sideshows from a Social Welfare Perspective*, 56 UCLA L. REV. 1041, 1081 (2009).

Third, the carrying of firearms in public negatively implicates other social issues and portends societal ills unlike firearms in the home. As courts recognize, when the carrying of guns in public is restricted, "possession of a concealed firearm by an individual in public is sufficient to create a reasonable suspicion that the individual may be dangerous, such that an officer can approach the individual and briefly detain him in order to investigate whether the person is properly licensed." *Commonwealth v. Robinson*, 600 A.2d 957, 959 (Pa. Super. Ct. 1991); *accord Commonwealth v. Romero*, 673 A.2d 374, 377 (Pa. Super. Ct. 1996).

PHAs and HUD have worked diligently with law enforcement officials to implement crime prevention plans. Their efforts have been credited with helping to decrease public housing gun violence. *See* U.S. Dept. of Hous. & Urban Dev., *Crossfire*, at 7-8; Press Release, U.S. Conference of Mayors. Yet law enforcement's ability to protect the public could be greatly restricted if officers were required to effectively presume that a person carrying a firearm well outside his apartment, and in the presence of unrelated bystanders, was doing so lawfully. Under such a legal regime, an officer might not be deemed to have cause to arrest, search, or stop a person seen carrying a loaded gun, even though far less risky behavior could justify police intervention. Law enforcement should not have to wait for a gun to be fired before protecting the public.

The regulations at issue here lessen many of these risks, without implicating the right to carry under Delaware law. WHA tenants who are not otherwise disqualified by operation of law and who can demonstrate that they can possess and use firearms responsibly are allowed to maintain handguns to protect themselves in the home. The Delaware Constitution simply provides no basis for expanding that authority into a broad constitutional right to carry and use guns for non-defensive purposes on state-owned or managed public housing property.

**CONCLUSION**

For all the foregoing reasons, as well as those stated by Appellees, this Court should affirm the decision of the District Court.

Respectfully submitted,

/s/ Adam K. Levin
ADAM K. LEVIN
S. CHARTEY QUARCOO
MATTHEW C. SULLIVAN
Hogan Lovells US LLP
555 13th Street, N.W.
Washington, D.C. 20004
(202) 637-5600

Jonathan E. Lowy
Daniel R. Vice
Brady Center to Prevent Gun Violence
Legal Action Project
1225 Eye Street, N.W., Suite 1100
Washington, D.C. 20005

Counsel for *Amicus Curiae*

**CERTIFICATE OF BAR MEMBERSHIP**

This is to certify that I am a member in good standing of the bar of this Court.

DATED: November 30, 2012

/s/ Adam K. Levin
Adam K. Levin
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel.: (202) 637-5600
Fax: (202) 637-5910

# CERTIFICATE OF COMPLIANCE

## WITH TYPE-VOLUME LIMITATIONS

Pursuant to Fed. R. App. P. 32(a)(7)(C), I hereby certify that this brief contains 4551 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), and has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in Times New Roman 14-point font.

/s/ Adam K. Levin
Adam K. Levin
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel.: (202) 637-5600
Fax: (202) 637-5910

**CERTIFICATION OF COMPLIANCE WITH L.A.R. 31.1(c)**

The electronic submissions have been scanned for viruses with the most recent version of a commercial virus scanning program (Symantec Endpoint Protection, Version 11.0.7000.975, updated May 2012) and, according to the program, are free of viruses.

/s/ Adam K. Levin
Adam K. Levin
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel.: (202) 637-5600
Fax: (202) 637-5910

**CERTIFICATE OF SERVICE**

I hereby certify that on this 30th day of November, 2012, the foregoing Brief for Amicus Curiae was filed with the Court's ECF system, and accordingly was served electronically on all parties. Pursuant to L.A.R. 31.1, I certify that ten paper copies are being sent to the Clerk's Office on November 30, 2012. A PDF copy, which is in all respects identical to the ten hard copies, is being electronically submitted on this same date.

/s/ Adam K. Levin
Adam K. Levin
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
Tel.: (202) 637-5600
Fax: (202) 637-5910