EFiled: Mar 18 2014 01:07PM EDT
Filing ID 55163970
Case Number 403,2013

# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| JANE DOE and CHARLES BOONE, | § | |
| | § | No. 403, 2013 |
| Plaintiffs Below- | § | |
| Appellants, | § | Certification of a Question of |
| | § | Law from the United States Court |
| | § | of Appeals for the Third Circuit |
| v. | § | |
| | § | No. 12-3433 |
| | § | |
| WILMINGTON HOUSING | § | |
| AUTHORITY and FREDERICK | § | |
| S. PURNELL, SR., in his capacity as | § | |
| Executive Director of the Wilmington | § | |
| Housing Authority, | § | |
| | § | |
| Defendants Below- | § | |
| Appellees. | § | |

Submitted: December 18, 2013
Decided: March 18, 2014

Before **HOLLAND**, **BERGER**, **JACOBS**, and **RIDGELY**, Justices and
**COOCH**, Resident Judge,[*] constituting the Court *en Banc*.

Upon Certified Questions of Law from the United States Court of Appeals for the
Third Circuit.  **QUESTIONS ANSWERED**.

Francis G.X. Pileggi, Esquire (*argued*) and Jill Agro, Esquire, of Eckert Seamans
Cherin & Mellott, LLC, Wilmington, Delaware for appellants.

Barry M. Willoughby, Esquire (*argued*) and Lauren E.M. Russell, Esquire, of
Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware for appellee.

---

[*] Sitting by designation pursuant to art. IV, § 12 of the Delaware Constitution and Supreme
Court Rules 2 and 4 (a) to fill up the quorum as required.

**RIDGELY**, Justice:

In this certified question proceeding, we address whether lease provisions for apartments of a Delaware public housing authority that restrict when residents, their household members, and their guests may carry and possess firearms in the common areas violate the right to keep and bear arms guaranteed by Article I, Section 20 of the Delaware Constitution.  We accepted two questions of state law from the United States Court of Appeals for the Third Circuit ("Third Circuit"). Pending before the Third Circuit is an appeal from a judgment of the United States District Court for the District of Delaware in *Doe. v. Wilmington Housing Authority*.[1]  The District Court found no violation of the Second Amendment or the Delaware Constitution.  The certified questions are:

1.  Whether, under Article I, §20 of the Delaware Constitution, a public housing agency such as the WHA may adopt a policy prohibiting its residents, household members, and guests from displaying or carrying a firearm or other weapon in a common area, except when the firearm or other weapon is being transported to or from a resident's housing unit or is being used in self-defense.

2.  Whether, under Article I, §20 of the Delaware Constitution, a public housing agency such as the WHA may require its residents, household members, and guests to have available for inspection a copy of any permit, license, or other documentation required by state, local, or federal law for the ownership, possession, or transportation of any firearm or other

_____

[1] 880 F. Supp. 2d 513 (D. Del. 2012).

weapon, including a license to carry a concealed weapon, as required by Del. Code Ann. tit. 11, §1441, on request, when there is reasonable cause to believe that the law or policies have been violated.[2]

We answer both certified questions in the negative.

### *Facts and Procedural History*[3]

Appellants Jane Doe and Charles Boone ("Residents") filed suit in the Delaware Court of Chancery against the Wilmington Housing Authority (WHA), a nonprofit agency of the State of Delaware that provides housing to low-income individuals and families, and against WHA's Executive Director, Frederick Purnell. Jane Doe lived in the Park View, a privately owned housing facility managed by the WHA. Doe's lease required her to follow the "House Rules." The original version of House Rule 24, in effect when the suit was filed, stated, "Tenant is not permitted to display or use any firearms, BB guns, pellet guns, slingshots, or other weapons on the premises." Charles Boone lived in the Southbridge Apartments, a public housing facility owned and operated by the WHA. Boone's lease stated that residents are "not to display, use, or possess . . . any firearms, (operable or inoperable) or other dangerous instruments or deadly weapons as defined by the laws of the State of Delaware anywhere on the property of the

---

[2] *Doe v. Wilmington Housing Auth.*, No. 403, 2013, 1–2 (Del. July 30, 2013).
[3] The facts are drawn from the Certification of Questions of Law submitted by the Third Circuit. *See* Certification of Questions of Law, *Doe v. Wilmington Housing Auth.*, No. 12-3433 (3d Cir. May 23, 2013) [hereinafter Certification].

Authority." Residents were subject to eviction if they, their household members, or their guests violated the lease provisions and rules.

Doe and Boone alleged that the restrictions on gun use and possession violated their right to bear arms as provided in the Second Amendment to the United States Constitution and in Article I, Section 20 of the Delaware Constitution. They also alleged that the WHA firearms rules and policies were preempted by Delaware law and that the WHA exceeded its statutory authority by enacting them.

The defendants removed the case to the United States District Court for the District of Delaware on June 1, 2010. On June 28, 2010, the Supreme Court of the United States decided *McDonald v. City of Chicago*,[4] holding that the Second Amendment applies to the states through the Due Process Clause of the Fourteenth Amendment. The defendants informed the District Court that they were reevaluating the constitutionality of the WHA firearm rules and policies in light of *McDonald.*

On October 25, 2010, the WHA adopted a new firearms policy (the "Revised Policy") for its public housing units, including Southbridge. The Revised Policy provides, in full:

_____

[4] 130 S. Ct. 3020 (2010).

Lease Modification (Replaces Lease Part I § DC.P.):

Ownership, possession, transportation, display, and use of firearms and weapons is governed by the Wilmington Housing Authority Firearms and Weapons Policy which is incorporated into and made a part of this lease.

Wilmington Housing Authority Firearms and Weapons Policy:

WHA recognizes the importance of protecting its residents' health, welfare, and safety, while simultaneously protecting the rights of its residents to keep and bear arms as established by the federal and state constitutions. WHA therefore adopts the following Firearms and Weapons Policy. Residents, members of a resident's household, and guests:

1. Shall comply with all local, state, and federal legal requirements applicable to the ownership, possession, transportation, and use of firearms or other weapons. The term "firearm" includes any weapon from which a shot, projectile or other object may be discharged by force of combustion, explosive, gas and/or mechanical means, whether operable or inoperable, loaded or unloaded, and any weapon or destructive device as defined by law.

2. Shall not discharge or use any firearm or other weapons on WHA property except when done in self-defense.

3. Shall not display or carry a firearm or other weapon in any common area, except where the firearm or other weapon is being transported to or from the resident's unit, or is being used in self-defense.

4. Shall have available for inspection a copy of any permit, license, or other documentation required by state, local, or federal law for the ownership, possession, or transportation of any firearm or other weapon, including a license to carry a concealed weapon as required by 11 Del C. § 1441, upon request, when there is reasonable cause to believe that the law or this Policy has been violated.

5. Shall exercise reasonable care in the storage of loaded or unloaded firearms and ammunition, or other weapons.

6. Shall not allow a minor under 16 years of age to have possession of a firearm, B.B. gun, air gun, or spear gun unless under the direct supervision of an adult.

7. Shall not give or otherwise transfer to a minor under 18 years of age a firearm or ammunition for a firearm, unless the person is that child's parent or guardian, or unless the person first receives the permission of the minor's parent or guardian.

Violation of this Policy by any resident or member of the resident's household shall be grounds for immediate Lease termination and eviction. In addition, a resident or member of the resident's household who knowingly permits a guest to violate this Policy shall be subject to immediate Lease termination and eviction.[5]

On December 13, 2010, the WHA replaced the Park View's House Rule 24 with amended Rule 24, which was substantively identical to the Revised Policy.

Residents filed an amended complaint challenging only paragraph 3, the Common Area Provision, and paragraph 4, the Reasonable Cause Provision, of the Revised Policy. The parties filed cross-motions for summary judgment.

The District Court granted the summary judgment motion filed by the WHA and denied the motion filed by Residents. The District Court found no Second Amendment violation, and no appeal was taken from that ruling. The District Court applied the same analysis to the challenge under Article I, Section 20 of the

---

[5] *Doe*, 880 F. Supp. 2d at 519–20.

Delaware Constitution ("Section 20") and found no violation.  The District Court found no legal merit to the preemption and scope-of-authority challenges.  The questions on which the Third Circuit seeks guidance concern the Section 20 analysis.

In addressing the Section 20 claims, the District Court noted that "[t]here is scant judicial authority interpreting Delaware's constitutional right to bear arms, and none is directly relevant to the issue now before this Court."[6]  The District Court granted summary judgment on the Section 20 claims for the same reasons it granted summary judgment on the Second Amendment claims.[7]

The District Court analyzed the Second Amendment issues under recent Supreme Court decisions, including *District of Columbia v. Heller*,[8] and *McDonald*.[9]  The District Court also examined the circuit court cases applying *Heller* and *McDonald,* including the Third Circuit's opinion in *United States v. Marzzarella*.[10]  The District Court noted that all had adopted a form of intermediate

---

[6] *Id.* at 538.
[7] *Id.* at 539.
[8] 554 U.S. 570 (2008).
[9] *See Doe*, 880 F. Supp. 2d at 525–26.
[10] 614 F.3d 85, 97 (3d Cir. 2010), *cert. denied*, 131 S. Ct. 958 (2011).

rather than strict scrutiny to analyze laws and policies that restrict firearm possession in public spaces as opposed to in the home.[11]

The District Court followed *United States v. Marzzarella*, examining:

> whether the challenged law imposes a burden on conduct falling within the scope of the Second Amendment's guarantee. If it does not, our inquiry is complete. If it does, we evaluate the law under some form of means-end scrutiny. If the law passes muster under that standard, it is constitutional. If it fails, it is invalid.[12]

Applying this analysis, the District Court first assumed that the Revised Policies fell within the Second Amendment's scope,[13] then applied intermediate scrutiny to assess the constitutionality of paragraphs 3 and 4 of the Revised Policy.[14] The District Court applied intermediate scrutiny on the basis that those policies do not prohibit residents from possessing firearms in their homes, but rather regulate "the manner in which Plaintiffs may lawfully exercise their Second Amendment

---

[11] *Doe*, 880 F. Supp. 2d at 533–35 (citing *United States v. Masciandaro*, 638 F.3d 458, 470 (4th Cir. 2011), *cert. denied*, 132 S. Ct. 756; *Marzzarella*, 614 F.3d at 97; *United States v. Skoien*, 587 F.3d 803, 814 (7th Cir. 2009), *rev'd en banc*, 614 F.3d 638 (7th Cir. 2010), *cert. denied*, 131 S. Ct. 1674 (2011)); *see also Kachalsky v. Cnty. of Westchester*, 701 F.3d 81, 96–97 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 1806 (decided after *Doe* and applying intermediate scrutiny to a state law restricting an individual's ability to carry firearms in public); *cf. Moore v. Madigan*, 702 F.3d 933, 941–42 (7th Cir. 2012) (holding that the Second Amendment protects the right to bear arms outside the home, without deciding the appropriate level of scrutiny to apply to a law that burdens that right).

[12] *Doe*, 880 F. Supp. 2d at 526–27 (quoting *Marzzarella*, 614 F.3d at 89).

[13] *Id.* at 528–30.

[14] *Id.* at 533.

rights."[15]  The District Court concluded that the two challenged paragraphs of the Revised Policies were reasonably related to important government interests in promoting and protecting the safety of public housing residents, guests, and employees.[16]  The District Court also found a reasonable fit between the Common Area Provision and the promotion of safety in shared areas of public housing complexes.[17]  The District Court further found a reasonable fit between the Reasonable Cause Provision and the promotion of safety because obtaining a concealed-weapon permit requires training in gun safety and is a "reasonable mechanism for assisting with enforcement of the Common Area Provision."[18]  Doe and Boone did not appeal the District Court's ruling dismissing their Second Amendment claims.  Therefore, the Second Amendment analysis remains the law of the case.

The District Court dismissed the claims under the Delaware Constitution, Article I, Section 20 for the same reasons it dismissed the Second Amendment claim after applying the same analysis.  Doe and Boone timely appealed the

---

[15] *Id.* at 533 (citing *Masciandaro*, 638 F.3d at 470–71).  *See also Masciandaro*, 638 F.3d at 470–71 ("[T]his longstanding out-of-the-home/in-the-home distinction bears directly on the level of scrutiny applicable. . . . [A] lesser showing is necessary with respect to laws that burden the right to keep and bear arms outside of the home.").

[16] *Doe*, 880 F. Supp. 2d at 535.

[17] *Id.* at 536.

[18] *Id.* at 538.

District Court's rulings on their state constitutional claims to the Third Circuit, which thereafter certified the two questions now before us.

## *Discussion*

The acceptance of certified questions of law under Article IV, Section 11 of the Delaware Constitution and Supreme Court Rule 41 is entirely within the discretion of this Court.[19]  We review a certified question in the context in which it arises.[20]  We have the discretion to reformulate or rephrase the question of law certified.[21]  Questions of law and constitutional claims are decided *de novo*.[22]

We begin by noting that the Declaration of Rights in the Delaware Constitution has not always been interpreted identically to the counterpart provisions in the federal Bill of Rights.[23]  As we have previously explained:

---

[19] Del. Const. art. IV, § 11; Del. Supr. Ct. R. 41; *Randolph v. Wilmington Hous. Auth.*, 139 A.2d 476, 490 (Del. 1958).

[20] *Riblet Products Corp. v. Nagy*, 683 A.2d 37, 39 (Del. 1996) (citing *Rales v. Blasband*, 634 A.2d 927, 931 (Del. 1993)).

[21] *See generally* Eric C. Surette, *Construction and Application of Uniform Certification of Questions of Law Act*, 69 A.L.R. 6th 415, §43 (2011).

[22] *Sheehan v. Oblates of St. Francis de Sales*, 15 A.3d 1247, 1258 (Del. 2011), *reargument denied* (Apr. 19, 2011); *Lambrecht v. O'Neal*, 3 A.3d 277, 281 (Del. 2010).

[23] *See, e.g.*, *E. Lake Methodist Episcopal Church, Inc. v. Trs. of Peninsula-Delaware Annual Conference of United Methodist Church, Inc.*, 731 A.2d 798, 807 n.2 (Del. 1999) ("Although the controlling standards of judicial deference to religious disputes have evolved primarily from interpretations of the First Amendment to the United States Constitution, art. I, § 1 of the Delaware Constitution, enjoining 'any magistrate . . . in any case' from interfering with the free exercise of religious worship is of equal force." (omission in original) (quoting *Trs. of Pencader Presbyterian Church in Pencader Hundred v. Gibson*, 22 A.2d 782, 790 (Del. 1941))); *Bryan v. State*, 571 A.2d 170, 177 (Del. 1990) (deciding the rights of a defendant to see his attorney on independent state grounds under the Delaware Constitution); *Hammond v. State*, 569 A.2d 81, 87 (Del. 1989) (requiring a higher standard for the preservation of evidence than Federal

> The Declaration of Rights in the Delaware Constitution is not a mirror image of the federal Bill of Rights. Consequently, Delaware judges cannot faithfully discharge the responsibilities of their office by simply holding that the Declaration of Rights in Article I of the Delaware Constitution is necessarily in "lock step" with the United States Supreme Court's construction of the federal Bill of Rights.[24]

To determine whether a state constitutional provision is substantively identical to an analogous provision of United States Constitution, this Court considers the list of nonexclusive factors originally articulated in the concurring opinion of Justice Handler of the New Jersey Supreme Court in *Hunt v. State*.[25] The *Hunt* factors provide a framework to determine whether a state constitutional provision affords an independent basis to reach a different result than what could be obtained under federal law. The seven factors include:

> (1) Textual Language—A state constitution's language may itself provide a basis for reaching a result different from that which could be obtained under federal law. Textual language can be relevant in either of two contexts. First, distinctive provisions of our State charter may recognize rights not identified in the federal constitution. . . . Second, the phrasing of a particular provision in our charter may be so significantly different from the language used to address the same subject in the federal Constitution that we can feel free to interpret our provision on an independent basis . . . .

---

Constitution); *see also State v. Holden*, 54 A.3d 1123, 1128 n.14 (Del. Super. Ct. 2010) (noting that the Delaware Constitution provides greater criminal procedure protection than the U.S. Constitution).

[24] *Dorsey v. State*, 761 A.2d 807, 814 (Del. 2000) (footnote omitted) (citing *Claudio v. State*, 585 A.2d 1278, 1289 (Del. 1991)).

[25] *Jones v. State*, 745 A.2d 856, 864 (Del. 1999).

(2)   Legislative History—Whether or not the textual language of a given provision is different from that found in the federal Constitution, legislative history may reveal an intention that will support reading the provision independently of federal law . . . .

(3)   Preexisting State Law—Previously established bodies of state law may also suggest distinctive state constitutional rights. State law is often responsive to concerns long before they are addressed by constitutional claims.   Such preexisting law can help to define the scope of the constitutional right later established.

(4)   Structural Differences—Differences in structure between the federal and state constitutions might also provide a basis for rejecting the constraints of federal doctrine at the state level. The United States Constitution is a grant of enumerated powers to the federal government.  Our State Constitution, on the other hand, serves only to limit the sovereign power which inheres directly in the people and indirectly in their elected representatives.  Hence, the explicit affirmation of fundamental rights in our Constitution can be seen as a guarantee of those rights and not as a restriction upon them.

(5)   Matters of Particular State Interest or Local Concern—A state constitution may also be employed to address matters of peculiar state interest or local concern.    When particular questions are local in character and do not appear to require a uniform national policy, they are ripe for decision under state law.   Moreover, some matters are uniquely appropriate for independent state action . . . .

(6) State Traditions—A state's history and traditions may also provide a basis for the independent application of its constitution . . . .

(7) Public Attitudes—Distinctive attitudes of a state's citizenry may also furnish grounds to expand constitutional rights under

state charters.  While we have never cited this criterion in our decisions, courts in other jurisdictions have pointed to public attitudes as a relevant factor in their deliberations.[26]

"The[se] enumerated criteria, which are synthesized from a burgeoning body of authority, are essentially illustrative, rather than exhaustive."[27]  But those criteria do "share a common thread—that distinctive and identifiable attributes of a state government, its laws and its people justify recourse to the state constitution as an independent source for recognizing and protecting individual rights."[28]

This case concerns the right to keep and bear arms under Article I, Section 20 of the Delaware Constitution.  Although Section 20 was not enacted until 1987, Delaware has a long history, dating back to the Revolution, of allowing responsible citizens to lawfully carry and use firearms in our state.  The parties agree, as does this Court, that Delaware is an "open carry" state.  Like the citizens of our sister states at the founding, Delaware citizens understood that the "right of self-preservation" permitted a citizen to "repe[l] force by force" when "the intervention of society in his behalf, may be too late to prevent an injury."[29]  An individual's right to bear arms was "understood to be an individual right protecting

---

[26] *Id.* at 864–65 (omissions in original) (quoting *State v. Hunt*, 450 A.2d 952, 962 (N.J. 1982) (Handler, J., concurring)).
[27] *Id.* at 865 (quoting *Hunt*, 450 A.2d at 967).
[28] *Id.* (quoting *Hunt*, 450 A.2d at 967).
[29] *Heller*, 554 U.S. at 595 (alteration in original) (quoting 1 *Blackstone's Commentaries* 145–46 n.42 (1803)).

against both public and private violence."[30]  The right to keep and bear arms was also understood to exist for membership in the militia and for hunting.[31]

In 1791, Delaware delegates to the state constitutional convention were unable to agree on the specific language that would codify in our Declaration of Rights the right to keep and bear arms in Delaware.[32]  After several attempts, the effort was abandoned.[33]  Concerns over groups of armed men stood in the way of an agreement even though there was an apparent consensus among the delegates on an individual's right to bear arms in self-defense.[34]

Not until almost 200 years later did the Delaware General Assembly agree on the language to be used.  Article I, Section 20 provides:  "A person has the right to keep and bear arms for the defense of self, family, home and State, and for hunting and recreational use."[35]  The General Assembly's stated purpose in enacting the constitutional amendment was to "explicitly protect[] the traditional right to keep and bear arms," which it defined in the text of the amendment.[36]  By

---

[30] *Id.* at 594.
[31] *Id.* at 598–99.
[32] *See* Dan M. Peterson & Stephen P. Halbrook, *A Revolution in Second Amendment Law*, Del. Law., Winter 2011/2012, at 12, 15.
[33] *Id.*
[34] *Id.*
[35] Del. Const. art. I, § 20.
[36] H.B. 30, 134th Gen. Assembly (Del. 1987), *passed* Jan. 20, 1987.

including the right to keep and bear arms in the Delaware Constitution, the General Assembly has recognized this right as fundamental.[37]

## Contentions of the Parties

Residents argue that we should answer both questions in the negative. The WHA argues for an affirmative answer to both. Residents contend that Article I, Section 20 is not a mirror image of the Second Amendment, that the protections it provides are not limited to the home, and that the WHA Revised Policy cannot withstand strict scrutiny, intermediate scrutiny, or the *Hamdan* test that we utilized in *Griffin v. State*.[38] WHA replies that: (1) the rights protected by Section 20 are coextensive with those protected by the Second Amendment because hunting and recreational use are not in issue, (2) intermediate scrutiny applies, (3) as a landlord WHA may adopt reasonable policies for the protection of residents, and (4) its Revised Policy is narrowly tailored to advance the compelling interest in assuring the safety of its tenants.

_____

[37] A fundamental right has been defined as a right that is guaranteed either explicitly or implicitly by the constitution. *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 33–34 (1973).

[38] *Griffin v. State*, 47 A.3d 487, 489–90 (Del. 2012). Residents also have argued before the federal courts and this Court that under state law the WHA is preempted from adopting the Revised Policy based upon Delaware statutes that prohibit county and municipal governments from enacting laws, regulations, or ordinances governing firearms. *See* 9 *Del. C.* § 330(c); 22 *Del. C.* § 111. The Third Circuit expressly stated in its certification that these preemption and scope-of-authority challenges "do not form part of this certification request." Certification at 5 n.1. So we do not reach those challenges.

*Article I, Section 20 of the Delaware Constitution Is an Independent Source for Recognizing and Protecting the Right to Keep and Bear Arms*

This Court has previously addressed the application of Article I, Section 20 of the Delaware Constitution on four occasions. In *Short v. State*, we held that 11 *Del. C.* § 1448, which prohibits felons from possessing a deadly weapon, does not violate Section 20.[39] In *Smith v. State*, we held that Section 20, when enacted, did not alter the then-existing law pertaining to the crime of carrying a concealed deadly weapon without a license and the statutory privilege to carry a concealed deadly weapon with a license.[40] In *Dickerson v. State*, we affirmed a conviction for carrying a concealed weapon without a license outside of the home.[41] And most recently in *Griffin v. State*, we considered an as-applied challenge to a conviction for carrying a concealed deadly weapon without a license in the home.[42] In *Griffin*, we explained that although the right to bear arms "is not absolute," "Griffin's constitutional right to bear arms authorized his carrying a concealed knife in his home."[43] That did not end the inquiry, because after the police arrived "the balance

---

[39] *Short v. State*, 586 A.2d 1203, 1991 WL 12101, at *1 (Del. 1991).
[40] *Smith v. State*, 882 A.2d 762, 2005 WL 2149410, *3 (Del. 2005).
[41] *Dickerson v. State*, 975 A.2d 791, 795–96 (Del. 2009).
[42] *Griffin*, 47 A.3d at 489–90.
[43] *Id.* at 488, 491.

between [Griffin's] interest in carrying a concealed weapon in his home and the State's interest in public safety shifted in favor of the State."[44]

In all of these cases but one, no federal Second Amendment jurisprudence was cited.[45] Although both Section 20 and the Second Amendment share a similar historical context that informs our analysis,[46] the interpretation of Section 20 is not dependent upon federal interpretations of the Second Amendment. The text of Section 20, enacted in 1987, and the Second Amendment, effective beginning in 1791, is not the same. On its face, the Delaware provision is intentionally broader than the Second Amendment and protects the right to bear arms outside the home, including for hunting and recreation. Section 20 specifically provides for the defense of self and family *in addition to* the home. Accordingly, our interpretation of Section 20 is not constrained by the federal precedent relied upon by the WHA, which explains that at the core of the Second Amendment is the right of law-abiding, responsible citizens to use arms in defense of "hearth and home."[47] We

---

[44] *Id.* at 491.

[45] In *Short v. State*, a reference was included to *United States v. Johnson*, 497 F.2d 548 (4th Cir. 1974).

[46] Hence, our reference to the historical context recited in *Heller v. District of Columbia*, 554 U.S. at 594–600.

[47] *Heller*, 554 U.S. at 635. We recognize as the Third Circuit has explained that "Second Amendment doctrine remains in its nascency." *Marzzarella*, 614 F.3d at 101. And like the District Court, we decline to determine whether Second Amendment rights extend outside of the home. *Doe*, 880 F. Supp. 2d at 529–30. We further acknowledge that there are federal courts which have. *See Peruta v. Cnty. of San Diego*, --- F.3d ----, 2014 WL 555862, at *23–24 (9th Cir. Feb. 13, 2014) (holding that broad limits on both open and concealed carry of loaded guns

agree with Residents that Article I, Section 20 is not a mirror image of the Second Amendment and that the scope of the protections it provides are not limited to the home.

Our conclusion that the interpretation of Article I, Section 20 is a source, independent from the Second Amendment, for recognizing and protecting individual rights, is supported by the *Hunt* factors. The distinctive language of Section 20 and the legislative history demonstrates the General Assembly's intent to provide a right to keep and bear arms independent of the federal right. Moreover, public attitudes, as reflected in the laws passed by the General Assembly, and Delaware's long tradition of allowing responsible, law-abiding citizens to keep and bear arms outside of the home, favor recognizing an independent right under the Delaware Constitution. Two *Hunt* factors—the structural differences in constitutional provisions and matters of particular state interest—do not require that Section 20 be interpreted coextensively with the Second Amendment. In summary, Article I, Section 20 of the Delaware Constitution is an independent source for recognizing and protecting the right to keep and bear arms.

---

impermissibly infringes on the Second Amendment right to bear arms); *Moore*, 702 F.3d at 936 (holding that the "right to bear arms thus implies a right to carry a loaded gun outside the home").

*Intermediate Scrutiny Applies*

In *Griffin v. State*, this Court applied the three-part analysis adopted from the Wisconsin Supreme Court's decision in *State v. Hamdan*, in deciding whether an individual has a right to carry a concealed deadly weapon in the home.[48]  We held that:

> First, the court must compare the strength of the state's interest in public safety with the individual's interest in carrying a concealed weapon.  Second, if the individual interest outweighs the state interest, the court must determine, "whether an individual could have exercised the right in a reasonable, alternative manner that did not violate the statute."  Third, the individual must be carrying the concealed weapon for a lawful purpose.[49]

Our analysis employed heightened scrutiny in the context of a prosecution for carrying a concealed deadly weapon.

Where government action infringes a fundamental right, Delaware courts will apply a heightened scrutiny analysis.[50]  The parties have not argued otherwise here.  Where heightened scrutiny applies, the State has the burden of showing that the state action is constitutional.[51]  Here, the parties differ on the appropriate

---

[48] *Griffin*, 47 A.3d at 487 (citing *State v. Hamdan*, 665 N.W.2d 785 (Wis. 2003)).

[49] *Id.* at 490–91 (footnote omitted) (quoting *Hamdan*, 665 N.W.2d at 808).

[50] *See Jones v. Milford Sch. Dist.*, 2010 WL 1838961, at *3 n.17 (Del. Ch. Apr. 29, 2010) ("If the state action, however, creates a suspect classification or infringes upon a fundamental right, the state must prove the constitutionality of its conduct under either intermediate or strict scrutiny judicial review.").

[51] *Id.*

heightened scrutiny analysis, Residents argue for strict scrutiny and the WHA argues for intermediate scrutiny. Both sides also argue that under strict scrutiny, intermediate scrutiny, or the *Hamdan* test, the result is in their favor. For the reasons which follow, we conclude that intermediate scrutiny is the proper level of constitutional review.

"A governmental action survives strict scrutiny only where the state demonstrates that the test is narrowly tailored to advance a compelling government interest."[52] "[S]trict scrutiny is a tool to determine whether there is a cost-benefit justification for governmental action that burdens interests for which the Constitution demands unusually high protection."[53] In contrast, intermediate scrutiny requires more than a rational basis for the action, but less than strict scrutiny.[54] Intermediate scrutiny seeks to balance potential burdens on fundamental rights against the valid interests of government.[55] To survive intermediate scrutiny, governmental action must "serve important governmental objectives and [must be] substantially related to [the] achievement of those

---

[52] *Turnbull v. Fink*, 668 A.2d 1370, 1379 (Del. 1995).
[53] Stephen A. Siegel, *The Origin of the Compelling State Interest Test and Strict Scrutiny*, 48 Am. J. Legal Hist. 355, 394 (2006) (emphasis added).
[54] *Turnbull*, 668 A.2d at 1379.
[55] *See* Kathleen M. Sullivan, *The Justices of Rules and Standards*, 106 Harv. L. Rev. 22, 61 (1992) (explaining that intermediate scrutiny involves the balancing and comparison of "rights or structural provisions, modes of infringement, and government interests" in a way where "[t]he outcome . . . is not foreordained").

objectives."[56]    The governmental action cannot burden the right more than is reasonably necessary to ensure that the asserted governmental objective is met.[57]

Although the right to bear arms under the Delaware Declaration of Rights is a fundamental right, we have already held that it is not absolute.[58]  The General Assembly that enacted Article I, Section 20 left in place a series of statutes affecting the right to keep and bear arms in Delaware.[59]   Our prior cases so recognized and found no legislative intent (for example) to invalidate laws prohibiting felons from possessing deadly weapons or prohibiting (with certain exceptions) the carrying of a concealed deadly weapon outside the home without a license.[60]   The General Assembly's careful and nuanced approach supports an intermediate scrutiny analysis that allows a court to consider public safety and other important governmental interests.  Accordingly, we agree with the WHA that

---

[56] *Turnbull*, 668 A.2d at 1379 (first alteration in original) (quoting *Orr v. Orr*, 440 U.S. 268, 279 (1979)).

[57] *Marzzarella*, 614 F.3d at 98 (citing *U. S. v. O'Brien*, 391 U.S. 367, 377 (1968)); *see also* Eugene Volokh, *Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda*, 56 UCLA L. Rev. 1443, 1470 (2009) (explaining that "intermediate scrutiny allows restrictions that serve merely important and not compelling government interests" and "restrictions that are merely substantially related to the government interest rather than narrowly tailored to it").

[58] *Griffin*, 47 A.3d at 488.

[59] *See, e.g.*, 11 *Del. C.* § 1444 (prohibiting the possession of "a bomb, bombshell, firearm silencer, sawed-off shotgun, machine gun or any other firearm or weapon which is adaptable for use as a machine gun"); *id.* § 1446A (prohibiting the possession of undetectable knives); *id.* § 1448 (prohibiting the possession and purchase of deadly weapons by persons prohibited); *id.* § 1459 (prohibiting the possession of a weapon with an obliterated serial number).

[60] *E.g.*, *Smith*, 2005 WL 2149410, *3; *Short*, 1991 WL 12101, at *1.

paragraphs 3 and 4 of the Revised Policy should be subject to intermediate scrutiny.

### *Under Intermediate Scrutiny the Common Area Provision Is Overbroad*

It is undisputed that Residents are subject to eviction under the WHA lease provision and rules if they, their household members, or their guests violate the Common Area Provision that restricts the possession of firearms in the common areas of the WHA properties where the Residents and their household members live. That restriction infringes the fundamental right of responsible, law-abiding citizens to keep and bear arms for the defense of self, family, and home. WHA therefore has the burden to demonstrate that its governmental action passes intermediate scrutiny.

To satisfy its burden, WHA argues that it has an important governmental interest in protecting the health, welfare, and safety of all WHA residents, staff, and guests who enter onto WHA property. WHA argues that an accidental discharge of a firearm may have serious fatal consequences and that dangers inhere in the increased presence of firearms. But these same concerns would also apply to the area within any apartment—interior locations where the WHA concedes it cannot restrict the possession of firearms for self-defense. The Revised Policy does more than proscribe the unsafe *use* of a firearm. It also prohibits *possession* in the public housing common areas except where the firearm is being transported

to or from an apartment.  In this context, WHA must show more than a general safety concern and it has not done so.

In *Griffin v. State* we explained that an individual's interest in the right to keep and bear arms is strongest when "the weapon is in one's home or business and is being used for security."[61]  Residents have a possessory interest in both their apartments and the common areas.  And although Residents cannot exclude other residents or the public from the common areas, their need for security in those areas is just as high for purposes of Section 20 as it would be inside their apartment or business.  The common areas are effectively part of the residences.  The laundry rooms and TV rooms are similar to those typically found in private residences; and the Residents, their families, and their guests will occupy them as part of their living space.

With the Common Area Provision in force under penalty of eviction, reasonable, law-abiding adults become disarmed and unable to repel an intruder by force in any common living areas when the intervention of society on their behalf may be too late to prevent an injury.  Even active and retired police officers who are residents, household members, or guests are disarmed by the Common Area Provision.  They are restricted in possessing firearms in the public housing

---

[61] *Griffin*, 47 A.3d at 491.

common areas of the apartment buildings despite their exemption by the General Assembly from concealed-carry license requirements.[62]

Nor is the Common Area Provision sustainable under intermediate scrutiny because the WHA owns the property and is a landlord. WHA contends that it is acting as a landlord and not as a sovereign. We recognize that where the government is a proprietor or employer, it has a legitimate interest in controlling unsafe or disruptive behavior on its property. But WHA has conceded that after *McDonald,* as a landlord it may not adopt a total ban of firearms. Thus, occupying the status of government landlord, alone and without more, does not control. How the property is used must also be considered. Public housing is "a home as well as a government building."[63] The WHA is different from other public agencies in that it essentially replicates for low-income families services similar to those provided by a private landlord. The individual's need for defense of self, family, and home in an apartment building is the same whether the property is owned privately or by the government.

---

[62] Delaware law places special trust in active and retired police officers to carry concealed weapons. Active police and peace officers are exempted from the concealed-carry license requirements and may carry a firearm while on or off duty. 11 *Del. C.* § 1441(g). Further, retired police officers may be specially licensed to carry a concealed weapon following their retirement. *Id.* § 1441(h). Delaware has also implemented the federal Law Enforcement Officers Safety Act, allowing qualified active and retired officers to carry concealed weapons within or outside of their home jurisdiction. *Id.* § 1441A.

[63] Volokh, *supra*, at 1533.

Unlike a state office building, courthouse, school, college, or university, the services provided by the WHA in the common areas are not the services typically provided to the public on government property.  They are limited to supplying adequate housing for low-income families and individuals and to maintaining the grounds and buildings for the residents.  Some regulation of possessing firearms on WHA property could pass intermediate scrutiny, for example prohibiting possession in offices where state employees work and state business is being done.  Here, however, the restrictions of the Common Area Provision are overbroad and burden the right to bear arms more than is reasonably necessary.  Indeed, the Common Area Provision severely burdens the right by functionally disallowing armed self-defense in areas that Residents, their families, and guests may occupy as part of their living space.  Section 20 of the Delaware Constitution precludes the WHA from adopting such a policy.

Accordingly, we answer the first certified question in the negative.[64]

---

[64] Nor would the Common Area Provision withstand the scrutiny under the *Hamdan* analysis we applied in *Griffin*.  The Residents have a possessory interest as tenants in the common areas where they live and their own apartments.  Thus, the need for "security" in each is acute for purposes of Article I, Section 20.  Further, there is no realistic alternative way that the Residents and their guests can exercise their right to bear arms in the common areas with the ban in place.  It is also undisputed that Residents are not attempting to exercise their right to bear arms for an unlawful purpose.  As a result, the Common Area Provision would likewise fail under a *Hamdan* analysis.

*The Reasonable Cause Provision Is Overbroad*

The record before us shows that the Revised Policy was adopted by the WHA during the litigation before the District Court and after the United States Supreme Court decision in *McDonald v. City of Chicago*. The WHA "suspended, reviewed, and replaced" its original policies banning all firearms on its property pursuant to "the HUD-mandated procedure for doing so . . . in view of the Supreme Court's holding in *McDonald*."[65] The Reasonable Cause Provision of the Revised Policy requires the production upon request by a resident, household member, or guest of

> a copy of any permit, license, or other documentation required by state, local, or federal law for the ownership, possession, or transportation of any firearm or other weapon, including a license to carry a concealed weapon as required by 11 *Del C.* § 1441, upon request, when there is reasonable cause to believe that the law *or this Policy* has been violated.[66]

By it terms, the Reasonable Cause Provision exists, as least in part, to enforce compliance with the Common Area Provision, which we have found to be overbroad and unconstitutional.

Where a statute, regulation, or state action faces a constitutional challenge, "a Court may preserve its valid portions if the offending language can lawfully be

---

[65] *Doe*, 880 F. Supp. 2d at 524.
[66] *Id.* at 520 (emphasis added).

severed."[67]   But where it is evident that the remaining provisions would not have been enacted without the unconstitutional provision, a court should invalidate the entire provision.[68]   The Reasonable Cause Provision was enacted, together with the Common Area Provision, by the WHA in response to *McDonald*.   Because the unconstitutional Common Area Provision is not severable as a matter of Delaware law, the Reasonable Cause Provision which enforces it is unconstitutional and overbroad as well.   For that reason, we answer the second certified question in the negative.

## Conclusion

We answer both certified questions in the negative.   The Clerk is directed to transmit this opinion to the Third Circuit.

---

[67] *Farmers for Fairness v. Kent Cnty.*, 940 A.2d 947, 962 (Del. Ch. 2008) (quoting *Newark Landlord Ass'n v. City of Newark*, 2003 WL 22724663, at *1 (Del. Ch. Nov. 17, 2003)).

[68] *Cf. id.* ("The standard for severability has been articulated in the following two part test:  i) 'Is the unobjectionable part, standing alone, capable of enforcement?' and ii) 'Did the legislature intend the [un]objectionable part to stand alone in case the other part should fall?'" (alternation in original) (quoting *Newark Landlord Ass'n*, 2003 WL 22724663, at *1)).